## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

In re:

MASSA FALIDA DE MAPPIN LOJAS DE
DEPARTAMENTO S.A.,

Debtor in a Foreign Proceeding.

Case No.: _____
Chapter 15

## FOREIGN REPRESENTATIVE'S VERIFIED PETITION FOR RECOGNITION OF DEBTOR'S BRAZILIAN PROCEEDING PURSUANT TO 11 U.S.C. §§ 1515 & 1517

Afonso Henrique Alves Braga (the "Petitioner" or "Foreign Representative"), in his capacity as the court-appointed Trustee responsible for asset recovery internationally and duly-authorized foreign representative of the Brazilian proceeding (the "Brazilian Proceeding") of the above-captioned debtor, Massa Falida de Mappin Lojas de Departamento S.A. ("Mappin Lojas"), together with its affiliates that are also subject to the Brazilian Proceeding, Mappin Telecomunicações Ltda. ("Mappin Telecomunicações"), and Casa Anglo Brasileira ("Casa Anglo") (together, the "Debtors"),[1] pending before the Court of Justice of the State of São Paulo, Central Civil Court, 18th Civil Division (the "Brazilian Court") pursuant to Brazilian Bankruptcy Law, number 11.101 of 2005 ("Brazilian Bankruptcy Law") under the laws of the Federative Republic of Brazil ("Brazil"), respectfully submits this petition, and hereby moves the Court for entry of an order, substantially in the form attached hereto as **Exhibit 1** (the "Proposed Order"), recognizing the Brazilian Proceeding as a "foreign main proceeding" pursuant to section 1517 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and granting certain related relief pursuant to sections 105(a), 1509(b), 1520, 1521, 1525 and

---

[1]     Each of the three Debtors has petitioned for recognition of the Brazilian Proceeding, and joint administration is being requested concurrently by separate motion.

1527 of the Bankruptcy Code.  In support of the Chapter 15 Petition, the Petitioner has filed contemporaneously herewith and incorporates herein by reference a declaration in support of the Petition (the "<u>Foreign Representative Declaration</u>" or "<u>Foreign Rep. Decl.</u>"),[2] a March 10, 2010 order of the Brazilian Court confirming the appointment of the Petitioner as the Foreign Representative (the "<u>Order Appointing the Trustee</u>"),[3] and an August 12, 2011 order of the Brazilian Court authorizing the Petitioner to carry out investigations abroad (the "<u>Chapter 15 Authorization Order</u>"),[4] and respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, as well as Rule 87.2 of the Local Rules of the United States District Court for the Southern District of Florida ("<u>Local District Rule 87.2</u>"), which incorporates the General Order of Reference entered July 11, 1984 referring all cases arising under Title 11 of the United States Code and proceedings arising in or related to cases under Title 11, United States Code, to the Bankruptcy Judges for this judicial district ("<u>Standing Order of Reference</u>").

2.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(p).

3.      For reasons discussed below, venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1410(1) and (3).

---

[2]      The Foreign Representative Declaration is attached hereto as **Exhibit 2**.

[3]      A certified copy and certified translation of the March 10, 2010 Order Appointing the Trustee are attached as **Exhibit G** to the Foreign Representative Declaration.  Pursuant to 11 U.S.C. § 1515(b)(3), the Order Appointing the Trustee confirms the existence of an active "foreign proceeding" involving the Debtor, and the Petitioner's appointment as Trustee for the Debtor.

[4]      A certified copy and certified translation of the Brazilian Court's August 12, 2011 Chapter 15 Authorization Order are attached as **Exhibit H** to the Foreign Representative Declaration.  Pursuant to 11 U.S.C. § 1515(b)(3), the Chapter 15 Authorization Order confirms the existence of an active "foreign proceeding" involving the Debtor, and the Petitioner's appointment as Trustee for the Debtor.

## FACTUAL BACKGROUND

### A.  Corporate History of the Debtors

4.      The Mappin chain of department stores was founded in 1774 in England.  On November 29, 1913, two brothers, Walter and Herbert Mappin, opened the first Mappin department store in Brazil.  *See* Foreign Rep. Decl.  ¶ 7.

5.      In 1990, Mappin Lojas became incorporated in Brazil, with its headquarters in São Paulo, Brazil, and began to operate the Mappin chain of department stores.  The Mappin department stores quickly became known as one of the most popular department store chains in Brazil. *Id.* ¶  8.

6.      In October 1996, Ricardo Mansur ("Mansur"), a Brazilian businessman and bank owner, acquired Mappin Lojas and became its CEO. At that time, Mappin Lojas had approximately 9,000 employees and annual sales in excess of 1 billion Reais per year (approx. US$ 300,000,000.00).  *Id.* ¶  9.

7.      Mappin Telecomunicações is an affiliate of Mappin Lojas. *Id.* ¶  10.

8.      Mansur indirectly owns Mappin Lojas and Mappin Telecomunicações through Casa Anglo. *Id.* ¶  11.

### B.  Events Precipitating Commencement of Brazilian Proceeding

9.      In or around 1999, Mappin Lojas began to fail paying its debts as they fell due. The Debtors' fall into financial distress and eventually insolvency was widely suspected to have been the result of a fraud perpetrated by Mansur and others, as evidenced by considerable Brazilian press coverage to that effect at that time. *Id.* ¶  12.

10.      These developments prompted a large number of creditors to petition for Mappin Lojas to be declared bankrupt and placed into insolvency proceedings. *Id.* ¶  13.

3

### C.  Commencement of Brazilian Proceeding

11.     By order dated July 29, 1999, issued by the Brazilian Court, Mappin Lojas was placed into a formal Brazilian insolvency process pursuant to Brazilian Bankruptcy Law under the laws of Brazil. *Id.* ¶ 14.

12.     Subsequently, on March 23, 2000, the bankruptcy was extended to Mappin Telecomunicações and Casa Anglo. *Id.* ¶ 15.

13.     After Mappin Lojas was declared bankrupt, the press reported that Mansur had fled to the United Kingdom. *Id.* ¶ 16.

14.      Initially, Dr. Alexandre Alberto Carmona was appointed as the trustee in bankruptcy responsible for the collection of assets located in Brazil. *Id.* ¶ 17.

15.     Then, on March 16, 2010, the Petitioner was appointed as a trustee in bankruptcy responsible for the collection of assets internationally. *Id.* ¶ 18.

16.     Under Brazilian law, the roles of Dr. Carmona and the Petitioner are distinct and each operates independently.  Dr. Carmona is responsible for the recovery of Brazilian assets, whereas the Petitioner is responsible for the recovery of assets internationally. *Id.* ¶ 19.

### D.  The Brazilian Court Holds Mansur Personally Liable for the Debts of the Debtors and Includes His Assets within the Brazilian Liquidation Estate

17.     After extensive investigation, and based on among other evidence, a report from the Central Bank, the Petitioner concluded that Mansur had fraudulently misapplied assets.  This conclusion was corroborated by contemporaneous press coverage reporting that Mansur was a fraudster. *Id.* ¶ 20.

18.     As a result, on July 6, 2011, the Petitioner applied to the Brazilian Court for an *ex parte* order, for among other relief, to pierce the corporate veil of the Debtors to hold Mansur and his assets personally liable for the debts of the Debtors pursuant to Article 50 of Law number

4

10.406, dated of 2.002, as amended (the "Brazilian Civil Code").  The Petitioner also requested the Brazilian Court to reverse pierce the corporate veil of other, non-debtor entities owned and controlled by Mansur so that those assets would also be subject of the bankruptcy. *Id.* ¶ 21.

19.    On August 6, 2011, the Brazilian Court granted the Petitioner's application.  The Brazilian Court entered an *ex parte* order that pierced the corporate veil of the Debtors, extended the bankruptcy to Mansur, and made Mansur and his assets personally liable for the debts of the Debtors (the "Veil Piercing Order").  *See* Aug. 6, 2011 Veil Piercing Order, attached as **Exhibit A** to Foreign Rep. Decl.  The order also granted the Petitioner's request for reverse veil piercing, and extended the bankruptcy to various, non-debtor entities owned and controlled by Mansur. *Id.* ¶ 22.

20.    On August 24, 2011, Mansur was duly served with the August 6, 2011 Veil Piercing Order. *Id.* ¶ 23.

21.    The various entities owned and controlled by Mansur that were made subject to the August 6, 2011 Veil Piercing Order appealed, and the Tribunal de Justiça de São Paulo (the "São Paulo Court of Appeals") allowed them to defend against the application for reverse veil piercing on an *inter partes* basis before the Brazilian Court. *Id.* ¶ 24.

22.    Mansur in his individual capacity, however, although given notice of order, chose not to appeal the Brazilian Court's decision in its August 6, 2011 Veil Piercing Order to pierce the corporate veil of the Debtors and hold Mansur personally liable for the debts of the Debtors' estate.  Therefore, the August 6, 2011 Veil Piercing Order is enforceable against Mansur personally and any assets that he owns, directly or indirectly, including through shares that he holds in any company. *Id.* ¶ 25.

23.     In addition, on December 16, 2014, the Petitioner filed an application seeking to obtain a certification that the decision that pierced the corporate veil of the Debtors is final and non-appealable, as well as clarification as to whether the August 6, 2011 Veil Piercing Order applied to Mansur, in his individual capacity. *Id.* ¶ 26.

24.     On January 15, 2015, the Brazilian Court confirmed that the August 6, 2011 Veil Piercing Order extended the bankruptcy to Mansur's personal assets, and that Mansur had failed to appeal that decision (the "January 15, 2015 Decision").  *Id.* ¶ 27. *See* Aug. 6, 2011 Veil Piercing Order, attached as **Exhibit B** to Foreign Rep. Decl.

25.     On December 9, 2015, Mansur took an interlocutory appeal of a November 24, 2015 order by the Brazilian Court that authorized the collection for the estate of Ricardo Mansur´s shares in Brazilian companies (the "November 24, 2015 Order"). *Id.* ¶ 28.

26.     On June 17, 2016, the São Paulo Court of Appeals dismissed Mansur's interlocutory appeal (the "June 17, 2016 Appellate Order").  *See* Aug. 6, 2011 Veil Piercing Order, attached as **Exhibit C** to Foreign Rep. Decl.  Therein, the São Paulo Court of Appeals confirmed, yet again, that Mansur's assets are subject to the Brazilian Proceeding.  *See id.* Specifically, the São Paulo Court of Appeals confirmed that: "there is a final and non-appealable decision to impinge Ricardo Mansur's estate," and "Ricardo Mansur, the shareholder should respond with his assets to the debts incurred due to the bankruptcy of the Mappin group."  *See id.* *Id.* ¶ 29.

27.     Subsequently, Mansur has made a *recurso especial* or "special appeal" of the June 17, 2016 Appellate Order to the Brazilian Superior Court of Justice, which remains pending as of the date hereof.  As a result, the November 24, 2015 Order is not yet final.  The August 11, 2011 Veil Piercing Order and January 15, 2015 Decision are final under Brazilian law, however, and

the authorization they provide for me to collect Mansur's assets outside of Brazil has not been

impacted by the pendency of this special appeal. *Id.* ¶ 30.

> **E. Despite the Demise of the Debtors, Mansur Continues to Maintain an Extravagant Lifestyle Through Strategic Asset Planning and Multiple Relocations to Avoid Enforcement of His Liability to Mappin Creditors in the Brazilian Proceeding Current Status of Brazilian Proceeding**

28.     Despite being the majority shareholder and CEO of a company that had thrived

for nearly a century in Brazil, only to become woefully insolvent after three years of his

ownership and control, Mansur has continued to maintain a lavish lifestyle following the

Debtors' demise. *Id.* ¶ 31.

29.     A sophisticated and worldly businessman, the Petitioner's investigation has

revealed Mansur has a demonstrated history of using strategic asset protection tactics with the

purpose and effect of hiding his assets through the use of straw men or "*laranjas*" (oranges), as

they are called in Brazil (i.e., individuals who nominally own assets on Mansur's behalf and

defer completely to his use and control thereof), or interposing into the chain of ownership one

or more intermediary corporate entities through which his ultimate beneficial ownership and

control of corporate assets is maintained. *Id.* ¶ 32.

30.     According to court filings by Mansur's former wife, Patrícia Rollo Mansur, in

their divorce proceeding, obtained by the Petitioner through appropriate legal procedures as part

of the Petitioner's investigation into Mansur, he used numerous companies to manage assets he

owned and controlled that were improperly taken away from the Debtors and their bankruptcy

estate.   In the public records, Mansur did not own these companies.   Instead, they were

purportedly owned by Mansur's accountant, his personal trainer, and his gardener.   These straw

men (or *laranjas*), however, frequently appointed Mansur as the companies' attorney-in-fact

with broad powers to act on their behalf.   To date, there is evidence that Mansur used upwards of

thirty of these companies[5] to manage assets improperly taken away from the Debtors and their bankruptcy estate. *Id.* ¶ 33.

31.     In addition, Mansur has demonstrated a pattern of evading his responsibility to the Debtors' creditors by moving himself and his assets from jurisdiction to jurisdiction. *Id.* ¶ 34.

32.     Following the commencement of the Brazilian Proceeding, Mansur relocated to London, England, where he continued to lead an abundant lifestyle, which included living in a multi-million dollar house in Kensington and maintaining a polo center.  *Id.* ¶ 35.

33.     After investigation, the Petitioner concluded that, many years after the Debtors entered bankruptcy, Mansur relocated to or otherwise maintained a presence in Brazil in or around 2009 and 2010.   He and his second wife rented a house in the most expensive condominium in the countryside of São Paulo and were members in one of the most exclusive clubs in Ribeirão Preto.   Such a conclusion was corroborated by contemporaneous press coverage.  *Id.* ¶ 36.

34.     Most recently, Mansur once again moved himself and his assets from London to Miami Beach, Florida, shortly before the Petitioner has obtained orders from the Chancery

---

[5] Bankplus Administração de Bens e Participações Ltda.; Bankplus Factoring Fomento Comercial Ltda.; Premiere Editora e Promoções Ltda.; Info Refill Assistência Técnica e Comércio de Informática Ltda.; Madertuba Comércio de Madeiras Ltda.; Telemercantil Comércio de Equipamentos e de Artigos de Uso Doméstico Ltda.; Investcorp Financial Administração de Bens e Participações Ltda.; Society Tours Participações; Comércio e Turismo Ltda.; Mercantil Brasileira de Comércio Eletrônico Ltda.; Viva Financial Administração de Bens e Leilões Ltda.; SINGRA – Soluções Integradas de Gestão e Recuperação de Ativos Ltda.; SHF Holdings Ltda.; Volpi Imóveis e Participações Ltda.; Ophera Participações, Comércio de Equipamentos e Artigos de Uso Doméstico Ltda.; Axminster Consulting Inc; Sun North Motors Ltda. and Maclevi Administração de Bens Ltda.; Cibramar Comércio e Indústria Ltda.; Cibramar, Savena União de Revendedores de Veículos Ltda.; Alltrade Comércio Exterior; Presta Administração de Cartões de Crédito; Odejan Participações Ltda.; H.I.C. Hermann Beteiligunsgsgesellschaft M.D.B. do Brasil Ltda.; Pauliscar Distribuidora de Veículos; Cibramar Caminhões Ltda.; Comercial Cibramar Ltda.; Cibramar Imports Santo André Ltda.; Consórcio M Ltda.; and FlexPlan Securitizadora de Créditos Financeiros S.A.  This list is non-exhaustive.

Division of the English High Court (the "UK Court") that enabled the Petitioner to commence an asset recovery campaign against Mansur in the UK. *Id. ¶* 37.

**F. After the Petitioner Commenced a Recognition Proceeding in the United Kingdom, Mansur Moves and Transfers His Business Activities to Miami Beach Where He Currently Maintains a Lavish Lifestyle**

35.    On August 12, 2011, following shortly upon the issuance of the August 6, 2011 Veil Piercing Order, the Brazilian Court issued an order authorizing the Petitioner to take action abroad to identify and retrieve the assets of the Debtors' estate. *Id. ¶* 38.

36.    On May 14, 2015, based on information that Mansur was living and maintained a substantial asset presence in London, United Kingdom, the Petitioner applied to the UK Court to open proceedings (the "UK Ancillary Proceeding") to have the Brazilian Proceeding recognized under Article 15 of the UNCITRAL Model Law on Cross-Border Insolvency as adopted into UK law in Schedule 1 to the Cross-Border Insolvency Regulations 2006 (the "CBIR").   The Petitioner also sought an order to entrust him with the administration, realization and distribution of Debtors' assets located in the UK, as provided for in Articles 21(1)(e) and 21(2) of the CBIR. *Id. ¶* 39.

37.    On July 6, 2015, the UK Court recognized the Brazilian Proceeding under Articles 15 and 17 of the CBIR, and entrusted the Petitioner with the administration, realization and distribution of the Debtors' assets located in the UK pursuant to Articles 21(1)(e) and 21(2) of the CBIR.   Notably, this relief is substantially the same relief as certain of the relief the Petitioner seeks by this Verified Complaint. *Id. ¶* 40.

38.    In the wake of the UK Court recognizing the Brazilian Proceeding and entrusting the Petitioner with the distribution of the Debtors' assets located in the UK, Mansur since has relocated to Miami Beach, Florida where, upon information and belief, he has continued his lavish lifestyle. *Id. ¶* 41.

**G. Mansur's Lifestyle and Known Assets In Miami Beach Suggest He Has Additional Assets Located in the United States Within His Possession, Custody or Control, Which the Petitioner Has a Right to Recover for the Benefit of the Debtors' Estate and Their Creditors**

39.     According to Mansur's LinkedIn page, he resides in Miami Beach, Florida, is an as "angel investor," and holds several real estate development interests in the United States.  A true and correct copy of a screen capture of Mansur's LinkedIn page from November 3, 2011 is attached as **Exhibit D** to Foreign Rep. Decl. *Id.* ¶ 42.

40.     Previously, upon information and belief, Mansur was renting a penthouse in the luxury condominium building, Bal Harbour Tower. *Id.* ¶ 43.

41.     Upon information and belief, Mansur currently resides in a 6,000-plus square foot, seven-bedroom mansion on 5185 North Bay Road in Miami Beach, Florida.  Based on publicly available information, the mansion is estimated to be worth almost US $6 million, and rents for approximately US$35,000 per month. *Id.* ¶ 44.

42.     Mansur's name has also been associated with two other properties in this District: a condominium located on Collins Avenue and a business office at Kane Concourse, both in Miami. *Id.* ¶ 45.

43.     As reported in public filings with the Florida Secretary of State, Mansur is an authorized representative (either manager and/or managing member) of four Florida limited liability companies:  Florida Royal Distributions, LLC; Society Retail & Auction, LLC; King Royal Properties, LLC; and Unico Asphalt, LLC (together, the "Florida LLCs").  True and correct copies of the Florida LLCs' 2016 filings with the Florida Secretary of State are attached as **Exhibit E** to Foreign Rep. Decl. *Id.* ¶ 46.

44.     Society Retail & Auction, LLC has a similar name to entities that are known to be controlled by Mansur in Brazil.  For instance, Society Tours Participações translates to "Society

Tours Partnership," and Viva Financial Administração de Bens e Leilões Ltda. translates to "Viva Financial Asset Management and Auctions Ltd." *Id.* ¶ 47.

45.     Each of the Florida LLCs lists its principal address as 5185 North Bay Road in Miami Beach, Florida, which is believed to be Mansur's personal residence. Based on Mansur's history of sophisticated asset planning, among other factors, on information and belief Mansur is the ultimate and sole beneficial owner of the Florida LLCs. *Id.* ¶ 48.

46.     Pursuant to the Veil Piercing Order, for the benefit of the Debtors' estate, the Petitioner is entitled to apply for the seizure of Mansur's ownership in the Florida LLCs, as well as any and all assets nominally owned by the Florida LLCs. *Id.* ¶ 49.

47.     By way of example as to what these assets may be, to date, the Petitioner is aware that one of the Florida LLCs, Society Retail & Auction, LLC, has (or recently has had) at least fifteen luxury vehicles registered under its name (together, the "Luxury Vehicles"). The following is a list of the Luxury Vehicles and a brief description of public estimates of their current market value:

- 2014 blue **Rolls-Royce Wraith** (VIN: SCA665C51EUX84466), which, according to Kelley's Blue Book Official Guide ("KBB"), has a $300,000 estimated at-purchase market value;

- 2014 silver **Rolls-Royce Wraith** (VIN: SCA665C58EUX84299), which, according to KBB, has a $300,000 estimated at-purchase market value;

- 2012 blue **Rolls-Royce Phantom** (VIN: SCA682D58CUX16704), which, according to The Car Connection ("TCC"), has a $380,000 estimated at-purchase market value for the base model;

- 2009 black **Rolls-Royce Phantom** (VIN: SCA3C67569UX32011), which, according to TCC, has a $340,000 estimated at-purchase market value for the base model;

- 2015 black **Bentley Continental** (VIN: SCBGJ3ZA2FC044844), which, according to the manufacturer's suggested retail price, is sold at $214,000;

11

- 2013 black **Bentley Continental** (VIN: SCBFR7ZA9DC078126), which, according to KBB, has a $200,000 estimated at-purchase market value;

- 2012 black **Bentley Continental GTC** (VIN: SCBGR3ZA3CC075217), which, according to KBB, has a $200,000 estimated at-purchase market value;

- 2015 white **Mercedes-Benz SL65 AMG** (VIN: WDDJK7KA2FF030898), which, according to the manufacturer's suggested retail price, is sold at $221,000;

- 2015 white **Mercedes-Benz S63 AMG** (VIN: WDDXJ7JB4FA005053), which, according to the manufacturer's suggested retail price, is sold at $157,400;

- 2014 silver **Mercedes-Benz S550** (VIN: WDDUG8CB6EA008460), which, according to KBB, has a $100,000 estimated at-purchase market value;

- 2014 black **Mercedes-Benz SL S Coupe** (VIN: WDDRJ7JA7EA010374), which, according to KBB, has a $200,000 estimated at-purchase market value;

- 2013 black **Mercedes-Benz SL63 AMG** (VIN: WDDJK7EA0DF011890), which, according to Car and Driver Magazine, has a $147,000 estimated at-purchase market value for the base model;

- 2011 black **Mercedes-Benz E3504M** (VIN: WDDHH8HB3BA383144), which, according to Car and Driver Magazine, has a $57,000 estimated base price value;

- 2012 silver **Aston Martin Virage Volante** (VIN: SCFFDEDN9CGH13478), which, according to Car and Driver Magazine, has a $211,600 estimated at-purchase market value for the base model; and

- 2016 black **Cadillac Escalade** (VIN: 1GYS3AKJ6GR167944), which, according to Car and Driver Magazine, has a $74,000 estimated at-purchase market value for the base model.

*Id.* ¶ 50.  A true and correct copy of the ownership records are attached as **Exhibits F** to the Foreign Rep. Decl.

### H. Current Status of Brazilian Proceeding

48. Based on the last report from Dr. Carmona, the court-appointed trustee responsible for the local asset recovery in Brazil, dated as of January, 28, 2016, at least 1092 claims against Mappin have been admitted to proof in the sum of R$ 361,538,176.94 (approximately US$109,226,035.33).  Of this sum, R$51,123,805.85 ≅ US$15,445,258.56 of the

total debt was already paid by the estate, leaving a balance of R$310,414,371.09 (approximately US$93,780,776.76) yet to be paid. The total amount of the unpaid debt can be divided into 4 categories: i) labor related debts (R$ 10,203,777.86, approximately US$3,082,712.34) which have preferential status under Brazilian law; ii) tax related debts (R$ 46,149,711.18 approximately US$13,942,510.93) also with preferential status; iii) privileged debts (R$ 5,256,965.42 approximately US$1,588,207.08); and iv) unsecured debts (R$ 248,800,593.11 approximately US$75,166,342.33).   Mr. Carmona is still considering claims which have been made by other ordinary unsecured creditors of Mappin.   In addition, Mr. Carmona has been considering the claims submitted by the Brazilian tax authorities.   Such claims, if admitted, will have preferential status.   At a minimum, these are worth R$350,000,000.00 (approximately US$105,740,181.27).   The total of the estimated debts of Mappin are, at a minimum, therefore, approximately R$700,000,000.00 (approximately US$211,480,000.00).   The value of the assets of Mappin collected by the Trustees in Bankruptcy to date is approximately R$131.123.805,85 (approximately US$39.614.442,85). *Id. ¶* 51.

49.     As such, the total of the estimated debts of the Debtors are, at a minimum, approximately R$380,000,000.00 (approximately US$114,803,625.38).   By contrast, the value of the assets of the Debtors collected by the Trustees in Bankruptcy to date is approximately R$131.123.805,85 (approximately US$39.614.442,85). *Id. ¶* 52.

50.     The prospect of any further substantial recovery becoming available to the Debtors' creditors is largely dependent upon finding and retrieving valuable assets outside of Brazil that the Petitioner has the right to recover for the benefit of the Debtors' Estate and their creditors. *Id. ¶* 53.

51.     To that end, the value the Petitioner will be able to realize post-recognition on behalf of the Debtors' creditors and Brazilian liquidation estate is highly dependent upon preventing Mansur from transferring assets in this District outside of the territorial jurisdiction of the United States following notice of these proceedings. *Id.* ¶ 54.

52.     Unfortunately, Mansur has demonstrated a pattern of evading his responsibility to the Debtors' creditors by moving himself and his assets from jurisdiction to jurisdiction, including most recently when he relocated to Miami Beach, Florida from the UK in time to frustrate execution of orders obtained by the Petitioner from the High Court of England and Wales to seize his assets in the UK.  Moreover, based on Petitioner's investigation, Mansur has engaged in strategic asset protection tactics with the effect and perhaps the purpose of hiding his ownership of assets nominally owned by limited liability companies over which he maintains ultimate beneficial ownership or control. *Id.* ¶ 55.

53.     The Petitioner now seeks recognition of the Brazilian Bankruptcy under the Bankruptcy Code so that he may pursue assets recovery in the United States, including against Mansur, who is personally liable for the debts of Mappin Lojas. *Id.* ¶ 56.

## **RELIEF REQUESTED**

54.     The Petitioner requests that this Court enter an order, substantially in the form of the Proposed Order attached hereto and pursuant to sections 105(a), 1509(b), 1517, 1520, 1521, 1525 and 1527 of the Bankruptcy Code:

      a.  granting the Chapter 15 Petition;

      b.  finding and concluding that the Brazilian Proceeding is a "foreign proceeding" as defined in section 101(23) of the Bankruptcy Code;

      c.  finding and concluding that the Petitioner is the "foreign representative" of the Brazilian Proceeding as defined in section 101(24) of the Bankruptcy Code;

d.  finding and concluding that the Chapter 15 Petition, together with the Foreign Representative Declaration (and exhibits thereto), meets the requirements of section 1515 of the Bankruptcy Code;

e.  recognizing the Brazilian Proceeding as a "foreign main proceeding" pursuant to section 1517 of the Bankruptcy Code;[6]

f.  granting relief available as of the right upon recognition of a foreign main proceeding pursuant to chapter 15 of the Bankruptcy Code, including, without limitation, relief pursuant to sections 1509(b) and 1520 of the Bankruptcy Code;

g.  granting additional appropriate relief authorized pursuant to section 1521(a) of the Bankruptcy Code and, to the extent necessary, Rule 65 of the Federal Rules of Civil Procedure as made applicable herein by Rule 7065 of the Federal Rules of Bankruptcy Procedure, including, without limitation:

   i.  staying the commencement or continuation of any action or proceeding without the consent of the Petitioner concerning the Debtors' assets, rights, obligations, or liabilities to the extent not stayed pursuant to section 1520(a)(1) of the Bankruptcy Code;

   ii.  staying execution against the Debtors' assets to the extent not stayed pursuant to section 1520(a)(2);

   iii.  suspending the right to transfer or otherwise dispose of any of the Debtors' assets to the extent this right has not been suspended pursuant to section 1520(a)(3);

   iv.  providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the Debtors' assets, affairs, rights, obligations, or liabilities pursuant to section 1521(a)(4) of the Bankruptcy Code, Rule 2004 of the Federal Rules of Bankruptcy Procedure ("Rule 2004"), and Local Rule 2004-1 of the United States Bankruptcy Court for the Southern District of Florida ("Local Rule 2004-1"), and finding and concluding that any such examinations, evidence, or information is necessary and appropriate under the law of the United States to assist the Petitioner in the fulfillment of its duties as trustee and Foreign Representative of the Brazilian Proceeding;

   v.  entrusting the administration or realization of all of the Debtors' assets within the territorial jurisdiction of the United States to the Petitioner pursuant to section 1521(a)(5) of the Bankruptcy Code; and

---

[6]    Out of an abundance of caution, to the extent the Court determines the Debtors' center of main interests is not in Brazil, the Petitioner alternatively requests recognition of the Brazilian Proceeding is a "foreign nonmain proceeding".

> vi. granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 550, and 724(a);

h. entrusting the distribution of all of the Debtors' assets located within the United States to the Petitioner pursuant to section 1521(b) of the Bankruptcy Code;

i. finding and concluding that the relief requested herein pursuant to section 1521 of the Bankruptcy Code sufficiently protects the interests of creditors and other interested entities, including the Debtor in satisfaction of section 1522(a) of the Bankruptcy Code;

j. finding and concluding that neither recognition of the Brazilian Proceeding as a "foreign main proceeding" nor the additional relief requested in the Chapter 15 Petition is manifestly contrary to the public policy of the United States or otherwise prohibited pursuant to section 1506 of the Bankruptcy Code; and

k. granting such other and further relief as this Court may deem just and proper.

## BASIS FOR RELIEF REQUESTED

### A. The Court Should Recognize the Brazilian Proceeding as a Foreign Main Proceeding and the Petitioner as its Foreign Representative

55. Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body, and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code. *See British American Ins. Co. Ltd. v. Fullerton* (*In re British American Ins. Co. Ltd.*), 488 B.R. 205, 213–14 (Bankr. S.D. Fla. 2013). As explained below, venue in this District is proper, and the Brazilian Proceeding, the Petitioner and this Chapter 15 Petition satisfy all of the section 1517(a) requirements.

1. **The Court has Jurisdiction to Recognize the Brazilian Proceeding and Grant the Relief Requested**

56. As noted above, this Court has jurisdiction to hear and determine chapter 15 cases as core matters pursuant to 28 U.S.C. §§ 157(b)(2)(P) and 1334, as well as S.D. Fla. Local Rule 87.2 which incorporates the Standing Order of Reference.

57. Sections 1504 and 1509(a) of the Bankruptcy Code provide that a chapter 15 case is properly commenced when a foreign representative files a petition for recognition of a foreign proceeding. For the reasons discussed below, the Brazilian Proceeding qualifies as a "foreign proceeding" and the Petitioner qualifies as its "foreign representative." Therefore, by filing this Chapter 15 Petition, the Petitioner properly commenced this chapter 15 case. Moreover, the Debtors—as entities subject to the Brazilian Proceeding—are each eligible to be a chapter 15 "debtor" as that term is defined in section 1502(1) of the Bankruptcy Code.

58. To the extent applicable to chapter 15 cases, the requirement in section 109(a) of the Bankruptcy Code that a debtor have assets or business operations in the United States to be a debtor is also satisfied here.[7] Specifically, Mansur, whose assets have been brought into the Mappin Lojas bankruptcy estate, is residing in this District and all of the assets the Petitioner has

---

[7] Although the Second Circuit has held that the requirements of section 109(a) of the Bankruptcy Code must be satisfied by chapter 15 debtors, courts in other circuits have disagreed. *Compare Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir. 2013), with Transcript of Bench Ruling on Dec. 17, 2013, at 8:14-9:18, *In re Bemarmara Consulting A.S.*, Case No. 13-13037 (KG) (Bankr. D. Del. Filed Feb. 20, 2014) (refusing to apply section 109(a) to chapter 15 case and stating belief of "strong likelihood" that the Third Circuit would not agree with the Second Circuit's *Drawbridge* decision). The Petitioner respectfully submits that the Eleventh Circuit would not conclude that section 109(a) applies to chapter 15 cases, consistent with its decisions prior to the enactment of chapter 15. *See, e.g.*, *Goerg v. Parungao*, 844 F.2d 1562, 1567-68 (11th Cir. 1988) (holding foreign proceeding should be granted comity pursuant to former section 304 of Bankruptcy Code regardless of whether foreign debtor meets eligibility requirements of section 109). In any event, the Petitioner does not concede that section 109(a) applies to this case and reserves all of its rights to argue otherwise.

been able to identify as of the date of this Petition are kept by Mansur in this District as well. *See* Foreign Rep. Decl. ¶ 59. Additionally, the Petitioner has deposited funds of the Debtors' estate in an account maintained by Kobre & Kim LLP at Citibank, N.A. in Miami, Florida (the "Escrow Account"). *See id.* ¶ 60. The Debtors retain full ownership of the funds in the Escrow Account unless and until they are released at the Petitioner's direction. *See id.*

59.     Further, the Petitioner anticipates that through recognition of the Brazilian Proceeding and the exercise of discovery powers requested herein, he will be able to identify additional assets and causes of action belonging to the Debtors and their Brazilian bankruptcy estates (including, without limitation, currently unknown assets in the name or under the beneficial ownership or control of Mansur) located in the territorial jurisdiction of the United States. *See id.* ¶ 61. The Petitioner submits that these assets satisfy the requirement of section 109(a) of the Bankruptcy Code. *See, e.g.*, *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 412–13 (Bankr. S.D.N.Y. 2014) (concluding section 109(a) satisfied by escrow account established using funds of debtor one day before chapter 15 petition was filed (*citing In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 372–73 (Bankr. S.D.N.Y. 2014) (finding section 109(a) satisfied by potential causes of action and funds in retainer account with foreign representative's United States law firm)).

60.     Venue is also proper in this District.  Section 1410 of Title 28 of the United States Code provides that a chapter 15 case "may be commenced in the district court of the United States for the district (1) in which the debtor has its principal place of business or principal assets in the United States, (2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court, or (3) in a case other than those specified in paragraph (1) or (2), in which venue will be

consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative." 28 U.S.C. § 1410.

61.     As described above, the Debtors do not have a place of business in the United States, and substantially all of their business operations were in Brazil.  Thus, to the best of the Petitioner's information and belief, as of the date hereof, the Debtors do not have any employees or operations in the United States. *See* Foreign Rep. Decl. ¶ 62. The Debtors' only known property of value in the United States, and therefore their principal assets, are the claims against and assets of Mansur, who is believed to reside in this District, and the funds held in the Escrow Account located in this District. *See id.*

62.     Further, to the best of the Petitioner's information and belief, the Debtors are not currently party to any pending lawsuits in the United States. *See id.*

63.     Since, to the best of the Petitioner's information and belief, the only known property of value in the United States are Mansur's assets and the funds held in the Escrow Account located in this District, the Debtors do not have any employees or operations in the United States, and the Debtors are not parties to any pending actions in the United States, the Petitioner asserts that venue in this District is consistent with the interests of justice and the convenience of the parties.  With regard to the convenience of the parties, upon information and belief, Mansur is presently residing in the District.  Moreover, because Miami is known as a financial and legal center within the United States for both Brazilian companies with international operations and wealthy Brazilian individuals—as evidenced by the fact that more than half of all chapter 15 cases seeking recognition of Brazilian proceedings have been commenced in this District (*see* infra ¶ 68)—the Petitioner believes that the interests of justice are served by establishing venue in this District.  Accordingly, the Petitioner respectfully

submits that venue in this District is proper pursuant to both sections 1410(1) and 1410(3) of Title 28 of the United States Code.

### 2. The Brazilian Proceeding Is a Foreign Main Proceeding

64.     The Brazilian Proceeding is a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code.

65.     *First*, the Brazilian Proceeding comes within the general definition of "foreign proceeding" as set forth in section 101(23) of the Bankruptcy Code. Section 101(23) requires that a "foreign proceeding" be (1) a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a foreign court and (4) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. *See* 11 U.S.C. § 101(23).  The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." *See* 11 U.S.C. § 1502(3).

66.     The Brazilian Proceeding fits squarely within the Bankruptcy Code's definition of a "foreign proceeding."  Insolvency proceedings in Brazil are governed by Brazilian Bankruptcy Law.  *See* Foreign Rep. Decl. ¶ 63.  Once a proceeding is converted to a liquidation, Brazilian Bankruptcy Law provides that officers and directors of the debtor company are no longer allowed to manage its affairs and the assets of the debtor are collected and sold by the judicial administrator under the continued supervision of the Brazilian Court.  *See id.*

67.     As noted above, the Brazilian Court commenced the Brazilian Bankruptcy Proceeding in 1999 as a formal insolvency process.  *See id.* ¶ 64.  In 2010, the Brazilian Court appointed the Petitioner as the Trustee.  *See id.*  Since then, the Petitioner continues to fulfill his obligations under Brazilian Bankruptcy Law and the supervision of the Brazilian Court to collect and liquidate the Debtors' assets.  *See id.*  Accordingly, the Petitioner respectfully submits that

the Brazilian Proceeding qualifies as a "foreign proceeding" for purposes of chapter 15 recognition.

68.     Consistent with the foregoing, Petitioner's United States counsel has identified a total of at least nineteen unrelated cases that have been commenced seeking chapter 15 recognition of a Brazilian proceeding governed by Brazilian Bankruptcy Law, including at least 12 in this District.  In every one of these cases, the Brazilian proceeding was found to be a "foreign proceeding" for purposes of granting chapter 15 recognition.  *See In re Diplomata S/A Industrial e Comercial, et al.*, Case No. 16-15327-LMI, ECF No. 15 (Bankr. S.D. Fla. May 4, 2016) (Isicoff, J.) (recognizing Brazilian liquidation proceeding pending under Brazilian Bankruptcy Law as "foreign proceeding");  *In re Viação Área São Paulo S.A.*, Case No. 15-22091, ECF No. 14 (Bankr. S.D. Fla. Aug. 18, 2015) (Mark, J.) (same); *In re OAS S.A.*, 533 B.R. 83 (Bankr. S.D.N.Y. 2015) (recognizing Brazilian judicial reorganization proceeding pending under Brazilian Bankruptcy Law as "foreign main proceeding");  *In re Aralco S.A. – Industria e Comercio*, Case No. 15-10419, ECF No. 22 (Bankr. S.D.N.Y. Apr. 21, 2015) (recognizing Brazilian liquidation proceeding pending under Brazilian Bankruptcy Law as "foreign proceeding");  *In re Probobank S.A.*, Case No. 14-37790, ECF No. 8 (Bankr. S.D. Fla. Feb. 19, 2015) (Cristol, J.) (same);  *In re Banco Cruzeiro do Sul S.A.*, Case No. 14-22974, ECF No. 16 (Bankr. S.D. Fla. July 11, 2014) (Isicoff, J.) (same);  *In re Industria de Alimentos Nilza S.A.*, Case No. 14-22589, ECF No. 8 (Bankr. S.D. Fla. July 2, 2014) (Mark, J.) (same);  *In re Petroforte Brasileiro de Petroleo Ltda.*, Case No. 14-15408, ECF No. 7 (Bankr. S.D. Fla. Mar. 27, 2014) (Mark, J.) (same);  *In re Banco Pontual S.A.*, Case No. 13-35298, ECF No. 10 (Bankr. S.D. Fla. Nov. 14, 2013) (Isicoff, J.) (same);  *In re Enco Zolcsak Eguipamentos Industriais Ltda.*, Case No. 1122924, ECF No. 15 (Bankr. S.D. Fla. July 12, 2011) (same);  *In re Transbrasil S.A.*

*Linhas Aereas*, Case No. 11-19484, ECF No. 9 (Bankr. S.D. Fla. May 11, 2011) (same);  *In re*

*Banco Santos, S.A.*, Case No. 10-47543, ECF No. 9 (Bankr. S.D. Fla. Jan. 2011) (same);  *In re*

*Fazendas Reunidas Boi Gordo, S.A.*, Case No. 09-37116, ECF No. 7 (Bankr. S.D. Fla. Jan. 11,

2010) (same); *In  re VarigLogistica S.A.*, Case No. 09-15717, ECF No. 77 (Bankr. S.D. Fla. May

11, 2009) (recognizing Brazilian judicial reorganization proceeding pending under Brazilian

Bankruptcy Law as "foreign proceeding");  *see also In re Sifco S.A.*, Case No. 14-11179, ECF

No. 38 (Bankr. S.D.N.Y. Oct. 23, 2014) (same);  *In re Lupatech S.A.*, Case No. 14-11559, ECF

No. 26 (Bankr. S.D.N.Y. June 26, 2014) (same);  *In re Rede Energia S.A.*, Case No. 14-10078,

ECF No. 18 (Bankr. S.D.N.Y. Mar. 6, 2014) (same);  *Centrais Eletricas Do Para S.A.*, Case No.

12-14568, ECF No. 19 (Bankr. S.D.N.Y. Dec. 12, 2012) (same);  *In re Independencia S.A.*, Case

No. 09-10903, ECF No. 23 (Bankr. S.D.N.Y. Mar. 26, 2009) (same);  *In re ITSA Intercontinental*

*Telecomunicacoes Ltda.*, Case No. 08-13927, ECF No. 16 (Bankr. S.D.N.Y. Jan. 29, 2009)

(recognizing Brazilian extra-judicial reorganization proceeding pending under Brazilian

Bankruptcy Law as "foreign proceeding").

69.     *Second*, the Brazilian Bankruptcy Proceeding qualifies as a "foreign main

proceeding."  A "foreign main proceeding" is defined in the Bankruptcy Code as a "foreign

proceeding pending in the country where the debtor has the center of its main interests."  11

U.S.C. § 1502(4).  The Bankruptcy Code neither defines nor provides a conclusive test for

determining the location of a debtor's center of main interests ("COMI").  However, "[i]n the

absence of evidence to the contrary," there is a statutory presumption that a debtor's "registered

office" is its COMI. *See* 11 U.S.C. § 1516(c).  To determine a debtor's COMI, this court and

others have placed importance on the ability of third parties to readily ascertain a corporate

debtor's COMI based on "where the debtor conducts its regular business . . . . Among other

factors that may be considered are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes." *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 130 (2d Cir. 2013); *see also In re British Am. Ins. Co.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's COMI should be readily ascertainable by third parties."); In *re Ran*, 390 B.R. 257, 266 (Bankr. S.D. Tex. 2008) ("A debtor's center of main interests must be identified by reference to criteria that are both objective and ascertainable by third parties.") (internal quotation marks omitted) (citing European Council Regulation No. 1346/2000 of 29 May 2000). Additionally, where, as here, there is a delay between the commencement of a foreign proceeding and the commencement of the chapter 15 case, the court may also consider relevant activities during that gap period such as liquidation activities and administrative functions. *See, e.g.*, *In re Fairfield Sentry Ltd.*, 714 F.3d at 137; *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399, 419 (Bankr. S.D.N.Y. 2014) (concluding, over objection, that debtor's COMI as of chapter 15 filing date was Cayman Islands despite finding Cayman Islands was not its COMI when the foreign liquidation proceeding was commenced, based on activities of provisional liquidators during period between filings).

70. At all times since it began operations in 1990, Mappin Lojas has been incorporated and headquartered in São Paulo, Brazil. *See* Foreign Rep. Decl. ¶ 66.

71. In addition, Mappin Telecomunicações and Casa Anglo are all Brazilian entities, and, upon information and belief, are headquartered in Brazil. *See id.* ¶ 67.

72. Moreover, the Brazilian Proceeding has been pending before the Brazilian Court for over 15 years now. *See id.* ¶ 68. Since then, the Petitioner and his co-trustee have collected and liquidated the Debtors' assets, which to date have largely been Brazilian assets, under the continuing supervision of the Brazilian Court. The Petitioner is not aware of the existence of any

insolvency proceeding concerning the Debtors other than the Brazilian Proceeding and the UK Ancillary Proceeding, nor is he aware of any suggestion having been made at any time during its pendency by a creditor or party in interest that the Debtors' center of main interest is anywhere other than Brazil.  *See id.* ¶¶ 68, 71, 73 & 74.  Indeed, the UK Court has already determined that the Brazilian Proceeding qualifies as a "foreign main proceeding" under the Model Law in the UK Ancillary Proceeding.  *See id.* ¶ 73.

73.    Thus, based on the facts present in this case, the Petitioner respectfully submits that São Paulo, Brazil should be held to be the center of the Debtors' main interests. Accordingly, given that it is pending in the Debtors' COMI, the Brazilian Proceeding should be recognized as a "foreign main proceeding" pursuant to section 1517(b)(l) of the Bankruptcy Code.

### 3.    The Petitioner is a Proper "Foreign Representative"

74.    The second requirement for recognition of a foreign main proceeding under section 1517(a) of the Bankruptcy Code is that the "foreign representative" applying for recognition be a person or body.  *See* 11 U.S.C. § 1517(a)(2). Section 101(24) of the Bankruptcy Code provides that

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

75.    Here, the Petitioner is the only duly appointed Foreign Representative for the Brazilian Proceeding and individual authorized to administer foreign proceedings of the Estate of Debtors Mappin Lojas, Mappin Telecomunicações, and Casa Anglo.  *See* Foreign Rep. Decl. ¶ 76.  In such capacity, he has sought to collect and liquidate the Debtors' assets under the

continued supervision of the Brazilian Court. Moreover, by the Chapter 15 Authorization Order, the Brazilian Court explicitly authorized the Petitioner to commence an ancillary case in the District seeking chapter 15 recognition of the Brazilian Proceeding.  For these reasons, the Petitioner respectfully submits that he is a "foreign representative" that is a "person or body" in satisfaction of sections 101(24) and 1517(a)(2) of the Bankruptcy Code.

        **4.**       **The Chapter 15 Petition Satisfies the Requirements of Section 1515**

76.      The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the procedural requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a)(3). Specifically, as relevant here, section 1515 requires a petition for recognition of a foreign proceeding to be accompanied by "a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative. . . [or] any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative" and "a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative." 11 U.S.C. §§ 1515(b)(2)&(3) and (c).

77.      Here, all of those procedural requirements are satisfied.  Pursuant to section 1515(b)(3) of the Bankruptcy Code, the Order Appointing Trustee and the Veil Piercing Order establish the existence of a foreign proceeding involving the Debtors, and the appointment of the Petitioner as Trustee. In addition, in the Chapter 15 Authorization Order, the Brazilian Court expressly authorized the Petitioner to carry out investigations abroad.  In accordance with section 1515(b)(3) of the Bankruptcy Code, copies of the Order Appointing Trustee, the Veil Piercing Order, and the Chapter 15 Authorization Order in Portuguese as well as a English translations thereof are attached to the Foreign Representative Declaration as **Exhibits A, G,** and **H**.  Finally, in accordance with section 1515(c) of the Bankruptcy Code, the Foreign Representative

25

Declaration contains a statement identifying the Brazilian Proceeding and the UK Ancillary Proceeding as the only foreign proceedings currently pending with respect to the Debtors.[8]  *See* Foreign Rep. Decl. ¶ 74.

*    *    *

78.    For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied, and that the Petitioner and/or the Debtors, as applicable, are entitled to all of the relief provided as of right upon recognition under chapter 15 of the Bankruptcy Code.[9]  Accordingly, the Court should enter the Proposed Order recognizing the Brazilian Proceeding as a foreign main proceeding.

**B.    The Court Should Grant the Petitioner's Request for Discretionary Relief under Chapter 15 of Bankruptcy Code**

79.    In addition to the relief automatically provided under sections 1509(b) and 1520 of the Bankruptcy Code upon recognition of the Brazilian Proceeding, the Petitioner requests that this Court provide additional relief and assistance pursuant to sections 105(a), 1521 and 1525 of the Bankruptcy Code as follows.

---

[8] The Petitioner is continuously analyzing whether commencing any such additional proceedings is in the best interests of the Debtors' bankruptcy estate and creditors.  *See* Foreign Rep. Decl. ¶ 75.  In the event any such additional proceedings are commenced, he will promptly notify the court in accordance with section 1518(2) of the Bankruptcy Code.

[9] Upon recognition of the Brazilian Proceeding as a foreign main proceeding, certain relief is automatically granted as a matter of right, including, among other things, the right of the Petitioner to direct access in other Federal and State courts in the United States, and a stay that enjoins actions against and otherwise protects the Debtors.  *See* 11 U.S.C. §§ 1509(b) and 1520, respectively. In addition, upon the Court's recognition of the Brazilian Bankruptcy Proceeding as a foreign main proceeding, section 1520(a)(l) of the Bankruptcy Code triggers the automatic stay provisions of section 362 of the Bankruptcy Code with respect to the Debtors.

1.      **The Relief Requested Pursuant to Sections 1521 is Warranted and Appropriate Under the Circumstances**

80.      Upon recognition of a foreign proceeding and at the request of a foreign representative, the Court may grant (with certain express exceptions not applicable here) "any appropriate relief," including any injunctive relief and "any additional relief that may be available to a trustee," that is necessary to effectuate the purpose of chapter 15 and to protect the assets of the debtor or the interests of the creditors. 11 U.S.C. § 1521(a).  Additionally, section 1521(b) provides that "[u]pon recognition of a foreign proceeding, whether main or nonmain, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative . . . provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." 11 U.S.C. § 1521(b).

81.      The Petitioner requests that the Court grant the relief authorized by sections 1521(a) and (b) of the Bankruptcy Code.

82.      *First*, to the extent not otherwise stayed under sections 1520 and 362 of the Bankruptcy Code, the Petitioner requests that the Court, in its discretion under sections 1521(a)(1), (2) and (3) of the Bankruptcy Code, enter a stay against any parties that may attempt to commence prepetition or post-petition actions and/or claims in the United States against the Debtors or their property, or otherwise attempt to transfer, encumber or dispose of such property. The Petitioner fears that certain creditors may take actions in the United States against the Debtors or their property—especially property which the Petitioner has yet to identify as belonging to the Debtors and/or recoverable for distribution to the Debtors' creditors—seeking to obtain more than the distribution they are entitled under the Brazilian Bankruptcy Law. If such creditors can effectively evade the Brazilian Proceeding by commencing actions in the United

States, the Petitioner, on behalf of the Debtors' estate, would be left to defend against these suits, regardless of their merit. This could irreparably deplete the resources available to the Petitioner to collect and administer the Debtors' assets and the resulting distributions to creditors in the Brazilian Proceeding. *See, e.g.*, *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("As a rule . . . irreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors."); *In re Rubin*, 60 B.R. 269, 283 (Bankr. S.D.N.Y. 1993) ("[T]he premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury." (quoting *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988)). For these reasons, an additional stay pursuant to sections 1521(a)(1) and (2) would protect the interests of all of the Debtors' creditors in having claims against the Debtors and their estate valued and paid on a consistent, non-discriminatory basis as determined by the Brazilian Court.[10]

83. *Second*, the Petitioner requests that the Court enter an order authorizing him to examine witnesses and take evidence and information concerning the Debtors' assets, affairs, rights, obligations or liabilities pursuant to section 1521(a)(4) of the Bankruptcy Code. As is clear by the background of the Brazilian Proceeding set forth above, the Petitioner has reason to

---

[10] The Petitioner submits that, to the extent the standards, procedures and limitations applicable to an injunction are applicable to this request, they are satisfied. *See* 11 U.S.C. § 1521(e); Fed. R. Bankr. P. 7065 (incorporating Fed. R. Civ. P. 65). For all the reasons set forth herein, among others, the Petitioner submits that (i) it will be successful on the merits in its request for recognition of the Brazilian Proceeding as a foreign proceeding and, in any event, such recognition will occur simultaneously with or prior to the granting of any relief to the Petitioner pursuant to section 1521 of the Bankruptcy Code, (ii) irreparable harm will result in the absence of injunctive relief, (iii) injunctive relief would not cause undue hardship or prejudice to the rights of any United States based creditors, and (iv) public policy supports the requested relief. The Petitioner reserves the right to set forth more fully the basis for injunctive relief at the request of the Court or in the event such relief is objected to by a party in interest. The Petitioner reserves the right to set forth more fully the bases for this relief at the request of the Court or in the event such relief is objected to by a party in interest.

believe that a substantial amount of property belonging to the Debtors was improperly transferred away in the lead-up to the commencement of, and in some cases after, the commencement of the Brazilian Proceeding.  In accordance with his duties as Trustee, the Petitioner is investigating these transfers in an attempt to find additional assets that should be collected and distributed to the Debtors' creditors in the Brazilian Proceeding.  That investigation has expanded beyond the borders of Brazil and led the Petitioner to believe that such assets exist within the United States, among other countries. In fact, obtaining relief under section 1521(a)(4) is central to the purpose for which the Brazilian Court directed the Petitioner to commence a chapter 15 case.

84.    The Debtors are not currently party to any United States litigation and, therefore, without authorization from this Court, the Petitioner will not have immediate means to otherwise obtain discovery or compel disclosures from third parties.  Moreover, the relief requested is consistent with relief granted by this and other courts upon granting Chapter 15 recognition.  *See, e.g.*, *Transbrasil S.A. Linhas Aereas,* Case No. 11-19484, 2014 WL 1655990 (Bankr. S.D. Fla. Apr. 25, 2014) (adjudicating third-party motions with respect to Rule 2004 examination and document requests made by foreign representative pursuant to section 1521(a)(4)), *aff'd in part, rev'd on other grounds*, Case No. 14–cv–22580 (KMM) [ECF No. 27] (S.D. Fla. March 30, 2015); *In re Hughes*, 281 B.R. 224, 227-230 (Bankr. S.D.N.Y. 2002) (holding, under statutory predecessor to Chapter 15, that scope of discovery in ancillary case was not limited by discovery available under law governing foreign proceeding, and noting that the same principle would apply under then-proposed section 1521(a)(4)).  Accordingly, the Petitioner submits that authorization under section 1521(a)(4) is warranted and appropriate here.

85.     *Third*, and finally, to the extent not provided by sections 1520 and 363 of the Bankruptcy Code, the Petitioner requests that the Court enter an order entrusting the administration, realization, and distribution of all of the Debtors' assets within the territorial jurisdiction of the United States to the Petitioner.  Akin to the duties of a chapter 7 trustee pursuant to section 704 of the Bankruptcy Code, the Petitioner (in his capacity as Trustee of the Brazilian Proceeding) is charged with liquidating the Debtors' assets and distributing the proceeds thereof in accordance with Brazilian Bankruptcy Law and under the supervision of the Brazilian Court.  Arguably, by continuing to fulfill these duties in the ordinary course of his appointment as trustee and Foreign Representative of the Brazilian Proceeding with respect to assets identified and collected in the territorial United States, the Petitioner will be exercising the rights and powers provided to him as of right upon recognition pursuant to section 1520(a)(3) of the Bankruptcy Code.  Nevertheless, the Petitioner submits a more express grant of authority by the Court pursuant to sections 1521(a)(5) and 1521(b) of the Bankruptcy Code is warranted and appropriate. Among other benefits, such relief would avoid the administrative cost and delay attendant to requesting similar relief in a piece-meal fashion for every asset subject to the Brazilian Proceeding that the Petitioner identifies as being located within the United States.[11]

### 2.     The Relief Requested Sufficiently Protects the Interests of Creditors

86.     Before granting relief pursuant to section 1521 of the Bankruptcy Code, the Court must be satisfied that "the interests of creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).  Although the Bankruptcy Code does not define "sufficient protection," the legislative history indicates that the prohibition applies where "it is

---

[11] Of course, the Petitioner will comply with any notice or reporting requirements that the Court may deem necessary or appropriate.

shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005). Courts have construed section 1522 to require a balance of the potentially competing interests among the parties to a foreign proceeding and to provide the Court with broad latitude in granting relief to meet specific circumstances. *See, e.g.*, *In re Atlas Shipping N S.*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009).

87.     Here, the Debtors' creditors are "sufficiently protected" by the treatment afforded to them in the Brazilian Proceeding under Brazilian Bankruptcy Law.  In particular, United States claimants (if any) are not being subjected to undue inconvenience or prejudice because, for example, Brazilian Bankruptcy Law does not create any additional burdens for foreign creditors to file a claim and confers upon them the same status and rights as creditors in Brazil. Moreover, the distribution scheme in liquidation prescribed under Brazilian Bankruptcy Law, is substantially in accordance to that under the Bankruptcy Code, as it grants priority to certain administrative claims and grants secured claims priority over unsecured claims.  Accordingly, the ultimate distributions creditors will receive on account of their claims in the Brazilian Proceeding will be materially consistent with those they would have received under U.S. law. While there may be exceptions on a case by case basis, courts have consistently held that the fact that certain creditors "may be denied an advantage over the debtor's other . . . creditors is not a valid reason to deny relief to the foreign representative."  *Atlas Shipping*, 404 B.R. at 742. Accordingly, the Petitioner submits that the relief requested pursuant to section 1521 of the Bankruptcy Code is should not be prohibited or limited by section 1522.

> **3.     The Relief Requested Is Consistent with the Purposes of Chapter 15 and the Court's Mandate to Cooperate to the Maximum Extent Possible**

88.     The relief requested herein is founded on the congressional mandate that United States courts should cooperate with foreign proceedings and foreign representatives to promote

the goals of chapter 15. Section 1525 of the Bankruptcy Code provides, in pertinent part, that "[c]onsistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee." 11 U.S.C. § 1525(a).  In turn, section 1501 provides, in pertinent part, that "[t]he purpose of [chapter 15 of the Bankruptcy Code] is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of:

> (1)    cooperation between (A) courts of the United States . . . and (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
>
> (2)    greater legal certainty for trade and investment;
>
> (3)    fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested parties, including the debtor;
>
> (4)    protection and maximization of the value of the debtor's assets; and
>
> (5)    facilitation of the rescue of financially troubled businesses, thereby protecting investments and preserving employment."

11 U.S.C. § 1501(a).

89.    All of the relevant objectives will be furthered by granting the relief requested herein.[12]  By recognizing the Brazilian Proceeding as a "foreign main proceeding" and enjoining creditors from commencing or continuing actions against the Debtors or their assets in the United States, the Court would be fostering cooperation between courts in Brazil and the United States and ensuring that the fair and efficient administration of the Debtors' assets in the Brazilian Proceeding cannot be disrupted by creditors or other parties in interest outside of Brazil. Moreover, by empowering the Petitioner to employ the means of investigation and discovery

---

[12] Because the Brazilian Proceeding is a liquidation rather than a reorganization, the objective set forth in section 1501(a)(5) is moot.

available under United States law and procedure, this Court would be protecting and maximizing the value of United States assets belonging to or absconded from the Debtors and promoting legal certainty by ensuring those assets are collected and administered by the Petitioner in accordance with Brazilian Bankruptcy Law.

### 4. The Relief Requested Is Consistent with the Court's Equitable Authority

90. Finally, section 105(a) of the Bankruptcy Code enables the Court to enforce the specific statutory language of the Bankruptcy Code's other provisions consistent with the Court's broad equitable powers. *See* 11 U.S.C. § 105(a) ("[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"). The Petitioner believes that the relief requested herein is expressly provided for by the statutory provisions of chapter 15, as set forth above. Out of an abundance of caution, however, to the extent that is not the case, the Petitioner submits that the relief requested is warranted under section 105(a) of the Bankruptcy Code, as it is wholly consistent the express provisions of Bankruptcy Code and fair and equitable to all parties involved.

*        *        *

91. For the foregoing reasons, the Petitioner respectfully requests that this Court grant the relief requested by the Petitioner through exercise of its discretionary authority pursuant to section 1521, its mandate to cooperate with the Brazilian Court and the Petitioner pursuant to sections 1525 and 1501(a), and its equitable powers pursuant to section 105(a) of the Bankruptcy Code.

### C. The Court Should Find and Conclude that None of the Relief Requested is Manifestly Contrary to the Public Policy of the United States

92. The Court may deny a request for any relief under chapter 15 that would be "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The legislative

33

history indicates that the "public policy" exception is narrow, applying only to the "most fundamental policies of the United States."  H.R. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 109 (2005).  "The narrow public policy exception contained in § 1506 is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States.  The key determination . . . is whether the procedures used [in the foreign proceeding] meet our fundamental standards of fairness."  *Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B. de C.V. (In re Vitro, S.A.B. de C.V.)*, 701 F.3d 1031, 1069 (5th Cir. 2012) (internal citations omitted).  It is not necessary that the result achieved in a foreign proceeding be identical to what could be obtained in the United States—"even the absence of certain procedural or constitutional rights will not itself be a bar under § 1506." *Id.*  Nor is it a requirement that the procedures of the foreign proceeding be identical to those of the United States when the foreign proceeding grants relief that is available under United States law. *See In re Petroforte Brasileiro de Petroleo Ltda.*, 542 B.R. 899, 903 (Bankr. S.D. Fla. 2015) (finding "that different requirements in Brazil for obtaining relief available in the U.S. do not render the [relief] contrary to U.S. policy").  Thus, a foreign representative should not be denied comity simply because the relief obtained in the foreign proceeding under the applicable law of that country would not be available in the United States or because the foreign proceeding employed different procedures than the United States courts. *See In re Condor Ins. Ltd.*, 601 F.3d 319, 327 (5th Cir. 2010); *In re Petroforte Brasileiro de Petroleo Ltda.*, 542 B.R. at 903.

93.    The Petitioner submits that neither the Brazilian Proceeding nor the relief requested in the Chapter 15 Petition warrant invocation of section 1506.  *See, e.g.*, *In re OAS S.A.*, 533 B.R. 83, 105 (Bankr. S.D.N.Y. 2015) (holding "that recognition of the OAS Debtor's Brazilian Bankruptcy Proceedings is not manifestly contrary to the public policy of the United

States"); *see generally In re Rede Energia S.A.,* 515 B.R. 69, 98 (Bankr. S.D.N.Y. 2014) ("Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence."). Pursuant to Brazilian Bankruptcy Law, the Brazilian Proceeding has provided (and continues to provide) creditors and other parties in interest with the notice and opportunities to participate and be heard that are wholly consistent with concepts of due process under United States law and jurisprudence.[13]

94.    Moreover, the Brazilian Proceeding has played out in a manner substantially similar to a chapter 7 case under the Bankruptcy Code, with a centralized process to assert and resolve claims against the estate and a court-appointed and supervised trustee (*i.e.*, the Petitioner) responsible for collecting and liquidating the debtor's assets and making distributions to creditors. In sum, the relief requested herein effectively extends this liquidation process into the United States, ensuring that assets belonging to or absconded from the Debtors located within the territorial United States do not escape the reach of the Brazilian Proceeding and empowering the Petitioner to employ the means of investigation and discovery that are afforded as of right to trustees in plenary United States bankruptcy cases. None of the relief requested is contrary, let alone manifestly so, to United States law or public policy.

95.    Accordingly, the Petitioner respectfully requests that the Court find and determine that recognizing the Brazilian Proceeding as a "foreign main proceeding" and granting the

---

[13] To the extent of any confidential or *ex parte* proceedings that have taken place in the Brazilian Proceeding, in each case the circumstances warranted such confidential or *ex parte* proceedings on a temporary basis before the Brazilian Court and, in any event, the Petitioner submits that such proceedings wholly comport with similar confidential and *ex parte* proceedings that are available in plenary United States bankruptcy cases under applicable United States law. *See In re OAS S.A.*, 533 B.R. at 104–105 ("Even United States recognizes exceptions to the general rule forbidding *ex parte* communications and procedures.").

additional relief requested in the Chapter 15 Petition is neither prohibited nor should be limited by section 1506 of the Bankruptcy Code.

## NOTICE AND HEARING

96.     In accordance with section 1517(c) of the Bankruptcy Code, the Petitioner requests that a hearing to consider the Chapter 15 Petition (the "Recognition Hearing") be scheduled at the "earliest possible time."[14]   Notice of the Recognition Hearing is governed by Bankruptcy Rule 2002(q)(1), which provides, in pertinent part, that:

> The clerk, or some other person as the court may direct, shall forthwith give the debtor, all persons or bodies authorized to administer foreign proceedings of the debtor, all entities against whom provisional relief is being sought under § 1519 of the Code, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and such other entities as the court may direct, at least 21 days' notice by mail of the hearing on the petition for recognition of a foreign proceeding.

Fed. R. Bankr. P. 2002(q)(1).

97.     Pursuant to 11 U.S.C. § 1515(c), to the best of its knowledge and belief, the Petitioner (a) is not aware of the existence of any foreign proceedings of the Debtors other than the Brazilian Proceeding and the UK Ancillary Proceeding, nor any person or body other than itself authorized to administer the Brazilian Proceeding internationally,[15] and (b) is not aware of

---

[14] Although the Petitioner does not anticipate any objections to recognition of the Brazilian Proceeding, applicable rules provide parties in interest 21 days from the service of summons regarding a chapter 15 petition to object thereto and require that any objection challenging a foreign representative's designation of COMI of the foreign proceeding be filed no later than seven (7) days prior to the hearing on recognition. *See* Fed. R. Bankr. P. 1011(b) and 1004.2, respectively.

[15] The Petitioner is the only trustee authorized by the Brazilian Court to administer the Brazilian Proceeding internationally. Dr. Carmona's role as trustee is limited to asset recovery within Brazil.  As such, the Petitioner has full authority to initiate this proceeding without Dr. Carmona joining. In any event, the Petitioner will provide Dr. Carmona with copies of all the filings in this Court.

any litigation pending in the United States in which the Debtors are a party as of the date hereof. *See* Foreign Rep. Decl. ¶¶ 74, 76, & 80.

98.     Concurrently with the filing of this Chapter 15 Petition, pursuant to section 1519 of the Bankruptcy Code (among other statutory authority), Petitioner is seeking provisional relief related to Mansur, Roberta de Menezes e Arruda, Florida Royal Distributions, LLC, Society Retail & Auction, LLC, King Royal Properties, LLC, Unico Asphalt, LLC, Jorge L. Coelho, Jose Carlos Santos, and Does 1-1000.

99.     Accordingly, Petitioner will provide notice of this Chapter 15 Petition and Recognition Hearing to Mansur, Roberta de Menezes e Arruda, Florida Royal Distributions, LLC, Society Retail & Auction, LLC, King Royal Properties, LLC, Unico Asphalt, LLC, Jorge L. Coelho, and Jose Carlos Santos.

100.     Aside from Mansur, Petitioner submits that no further notice of the Chapter 15 Petition and Recognition Hearing is required.

## **NO PRIOR REQUEST**

101.     No previous request for the relief requested herein has been made to this or any other court.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## <u>CONCLUSION</u>

**WHEREFORE**, the Petitioner respectfully requests that the Court: (a) enter the Proposed Order, upon notice and a hearing, substantially in the form attached hereto as **<u>Exhibit 1</u>**, and (b) grant such other and further relief as may be just and proper.

Dated: November 20, 2016

Respectfully submitted,

**KOBRE & KIM LLP**

<u>s/ John D. Couriel</u>
John D. Couriel
Fla. Bar No. 831271
Jeremy C. Hollembeak (*pro hac vice* pending)
Stephanie L. Hauser
Fla. Bar No. 92765
2 South Biscayne Boulevard, 35th Floor
Miami, FL  33131
Tel: +1 305 967 6100
Fax: +1 305 967 6120