Page 1

1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA
2                     MIAMI DIVISION
3   IN RE:                      CASE NO. 16-25541-BKC-RAM
                                Chapter 15
4   MASSA FALIDA DE MAPPIN LOJAS DE
    DEPARTAMENTO, S.A.,
5        Debtor in a Foreign Proceeding.
    _____/
6   IN RE:                      CASE NO. 16-25542-BKC-RAM
                                Chapter 15
7   MAPPIN TELECOMUNICACOES LTDA,
         Debtor in a Foreign Proceeding.
8   _____/
    IN RE:                      CASE NO. 16-25543-BKC-RAM
9                               Chapter 15
    CASA ANGLO BRASILEIRA S.A.,
10       Debtor in a Foreign Proceeding.
    _____/
11  AFONSO HENRIQUE ALVES BRAGA,  ADV NO. 16-1626-BKC-RAM
                     Plaintiff,
12  vs.
    RICARDO MANSUR, et al.,
13                   Defendants.
    _____/
14
            16-25541 ECF# (3), 16-25542 ECF# (3),
15          16-25543 ECF# (3), 16-1626 ECF# (3)
16                  December 14, 2016
17          The  above-entitled  cause   came  on  for
18  hearing before the  HONORABLE ROBERT A. MARK,  one of
19  the Judges sitting in the  UNITED  STATES  BANKRUPTCY
20  COURT,  in  and for the SOUTHERN DISTRICT OF FLORIDA,
21  at  301  North  Miami Avenue, Courtroom 4,  Miami,
22  Dade County, Florida, on Wednesday, December 14, 2016
23  commencing  at or about 10:04 a.m., and the following
24  proceedings were had:
25    Transcribed from a Digital Audio Recording by:
              Margaret Franzen, Court Reporter

Page 2

```
 1                    APPEARANCES:

 2

 3                 KOBRE & KIM, by
           JEREMY C. HOLLEMBEAK, ESQUIRE
 4          ADRIANA RIVIERE, ATTORNEY-AT-LAW
           STEPHANIE L. HAUSER, ATTORNEY-AT-LAW
 5              on behalf of the Debtor

 6

 7                 AKERMAN LLP, by
          ANDREA S. HARTLEY, ATTORNEY-AT-LAW
 8        CATHERINE E. DOUGLAS, ATTORNEY-AT-LAW
              ANA ESTEVAO, ATTORNEY-AT-LAW
 9           on behalf of Ricardo Mansur;
       Roberta De Menezes e Arruda; Florida Royal
10    Distributions, LLC; Society Retail & Auction, LLC;
       King Royal Properties, LLC and Unico Asphalt, LLC

11

12

                   ALSO PRESENT:
13

14            INTERPRETER (Unidentified)
          ECRO - Electronic Court Reporting Operator
15

16              - - - - - - -

17

18                I N D E X

19  WITNESS              DIRECT  CROSS  REDIRECT  RECROSS
    AFONSO HENRIQUE ALVES BRAGA
20   By Ms. Hauser         41            104
     By Ms. Hartley              84                --
21

22              - - - - - - -

23

24

25
```

1

2              **EXHIBITS ADMITTED INTO EVIDENCE**

3      Plaintiff's Exhibit Number   1............ Page   41
       Plaintiff's Exhibit Number   2 ........... Page   41
4      Plaintiff's Exhibit Number   4 ........... Page   41
       Plaintiff's Exhibit Number   8 ........... Page   60
5      Plaintiff's Exhibit Number   9 ........... Page   41
       Plaintiff's Exhibit Number  11 ........... Page   41
6      Plaintiff's Exhibit Number  12 ........... Page  108
       Plaintiff's Exhibit Number  13 ........... Page   74
7      Defendants' Exhibit Number   6............ Page   95

8                      - - - - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Have a seat.  Thanks.

2           Okay.  Let's get appearances.  This

3    will be both in the consolidated Chapter 15 cases

4    and in Adversary 16-1626, so we'll start on the

5    trustee/plaintiff side.

6           MR. HOLLEMBEAK:  Good morning, Your Honor.

7    Jeremy Hollembeak from the law firm of Kobre & Kim.

8    I have with me ---

9           THE COURT:  If you can spell your names for

10   the record --

11          MR. HOLLEMBEAK:  Yes.

12          THE COURT:  -- for the digital recording?

13          MR. HOLLEMBEAK:  It's Jeremy, J-e-r-e-m-y,

14   Hollembeak, H-o-l-l-e-m-b-e-a-k.

15          THE COURT:  Okay.

16          MS. RIVIERE:  Good morning, Your Honor.

17   Adriana Riviere of Kobre & Kim, it's A-d-r-i-a-n-a,

18   last name, R-i-v as in victor-i-e-r-e.

19          MS. HAUSER:  Good morning.

20   Stephanie Hauser of Kobre & Kim, S-t-e-p-h-a-n-i-e

21   H-a-u-s-e-r.

22          With us, Your Honor, is Dr. Braga,

23   Doctor and last name, B-r-a-g-a.

24          THE COURT:  Okay.  Let's get the --

25          MS. HARTLEY:  Sure.

1                THE COURT:  -- other side.

2                MS. HARTLEY:  Good morning, Your Honor.

3     Andrea Hartley, H-a-r-t-l-e-y; Catherine Douglas,

4     D-o-u-g-l-a-s; and Ana Estevao, E-s-t-e-v-a-o from

5     Akerman, on behalf of several parties, Your Honor,

6     Ricardo Mansur, M-a-n-s-u-r; Roberta De Menezes e

7     Arruda, D-e, new word M-e-n-e-z-e-s, new word e, new

8     word A-r-r-u-d-a; Florida Royal Distributions, LLC;

9     Society Retail & Auction, LLC; King Royal Properties,

10    LLC and Unico Asphalt, LLC.

11               THE COURT:  The -- the parties other than

12    Mr. Mansur are -- are basically just in the

13    adversary, that is they're -- they're not -- or -- or

14    let me ask, are those parties also objecting to

15    recognition?

16               MS. HARTLEY:  Your Honor, we did include

17    them because the relief sought in the recognition

18    papers seeks to reach them, as well.

19               THE COURT:  Okay.  All right.  So I've --

20    I've read the papers, unless something was filed this

21    morning.

22               Is there anything to report as far as

23    agreements or otherwise between the parties?

24               MR. HOLLEMBEAK:  I don't believe so, Your

25    Honor.  We have some evidentiary agreements as to the

Page 6

1    admission of certain of the documents and -- and not

2    in agreement with respect to others.

3              THE COURT:  Okay.

4              MS. HARTLEY:  That's correct, Your Honor.

5              THE COURT:  All right.

6              MR. HOLLEMBEAK:  Your Honor, the one other

7    thing I wanted to mention is there's two defendants

8    named in the adversary proceeding that are not

9    represented by Akerman, one of whom I don't believe

10   has appeared yet, that's Jorge Coelho, but the other

11   defendant, which is Jose Carlos Santos, did file an

12   appearance and his attorney contacted us yesterday.

13             We don't understand him to be objecting

14   to recognition, but I don't see him ---

15             THE COURT:  Okay.  Yeah, that's

16   Mr. Schwitalla filed a notice of appearance in the

17   adversary.

18             Okay.  Well, let me let you proceed

19   with the evidentiary stipulations, and then I may

20   just want to confirm or clarify what the issues

21   are from the -- I'm just going to refer to your

22   clients, Ms. Hartley, as the defendants, but it's

23   also the respondents in the main case.

24             Okay.

25             MR. HOLLEMBEAK:  I'm going to turn over to

1    my colleague, Stephanie Hauser for that.

2              THE COURT:  Okay.

3              MS. HAUSER:  Good morning, Your Honor.

4              THE COURT:  Good morning.

5              MS. HAUSER:  We have been able to stipulate

6    to a number of the Brazilian orders and filings that

7    were attached to Dr. Braga's declaration.

8              THE COURT:  Okay.

9              MS. HAUSER:  I have for you here, if you'll

10   allow me to approach, a binder of those exhibits, as

11   well as others that we may be offering into evidence.

12             THE COURT:  Al will -- well, hold on.  Al

13   will bring it up.

14             Okay.  So what portion -- so you're

15   going to walk me through which of these are

16   stipulated and which, if any --

17             MS. HAUSER:  Yes, Your Honor.

18             THE COURT:  -- are objected to?  Okay.

19             MS. HAUSER:  I've provided opposing counsel

20   with a copy of the binder, and at this point we've

21   stipulated to ---

22             THE COURT:  Is there an exhibit list?

23             MS. HAUSER:  Yes, it should be the front

24   page.  If not, I will provide that to you.

25             THE COURT:  Yeah, I guess we need one.

1              Okay.  Thanks.  Do you -- do you need

2    another copy or ---

3              MS. HAUSER:  No, no, we have plenty.  Thank

4    you.

5              THE COURT:  All right.

6              MS. HAUSER:  We've stipulated to the

7    exhibits at Tab 1, Tab 2, Tab 4 ---

8              THE COURT:  Okay.  Let -- let me just note

9    these so we have a record.

10              The trustee appointment order is Tab 1;

11    the Chapter 15 authorization order is Tab 2.

12              Okay.

13              MS. HAUSER:  The August 6, 2011 veil

14    piercing order at Tab 4.

15              THE COURT:  What -- did you mention Tab 3

16    or you didn't?

17              MS. HAUSER:  No, we have not reached an

18    agreement as to that exhibit at this time.

19              THE COURT:  Okay.  Okay.  Tab 4 is the veil

20    piercing order, August 6, 2011.

21              MS. HAUSER:  Skipping down to Tab 9, the

22    January 15, 2015 order.

23              THE COURT:  Okay.

24              MS. HAUSER:  Tab 11, the June 17, 2016

25    appellate order, and that is all at this time.

1                  THE COURT:  Okay.  Let me ask Ms. Hartley,

2      are you introducing any documents and if so, do we

3      have agreements or ---

4                  MS. HARTLEY:  Yes, we would like to

5      introduce documents.

6                  THE COURT:  Have they been -- have there

7      been discussions or exchanges or -- okay, thanks.

8                  MS. HARTLEY:  Your Honor, we had listed

9      certain exhibits that were attached to Mr. Braga's

10     declaration and identified them as Exhibit Number 1,

11     which is Exhibit A to the declaration.

12                 THE COURT:  Okay.  Hold on.  There's two --

13     is there a different exhibit register in the

14     adversary or there's just one extra exhibit or ---

15                 MS. HARTLEY:  Well, yeah, there's only one

16     extra exhibit since they've introduced our Numbers 1

17     through 5.  So the only ---

18                 THE COURT:  But you gave -- in this folder

19     you just handed up, there's one exhibit register in

20     the main case, main cases, and one in the adversary.

21                 MS. HARTLEY:  They're identical, Your

22     Honor.  So the only additional exhibit would be our

23     exhibit marked Number 6, which is an August 3, 2012,

24     court of appeals decision from Brazil --

25                 THE COURT:  Okay.

```
 1              MS. HARTLEY:  -- and we are not in
 2   agreement.
 3              THE COURT:  But there's an Exhibit 7 in --
 4   in the adversary, that's the November 24, 2015 order.
 5              MS. HARTLEY:  Your Honor, we're not going
 6   to move to introduce that at this time.
 7              THE COURT:  Okay.  All right.  So 1 through
 8   5 are --
 9              MS. HARTLEY:  Has already been agreed
10   upon --
11              THE COURT:  -- plaintiff's exhibits --
12              MS. HARTLEY:  -- our 1 through 5.
13              THE COURT:  -- that have already been
14   admitted, and is there any objection by the
15   plaintiff/trustee to Exhibit 6, the August 3, 2012
16   order?
17              MS. HAUSER:  We'll have to see how they use
18   it, Your Honor.  We don't know at this time.
19              THE COURT:  Okay.  All right.  So we'll
20   reserve on that.
21              All right.  While you're up,
22   Ms. Hartley, or were almost still there, I just
23   wanted to get some clarification.  You've
24   stipulated to some of the exhibits that go
25   towards recognition.
```

1              Is there any issue, there's nothing

2    raised in the response, but is there any issue as

3    to the Brazilian proceeding being a foreign main

4    proceeding and Dr. Braga being an authorized

5    representative --

6              MS. HARTLEY:  Yes, Your Honor.

7              THE COURT:  -- for purposes of recognition?

8              MS. HARTLEY:  Yes.

9              THE COURT:  There is an issue?

10             MS. HARTLEY:  There is an issue, yes.

11             THE COURT:  Okay.  I didn't see it in the

12   response.  What -- what's the issue?

13             MS. HARTLEY:  Your Honor, we don't believe

14   that the Court can rely on the veil piercing order.

15   We believe we can ---

16             THE COURT:  Let me -- yeah, let me --

17             MS. HARTLEY:  Oh.

18             THE COURT:  -- be more specific.

19             The issues that I understand you've

20   raised are -- in the recognition order are one,

21   that to recognize the veil piercing order, which

22   is an important piece of the discovery and asset

23   recovery they're attempting in -- in this

24   jurisdiction, would be contrary to -- manifestly

25   contrary and should not be recognized under 1506,

1    that -- that's the main argument.

2              And then, I guess as a -- if you win

3    that, then you're also arguing that there's not

4    jurisdiction or proper venue here because we

5    wouldn't be reaching Mr. Mansur's assets?

6              MS. HARTLEY:  Yes, Your Honor.  We don't

7    belive there's sufficient --

8              THE COURT:  But even ---

9              MS. HARTLEY:  -- property --

10             THE COURT:  Isn't ---

11             MS. HARTLEY:  -- under Mappin.  We don't

12   belive that by just retaining counsel, that that can

13   be sufficient for purposes of jurisdiction --

14             THE COURT:  Okay.

15             MS. HARTLEY:  -- for the debtors, Mappin,

16   Casa.

17             THE COURT:  I thought bank accounts were --

18             MS. HARTLEY:  There are no bank accounts --

19             THE COURT:  -- sufficient.

20             MS. HARTLEY:  -- in those --

21             THE COURT:  I thought they put ---

22             MS. HARTLEY:  -- debtors.

23             THE COURT:  You're saying putting money in

24   a retainer account is not ---

25             MS. HARTLEY:  We understand that there's

```
 1   a --
 2              THE COURT:  All right.
 3              MS. HARTLEY:  -- 2nd Circuit decision on
 4   that.
 5              However, Your Honor, we don't believe
 6   that this Court should follow that --
 7              THE COURT:  All right.
 8              MS. HARTLEY:  -- otherwise a representative
 9   from another country could just retain lawyers all
10   over the world and establish jurisdiction.  It just
11   doesn't seem proper.
12              THE COURT:  But if the veil piercing order
13   is recognized, you would acknowledge that there's
14   assets or potential assets here that would confer
15   jurisdiction?
16              MS. HARTLEY:  Yes.
17              THE COURT:  Okay.
18              MS. HARTLEY:  If the veil piercing ---
19              THE COURT:  All right, and then the only
20   other issue, and I don't say only to minimize it,
21   would be if the petition is recognized, what -- what
22   is the appropriate scope of relief both in the main
23   case under the additional relief sought and in the
24   preliminary injunction --
25              MS. HARTLEY:  Your Honor ---
```

1           THE COURT:  -- like how -- how far we

2    should go --

3           MS. HARTLEY:  Exactly, Your Honor --

4           THE COURT:  -- at this point.

5           MS. HARTLEY:  -- and we believe at this

6    point, the only authority Mr. Braga has is to perhaps

7    freeze Mr. Mansur's interest in companies, but that

8    would be the extent of it.

9           As far as liquidating those assets, we

10   don't believe he has that authority to even seize

11   them.  He doesn't have that authority in Brazil,

12   and he shouldn't be granted that authority here.

13          We also have issues with regards to the

14   companies and Roberta, Your Honor, and would say

15   that the relief shouldn't extend to them.  It

16   doesn't currently in Brazil.  The most that he

17   can do, as -- as I mentioned, is perhaps freeze

18   Mr. Mansur's interest in those companies, but

19   those companies are not directed to freeze any

20   assets of -- that Mr. Mansur may either equitably

21   or beneficially or et cetera have an interest in.

22          And so we believe that the TRO and

23   preliminary injunction that are currently in

24   affect are extremely broad, and remind the Court

25   that this is extraordinary relief, relief that

1   hasn't even been granted in Brazil.

2              THE COURT:  But would it be up to -- if I

3   grant recognition and recognize the veil piercing

4   orders, do they need to go back to Brazil or do we

5   just need further evidentiary proceedings here to

6   determine what assets are equit -- or beneficially or

7   actually owned by Mansur?

8              MS. HARTLEY:  Your Honor, they're putting

9   the cart before the horse.  They haven't even

10  established -- they would have to establish veil

11  piercing with regards to the LLCs that are here.

12  They haven't done that yet.

13             They're trying to restrict all their

14  assets because the relief -- I mean, this is --

15  is somewhat cleaver, in that, you know, the Court

16  may a year from now or down the road determine

17  that they are alter egos and at that point, then

18  all of the assets of the LLC should have been

19  frozen.  And so now they're asking for everybody

20  to sort of speculate what Mr. Mansur may have an

21  interest in, and none of that has been

22  determined.

23             This relief is not required in Brazil.

24  They listed numerous entities.  Mr. Braga entered

25  over 300 pages of documents, yet the appellate

Page 16

1    court still determined that there isn't

2    sufficient information to even link with regards

3    to veil piercing, and that there needs to be an

4    actual trial.

5                  So we would say if, you know,

6    Mister ---

7                  THE COURT:  That's as to the entities in

8    which the ownership interest was frozen, the -- the

9    appellate language you cited in your response?

10                  MS. HARTLEY:  Yes, Your Honor.

11                  THE COURT:  Okay.  All right.  So I think

12    that's -- so when I -- my earlier question, though,

13    was meant to just go to outside of the issue of

14    jurisdiction.  If the veil piercing order isn't

15    recognized and the manifest injustice argument, the

16    other elements for recognition are not contested,

17    right, that it's -- there's a foreign main -- foreign

18    main proceeding and Dr. Braga is an authorized

19    representative for purposes of 15?

20                  MS. HARTLEY:  No, Your Honor, except again,

21    we don't believe he's authorized to obtain the relief

22    he's requesting, but we don't object that he's a

23    foreign representative that could establish a

24    proceeding here.

25                  THE COURT:  Authorized in terms of scope of

1    the relief if there's recognition?

2                MS. HARTLEY:  Yes, Your Honor.

3                THE COURT:  All right.  So since this sort

4    of became a little opening, Mr. Hollembeak, if you're

5    going to do it, or Ms. Hauser, do you want to just

6    give a brief response to the objection or objections?

7                MR. HOLLEMBEAK:  Thank you, Your Honor.

8                I -- I want to say a few brief points

9    just to respond to the colloquy just now, and

10   then Ms. Hauser is going to take over for the

11   purposes of the evidentiary portion of the

12   hearing, and to have Mr. Braga to the stand to

13   give testimony.

14               I think Your Honor hit the issue on the

15   head when you were asking about whether if the

16   veil piercing order was enforced, that we had to

17   go back to Brazil or do something.  That's not

18   the case, that's not what we're seeking.

19               There is a -- an order, a final

20   non-appealable order in Brazil that pierces the

21   veil of the debtors and allows the -- the trustee

22   to seek the assets of Mr. Mansur, his personal

23   assets, to satisfy the debts of the estate.

24               Whether or not the -- there's a further

25   trial on the other -- the reverse veil piercing

1    relief, which has to do with other entities or

2    people related to those entities that are owned

3    by Mr. Mansur, is sort of besides the point.

4            From our viewpoint, if the veil

5    piercing order is enforced in the United States

6    under Chapter 15, then the trustee has the

7    authority to go after the assets of Mr. Mansur

8    within the territorial jurisdiction of the

9    United States, the same as if they are the

10   debtors' assets.

11           If you look at 1519 or 1521, it refers

12   to the debtors' assets, and whether or not the

13   assets that are nominally held by an LLC that's

14   incorporated in the State of Florida, really

15   beneficially belonged to Mr. Mansur and are,

16   therefore, assets of the debtor estate, is an

17   issue of U.S. law.

18           It -- it matters not that the Brazilian

19   Court has or hasn't given authority to reverse

20   veil pierce with respect to specific Brazilian

21   companies that are not the four defendants before

22   you today.

23           THE COURT:  Yeah, I mean, I agree with that

24   and the issue, though, is still what -- what will you

25   have proven by the end of today in terms of the scope

1    of relief?

2           I mean, if you -- if -- if the veil

3    piercing order is recognized, and I think you

4    have the better of that, I want to talk -- we'll

5    get into some of the issues, but if -- if you

6    obtain recognition, then the automatic relief,

7    1520(a)(5) says you're -- Dr. Braga is entrusted

8    with the administration, realization and

9    distribution of all the debtors' assets --

10          MR. HOLLEMBEAK:  Right.

11          THE COURT:  -- that's fine, I mean, that's

12   just --

13          MR. HOLLEMBEAK:  Right.

14          THE COURT:  -- a plain vanilla description.

15          The injunction goes further and says,

16   that includes taking control of the assets of

17   these LLCs, and I think that's where the

18   alleged -- the argument lies.

19          If recognition is granted, is it

20   premature today to freeze the assets of the LLCs,

21   and there you may have a sufficient showing to

22   freeze them, but is it premature to actually have

23   an injunction that says you're now authorized to

24   administer assets of LLCs before there's been a

25   determination that -- well, I guess it would be

1    reverse veil piercing.

2            MR. HOLLEMBEAK:  Right, Your Honor.

3            So let me hopefully clarify that.  The

4    way we -- we envision this, the way we structured

5    the complaint, was that we would seek final

6    enforcement of the veil piercing order at a later

7    date than today.

8            Today we're requesting a preliminary

9    injunction that would bring from the TR -- the

10   expiration of the TRO to a hearing on final

11   enforcement of the veil piercing order within the

12   United States, and that would also, at the same

13   time, grant us the ability to seek turnover of

14   those assets.

15           Now, I know in the -- in the

16   preliminary injunction motion, we asked for

17   entrustment specifically with respect to

18   transient assets, vehicles, money in bank

19   accounts ---

20           THE COURT:  Yeah, I mean, that's the

21   language.  I'm looking at Paragraph -- Paragraph --

22   for remedies, we were looking at Paragraph 6 of the

23   proposed preliminary injunction, Docket Entry 3-2,

24   and it has the standard language that you're entitled

25   to if you get recognition, about administration and

1    realization of Mansur's assets, but the -- the part

2    that maybe you're not even seeking today based on

3    what you just said, is the part that says including

4    without limitation, any motor vehicle and bank,

5    brokerage or other account held in the name of Mansur

6    or any of the Florida LLCs.

7                So you're not seeking that relief

8    today?

9                MR. HOLLEMBEAK:  Well, it's in the

10   preliminary injunction.  I would say if it is causing

11   the Court problems, we don't need that relief today,

12   so long as we reserve our rights to come back and

13   seek it on whatever basis makes sense --

14               THE COURT:  Well, then the issue ---

15               MR. HOLLEMBEAK:  -- before we get to a

16   final hearing.

17               THE COURT:  Then the issue is, do you --

18   which I think the defendants are also contesting, is

19   do you get injunctive relief that freezes the assets

20   of the LLCs?

21               And you believe --

22               MR. HOLLEMBEAK:  We believe we get that,

23   Your Honor.

24               THE COURT:  -- you're able to make a

25   showing --

1              MR. HOLLEMBEAK:  Yes.

2              THE COURT:  -- sufficient showing on that?

3  Okay.

4              MR. HOLLEMBEAK:  And that's based on --

5  what we're -- what we're requesting is a provisional

6  enforcement of the veil piercing order, and that's

7  what we based the TRO on and now we would just ask

8  that the Court continue that.

9              In addition to -- so -- so that what

10  we're seeking today, just to be clear, is the

11  same relief that was in the TRO, which includes

12  the provisional enforcement of the veil piercing

13  order, to the extent that it -- it renders

14  Mansur's assets debtor assets for purposes of

15  invoking Section 1519 and now Section 1521.

16              With that authority, we would freeze,

17  continue to freeze the assets of the debtors that

18  we've named, and ---

19              THE COURT:  Well, they're not debtors, the

20  defendant LLCs.

21              MR. HOLLEMBEAK:  The defendants, I'm sorry,

22  and continue to have the authority to seek discovery

23  on an expedited basis, that -- that's what's in the

24  TRO.  We would ask that that be extended today.

25              In addition to that, we've asked for

1   three things, which is -- well, one of those

2   three being to extend that relief; the second to

3   ask the defendants to provide an accounting of

4   their assets; and the third is the entrustment

5   relief with respect to specifically, you know,

6   cars or bank accounts, things that could be

7   easily transferred.

8           As long as we're assured that those are

9   frozen, we -- we don't need the entrustment

10  relief subject to a reservation of rights to --

11  to come back to Your Honor.

12          My point is, if we find a bank account

13  that has a substantial amount of money in it in

14  the name of one of the defendants, and we have a

15  reasonable basis to believe that the money might

16  be transferred out of that account, we would like

17  to be able to come back to Your Honor and say,

18  turnover, you know, entrustment of that account

19  until we get, again, to a hearing at which I

20  assume there's going to be more evidence than

21  today, maybe some expert testimony on Brazilian

22  law or whatever, that -- that would seek to

23  enforce the veil piercing order on a final basis

24  and grant us -- so that would be like a permanent

25  injunction, and then grant us turnover with

1    respect to -- authority with respect to all

2    assets that we find in the name of the defendants

3    that Your Honor applies the veil piercing order

4    to.

5              THE COURT:  I thought the accounting was

6    not an accounting of the assets of the LLCs, but an

7    accounting of assets that they may be holding

8    beneficially for Mansur, slightly different maybe.

9              MR. HOLLEMBEAK:  Maybe, but, Your Honor, we

10   don't understand there to be any actual difference.

11   All indications we have are that these LLCs are

12   100 percent owned directly by Mr. Mansur, and so

13   beneficially he would own 100 percent of the assets

14   of those LLCs.

15             THE COURT:  If there was a finding, and I

16   don't know that you're going to put on proof to -- or

17   have even requested that finding today, but if there

18   was a finding that all or majority control of the

19   LL -- each of the LLCs was in the -- was -- was

20   Mansur, that he either owned all of or owned

21   sufficient amount to control all of the LLCs, where

22   do the rights of a foreign representative in

23   Chapter 15 click in, and let me -- let me explain.

24             I mean, if -- if you had -- putting

25   aside veil piercing the LLCs themselves, if you

1  had just a typical Chapter 7 U.S. estate and the

2  debtor owned or controlled an entity, the trustee

3  would either -- may either abandon it, sometimes

4  they sell it back to -- to the debtor or they

5  take control of it, perhaps put it into a

6  Chapter 7 itself or just administer it.

7            Is there some notion down the road, I

8  mean, we're getting ahead of ourselves, of -- of

9  the trustee under U.S. law, either through the 15

10 or through some separate proceedings, taking

11 control of the LLCs based on the ownership

12 interest without necessarily having obtained a

13 veil piercing order?

14            It's kind of a long question.

15            MR. HOLLEMBEAK:  Yeah, I think the answer

16 is to the extent that -- that the veil piercing order

17 was recognized and enforced by this Court with

18 respect to assets in the name of Mr. Mansur, but

19 not ---

20            THE COURT:  I mean, absent a veil -- when I

21 say a veil piercing order, I mean, absent an order

22 that would say that these entities are Mr. Mansur's,

23 and therefore, you get their assets.

24            MR. HOLLEMBEAK:  Correct.

25            THE COURT:  Because that -- that would have

```
1    the effect, in theory, of all the assets going back
2    to Brazil and all the creditors of those entities
3    going to Brazil, as opposed to if it's -- if it's his
4    ownership interest and you administer it, then the
5    creditors of those entities would have their rights
6    to the assets of those entities.
7              So --
8              MR. HOLLEMBEAK:  That's correct.
9              THE COURT:  -- I mean, there is a
10   substantive distinction in terms of what happens with
11   assets and creditors of the LLCs.
12             MR. HOLLEMBEAK:  Correct, Your Honor.  I
13   mean, we would seek turnover of his ownership
14   interest and the ability -- the ability to -- for the
15   foreign trustee -- foreign representative, excuse me,
16   to -- to exercise those ownership interests.
17             THE COURT:  Okay.
18             MR. HOLLEMBEAK:  And to the extent that
19   they have any other creditors which we don't
20   understand them to be active businesses, we have no
21   indication that they are or would have, you know,
22   ordinary course creditors or anything like that, but
23   to the extent that there are, we would have to, you
24   know, take further steps, whether that's, you know,
25   seek to reach a deal with them to pay them or if it's
```

1    an insolvency situation, you know, I guess we could

2    put those entities into a Chapter 7 or something,

3    but ---

4              THE COURT:  Well, I thought some of the

5    vehicles, at least from a brief proffer by

6    Ms. Hartley at the last hearing, are liened.

7              So if you -- if we have lien creditors

8    on assets owned by the LLCs, and you would --

9    absent piercing the veil, you'd have to deal with

10   those creditors --

11             MR. HOLLEMBEAK:  Right.

12             THE COURT:  -- with the assets of the LLC.

13             MR. HOLLEMBEAK:  Right.  We can only step

14   into the shoes of -- of, you know --

15             THE COURT:  Ownership.

16             MR. HOLLEMBEAK:  -- the ownership, yeah.

17             THE COURT:  All right.  But today you're

18   not seeking a specific finding that Mansur owns or

19   controls these entities and, therefore, you can

20   immediately administer or are you?

21             Is that part of the injunction or just

22   a freeze for today?

23             MR. HOLLEMBEAK:  I think it's just a

24   freeze, Your Honor.  We don't -- we don't have the

25   ability -- we -- we have what's in the papers to show

1    you the state records as to who's registered these --

2    these LLCs.

3              I'm not aware that we have anything

4    other than that to say they're owned by

5    Mr. Mansur, other than, you know, the bank

6    account records and things that show a lot of

7    like money flowing in and out that's very

8    consistent with the behavior that the trustee can

9    testify to in Brazil.

10             THE COURT:  Okay.  So you want a freeze of

11   his ownership interest so that -- so he can't dispose

12   of that, and then you think there will be a

13   sufficient showing from what you've already learned

14   and -- and can present, that the assets should be

15   frozen, and I assume you wouldn't object to some

16   condition, and maybe it -- maybe it flows out of 1522

17   or -- or otherwise, that creditors of these entities

18   could come in and seek some relief if they had rights

19   to pursue the assets or pursue payment of debt from

20   frozen bank accounts.

21             MR. HOLLEMBEAK:  Absolutely.

22             THE COURT:  Okay.  Did you want to comment

23   on the manifest injustice argument?

24             MR. HOLLEMBEAK:  I mean, I -- I have plenty

25   to comment on on -- on a couple of these arguments.

1   I envision the hearing being evidentiary and then

2   both counsel following up with argument, but I'm

3   willing to go into 1506 with respect to recognition

4   or with respect to the preliminary injunction, as

5   well.

6           THE COURT:  Factually, and maybe if --

7   well, let me turn it -- if -- if Ms. Hauser is going

8   to present the evidence, let me have her step in

9   and -- and if -- if I have some questions about --

10  just by way of opening or proffer about the evidence,

11  I think maybe I should direct it to Ms. Hauser --

12          MR. HOLLEMBEAK:  Yeah.

13          THE COURT:  -- so let -- let's do that.

14          So the -- the -- one of the key issues

15  in -- in -- in my mind, and Ms. Hartley, this may

16  preview why I think you're going to lose the 1506

17  argument if certain facts are true, but is -- is

18  it your belief that the evidence will show that

19  Mr. Mansur was served with the veil piercing

20  order?

21          MS. HAUSER:  Yes, Your Honor.

22          THE COURT:  And the second order, Exhibit B

23  to the declaration, that was a late -- there was a

24  later proceeding to confirm that he was intended to

25  be brought in as a debtor?

1          MS. HAUSER:  Yes, Your Honor.  Mr. Mansur

2    had counsel of record throughout the bankruptcy

3    proceeding in Brazil.

4          We have -- in Brazil they file powers

5    of attorney on the document, and then their

6    counsel can receive notice of whatever is filed,

7    whether it be a petition or an order, much like

8    we have here, just without the CM/ECF e-mail

9    process.

10         THE COURT:  Did the same counsel who was

11   counsel of record for Mansur file the appeal of the

12   veil piercing order as to the entities that appealed,

13   if you know?

14         MS. HAUSER:  I do not know the answer to

15   that at this moment, Your Honor.

16         THE COURT:  Okay, and are you aware of

17   anything that prohibited him from filing an appeal?

18         MS. HAUSER:  No.

19         THE COURT:  And in the Petroforte case,

20   which is referred to and attempted to be

21   distinguished in the response, there actually was an

22   appeal and an opportunity to present argument and

23   evidence.

24         Is it your understanding, or do you

25   believe the evidence will show that had

1  Mr. Mansur appealed, he could have, as did the

2  debtor subject of extension orders in Petroforte,

3  he could have presented argument and evidence at

4  the appellate level to seek to set aside the

5  ex parte veil piercing order?

6          MS. HAUSER:  Mr. Mansur certainly had the

7  opportunity to do so, but he did not.

8          THE COURT:  Okay.  All right.  Well, we'll

9  go through the process, Ms. Hartley, but I -- I mean,

10 to me, if he had the opportunity, and I'll give you a

11 chance to address, and maybe now since I'm telling

12 you how I'm leaning, but let me ask Ms. Hartley just

13 to clarify or attempt to at least preliminarily

14 dissuade me.

15          If he had the opportunity to appeal and

16 chose not to, how could that be a due process

17 violation that would render this manifestly

18 contrary to U.S. policy?

19          I mean, notice and an opportunity to

20 object, that seems to be the key under U.S. due

21 process; right?

22          MS. HARTLEY:  Your Honor, but that's not

23 how it works in Brazil.  Mr. Braga got an ex parte

24 order, that's a -- the veil piercing order is an

25 ex parte order.

1              THE COURT:  Right.

2              MS. HARTLEY:  The right to appeal that

3    order is not what we look for at due process, and it

4    flies in the face of the U.S. Constitution.

5              Your Honor, the right to due process is

6    essential and protected, and here in the U.S.,

7    you would be served and then have a right to

8    trial.

9              There, simply because you have

10   appellate rights, is not the same and, in fact,

11   the Brazil -- if Your Honor -- the country of ---

12             THE COURT:  Are the appellate rights

13   de novo when it comes to presentation of evidence or

14   argument or do we not have anything to parse it

15   that --

16             MS. HARTLEY:  I mean ---

17             THE COURT:  -- specifically?

18             MS. HARTLEY:  Well, there was no evidence,

19   even at the lower level, my understanding is, and the

20   Court -- the orders I believe are somewhat in

21   evidence and may be introduced into evidence, also

22   reflect that all of this was on -- suspicion isn't

23   the right word, but on, you know, conjecture and it

24   wasn't -- nothing was proven in the ex parte order.

25             THE COURT:  But what -- but my opinion in

1    Petroforte and -- and the OAS opinion that I referred
2    to, go to the point that the procedures don't have to
3    be the same.
4              I mean, it doesn't -- it doesn't make
5    it manifestly contrary just because in Brazil
6    ex parte relief can be granted and then -- and
7    then you have the opportunity to present evidence
8    and argument, as opposed to evidence and argument
9    being presented in the first instance.
10             That -- that -- that difference in
11   procedure wouldn't seem, under the narrowly
12   construed exception you're looking at, be enough.
13             MS. HARTLEY:  And we believe it is, Your
14   Honor, because there's a difference between
15   procedural due process and substantive due process.
16   What Your Honor is referring to is procedural due
17   process, whereas the right to begin with, the --
18   Mr. Mansur never had the right to present his case
19   and be heard, and that is substantive due process,
20   and by failing to appear, a person cannot waive their
21   right to substantive due process.
22             And, Your Honor, if -- if I may also
23   point out that there was an order -- just let me
24   go back in history -- in March 23, 1999, the
25   Brazilian Central Bank issued a communication,

1    Number 006663, which declared the liquidation of

2    Bank Crefisul, S.A., in which Mr. Mansur had an

3    interest, that communication froze all of

4    Mr. Mansur's assets.  So all of his assets had

5    been frozen since 1999.

6           THE COURT:  I mean, I read that, I didn't

7    know what to make of it.  Did that preclude him from

8    filing an appeal --

9           MS. HARTLEY:  Your Honor, that is part --

10           THE COURT:  -- or you're arguing that he

11    couldn't have ---

12           MS. HARTLEY:  -- of the reason why the

13    appeal wasn't filed.

14           THE COURT:  He couldn't afford to because

15    his assets were frozen or he chose not to because,

16    what the hell, my assets are already frozen, so why

17    should I appeal?

18           I -- I didn't really understand what

19    the argument was.

20           MS. HARTLEY:  Well, I believe it's a,

21    perhaps, a combination of both, Your Honor, and even

22    Brazil recognized that their procedures do not afford

23    parties the due process rights that they're entitled

24    to.

25           As we point out in our papers, the --

Page 35

```
 1   let's see, Brazil enacted a new civil procedure
 2   code in March of 2015.  It's Law Number
 3   13.105\2015.
 4             THE COURT:  Retroactive?
 5             MS. HARTLEY:  Not that I'm aware of, Your
 6   Honor.
 7             THE COURT:  So if --
 8             MS. HARTLEY:  I don't ---
 9             THE COURT:  -- there was an argument --
10             MS. HARTLEY:  They might ---
11             THE COURT:  -- that -- that it should be
12   applied, wouldn't you have to go back to Brazil to
13   seek relief and say to the Bankruptcy Court there,
14   look -- look what you did, the Congress, if that's
15   what it is called, has now said our old procedures
16   weren't sufficient, we think there should be evidence
17   presented, and not allow this relief ex parte?
18             MS. HARTLEY:  But if Brazil itself
19   recognized its procedures did not afford parties --
20             THE COURT:  But -- but -- but wouldn't it
21   then be ---
22             MS. HARTLEY:  -- due process ---
23             THE COURT:  Then wouldn't it be up to
24   Brazil to undo the order based on this --
25             MS. HARTLEY:  Yes, but there's enough
```

1    before --

2              THE COURT:  -- later concept of what's

3    fair?

4              MS. HARTLEY:  -- this Court that the Court

5    shouldn't recognize it.  The Court shouldn't

6    recognize the order, otherwise it flies in the face

7    of due process, Your Honor, which is key.

8              I mean, it's in our U.S. Constitution.

9    It's one of, you know, the rights that our laws

10   stand by, and -- and I believe, you know, that

11   the record shows that he didn't -- the record

12   shows -- there's several orders that indicate

13   there's been no evidence, there's been no

14   testimony, there's been no -- nothing proven,

15   even if Mr. Mansur didn't appeal and didn't

16   object, Mr. Braga never put on his case.

17             THE COURT:  You didn't -- you don't dispute

18   service, right, of the veil piercing order or the

19   second order?

20             MS. HARTLEY:  No, no.

21             THE COURT:  Okay, and you don't dispute

22   that if he filed an appeal, he could have presented

23   evidence and argument to seek to set aside the veil

24   piecing order?

25             MS. HARTLEY:  It would be our

1   understanding, yes, Your Honor.

2           THE COURT:  Okay.  All right.  Well, we'll

3   hear some further argument, but let's get the

4   evidence because we're dealing with multiple issues.

5           I'd just point out to you in case you

6   want to look back at it, that Petroforte at --

7           MS. HARTLEY:  But, Your Honor ---

8           THE COURT:  -- 542 B.R. at 908 -- and --

9   and I realize the distinctions on what happened in

10  Petroforte, but each case has its own facts, but at

11  908 I cited to the OAS decision, which is -- I

12  thought I copied it -- In Re: OAS, S.A., 533

13  Bankruptcy Reporter 83, a Judge Bernstein decision,

14  bankruptcy, Southern District of New York, 2015, and

15  in discussing that, I quoted from OAS and said, the

16  U.S. Bankruptcy Court in OAS found that, quote, "due

17  process is satisfied because these ex parte

18  proceedings and orders are subject to ex post review,

19  just as the consolidation order has been subject to

20  ex post review."

21          So I'm having trouble with the concept

22  that if you can obtain -- you can present

23  evidence to set aside an order, that the fact

24  that it can be entered ex parte alone is so --

25          MS. HARTLEY:  But ---

1           THE COURT:  -- abhorrent to our principles

2    of due process, that it would be manifestly contrary

3    to U.S. policy.

4           MS. HARTLEY:  Your Honor, in Petroforte,

5    Your Honor relied on the fact that it was appealed,

6    that the parties did have a right to present their

7    case, and that the appellate court made specific

8    findings of wrongdoing, which supported the veil

9    piercing.

10          Those findings to date still have not

11   been proven in any -- whether -- whether to

12   Mr. Mansur, whether the reverse veil piercing, to

13   anyone, and it's noted in the orders, which I can

14   refer to that are in evidence, as well as in a

15   document that we intend to introduce.

16          THE COURT:  All right.  Well, we'll --

17   we'll -- I'll hear argument.

18          There's no question that the facts in

19   Petroforte were different, in that there was an

20   appeal and there were specific findings of -- of

21   wrongdoing against, I think it was Ms. Rabello

22   and Secure -- Securinvest.

23          All right.  Anyway, that's taken a lot

24   of time on the introduction, but let's go back

25   then to Ms. Hauser and let's get the record

```
 1   established in terms of the -- both the
 2   injunctive relief and the recognition issues.
 3            Okay.  Did you want to call Dr. Braga
 4   or ---
 5            MS. HAUSER:  Yes, yes.
 6            THE COURT:  Okay.
 7            MS. HAUSER:  The petitioner calls
 8   Dr. Afonso Henrique Alves Braga.  We also have an
 9   interpreter here today for Dr. Braga.
10            THE COURT:  Okay.  Then -- Elaine knows how
11   to do it.  I guess we swear in both of them or the
12   in -- swear in the interpreter and he swears in
13   the --
14            MS. HAUSER:  Yes, I believe so.
15            THE COURT:  -- I don't know.  So who's ---
16            MS. HAUSER:  Portuguese.
17            UNIDENTIFIED SPEAKER:  I'm the interpreter,
18   sire.
19            THE COURT:  Okay.  All right.  So let's get
20   your name first.
21            ECRO:  Raise your hand, please.
22            MS. HAUSER:  Do you want a chair?
23            ECRO:  Do you solemnly swear or affirm that
24   you will fully interpret from Portuguese into English
25   and from English into Portuguese the proceedings
```

1    before the Court in an accurate manner to your best

2    skill and knowledge?

3                    INTERPRETER:  I do.

4                    ECRO:  (Inaudible.)

5                    THE COURT:  Now, you translate the swearing

6    in of Dr. Braga, please.

7                    INTERPRETER:  Should I do it or will you do

8    it?

9                    ECRO:  I'll do it.

10                   THE COURT:  I don't think Elaine is going

11   to swear him in in Portuguese --

12                   ECRO:  No.

13                   THE COURT:  -- so if you can translate --

14                   INTERPRETER:  Yeah, you should (inaudible).

15                   THE COURT:  -- the oath.

16                   ECRO:  Do you solemnly swear or affirm that

17   the testimony you're about to give before this -- in

18   this case now before the Court, will be the truth,

19   the whole truth and nothing but the truth under the

20   penalty of perjury?

21                   THE WITNESS:  Yes.

22                   THE COURT:  Okay.

23                   ECRO:  Please be seated.

24                   THE COURT:  Okay.  Logistic, we really want

25   to have a microphone on the interpreter not on

1    Dr. Braga.  If our -- that microphone works and then,

2    Elaine, could -- could the one that's in front of

3    Dr. Braga be turned off or is that one not a switch

4    on/switch off.

5              ECRO:  I don't think it is.

6              THE COURT:  Or just move it -- move it a

7    little further away from him because we just need the

8    interpreter to hear him and then I just need to hear

9    the interpreter.

10             Okay.  Let's give it a go.

11             MS. HAUSER:  Your Honor, may I approach the

12   witness and hand him a binder of these exhibits, as

13   well?

14             THE COURT:  Yes, and if I didn't say it

15   earlier, based on the stipulations announced on the

16   record, Exhibits 1, 2, 4, 9 and 11 are admitted into

17   evidence and need no further testimony for purposes

18   of admissibility.

19             (Thereupon, Plaintiff's Exhibits 1, 2,

20   4, 9 and 11 were admitted into Evidence.)

21             MS. HAUSER:  Thank you, Your Honor.

22                     DIRECT EXAMINATION

23   BY MS. HAUSER:

24        Q    Good morning, Dr. Braga.

25        A    Good morning.

Page 42

1      Q     What is your occupation?

2      A     I am an attorney.  Since 2000 I've worked

3   as an administrator of the (inaudible).

4      Q     Could you please clarify what you mean by

5   an administrator of -- and I have to apologize, I did

6   not catch that last word?

7      A     I was named by the judge for bankruptcy and

8   recuperation of companies, basically to inventory the

9   assets and to pay off the debts or the liabilities of

10  the bankrupt companies.

11     Q     How many times have you been appointed as

12  an administrator or a trustee in Brazilian

13  bankruptcies?

14     A     Seventy to 100 bankruptcies.

15     Q     Are you familiar with the company

16  Mappin Lojas?

17     A     Yes.

18     Q     What is it?

19     A     Mappin Lojas was a company of department

20  stores, perhaps the largest in Brazil until stopped

21  working.

22     Q     And who was the majority shareholder of

23  Mappin Lojas?

24     A     Ricardo Mansur.

25     Q     Are you familiar with the company Mappin

Page 43

1    Telecomunicacoes?

2         A    Yes.

3         Q    Are you familiar with the company

4    Casa Anglo?

5         A    Yes.

6         Q    What is the relationship among these

7    entities, if any?

8         A    There -- there exists a stockholder

9    relationship among them and financial connections

10   among them.

11        Q    Are you aware that Mappin Lojas, Mappin

12   Telecomunicacoes, and Casa Anglo are in bankruptcy in

13   Brazil?

14        A    Yes.

15        Q    What is your role in the Mappin Lojas'

16   bankruptcy?

17        A    I was appointed by the Brazilian judge to

18   catalogue and list their assets, which had been sent

19   abroad and, therefore, involving a number of

20   different foreign jurisdictions, and then after this

21   inventory had been completed, to pay off the debtors,

22   the creditors.

23        Q    Please turn to what has been marked as

24   Exhibit Number 2 in the binder.

25             Do you recognize this document?

Page 44

1      A    Yes, I do.

2      Q    What is it?

3      A    This is a decision by the Judge who was

4  overseeing the bankruptcy process in Brazil,

5  authorizing me to go to the various countries to

6  visit -- to check on the assets in different

7  jurisdictions.

8      Q    Did there come a time when you commenced an

9  ancillary bankruptcy proceeding in London?

10     A    Yes.

11     Q    Why did you commence this ancillary

12  bankruptcy in London?

13     A    Because according to my research in Brazil,

14  there were a number of different assets that were

15  being controlled and manipulated by Mr. Mansur in

16  London.

17     Q    What types of assets were these?

18     A    Initially there were two residences of a

19  very, very high value.  There was also word from

20  her -- his ex-wife that there were airplanes there,

21  and also a rural property near London.

22     Q    How did the London court rule on your

23  petition to have the Mappin Lojas bankruptcy

24  recognized in the UK?

25     A    The Court recognized my authority as the

Page 45

1    administrator of the bankruptcy, and it began a

2    process of ancillary bankruptcy in that jurisdiction.

3    The Court gave me the same powers that I have in

4    Brazil, specifically to do an inventory and a listing

5    of these assets.

6         Q    What did your investigation reveal, if

7    anything, about Mansur's actions after the London

8    court recognized the Mappin Lojas bankruptcy?

9         A    There was indication that he sold a number

10   of the assets and then migrated to the United States.

11        Q    Are you aware of any assets of the

12   Mappin Lojas' estate being located in Miami?

13        A    Yes, I made a deposit in the name of the

14   bankruptcy assets here in Miami.

15        Q    Aside from the funds that the Mappin Lojas'

16   estate deposited in Miami, are you aware of any other

17   assets of the Mappin estate being located here?

18             THE COURT:  Could -- could I just get a

19   clarification?  When you say, "Mappin estate," are

20   you including Mansur in that question?

21             MS. HAUSER:  Yes, Your Honor.

22             THE COURT:  Okay, because ---

23             THE WITNESS:  From prior research I was

24   able to determine that there are transactions,

25   financial transactions, here on the part of Mansur

1    and also assets held here.

2    BY MS. HAUSER:

3         Q    Please turn to what has been marked as

4    Plaintiff's Exhibit Number 4.

5              Do you recognize this document?

6         A    Yes.

7         Q    What is it?

8         A    It's a decision by the bankruptcy judge in

9    Brazil, which they -- which cancels recognition of

10   the legal status of the companies involved in Brazil,

11   to give personal responsibility to Mr. Mansur of the

12   debts of the -- of the estate, and also to be

13   recognized the legal status, to -- yeah, to -- to

14   make responsible or to reach the companies under

15   Mr. Mansur in Brazil.

16             THE COURT:  Could I just interrupt?

17             Dr. Braga, you were also the trustee in

18   Petroforte; correct?

19             THE WITNESS:  Yes.

20             THE COURT:  In Petroforte we referred to

21   the orders that brought Ms. Rabello and Securinvest

22   into the estate as extension orders.

23             If you could translate just to make

24   sure.

25             INTERPRETER:  Would you repeat that,

1    please, sir, with the names so I can ---

2              THE COURT:  In Petroforte, the Brazilian

3    orders that brought Ms. Rabello and other entities

4    into the Petroforte estate as debtors were called

5    extension orders; correct?

6              THE WITNESS:  Yes.

7              THE COURT:  And they essentially became

8    debtors, we treated them as debtors for purposes of

9    the Chapter 15 in Petroforte; correct?

10             THE WITNESS:  You mean, if they were

11   considered debtors?

12             THE COURT:  Yeah, they -- they were

13   considered debtors such that the assets of

14   Ms. Rabello and Securinvest were considered to be

15   assets of the Petroforte estate.

16             THE WITNESS:  Yeah, I'm not sure if this

17   was the question, but, yes, Katia -- the assets of

18   Katia Rabello and Securinvest were considered to be

19   part of the (inaudible) of the estate, the bankruptcy

20   estate, to answer for the liabilities of the

21   bankruptcy estate.

22             THE COURT:  Right.  So that finally, I

23   apologize for the long intro, but that leads to my

24   question here, is the -- is it your understanding

25   that the veil piercing order is of similar effect,

Page 48

1    that is, the assets of Mr. Mansur and the entities

2    described in the veil piercing order, essentially

3    became liable for the debts of this estate?

4               THE WITNESS:  (No response in English.)

5               THE COURT:  Didn't understand -- you want

6    me to ---

7               INTERPRETER:  I'm sorry, yes, could you

8    repeat the question, he didn't get it?

9               THE WITNESS:  Are you -- are you asking

10   about the connection between Mappin and Petroforte?

11              THE COURT:  Not -- not -- I don't even want

12   to go there if there is one.

13              No, I'm asking -- let me try it this

14   way, I'm looking at Petroforte.  What was her

15   name -- so, what I'm asking from a -- under

16   Brazilian law, were the orders in Petroforte that

17   made Ms. Rabello's assets responsible for the

18   debts of Petroforte, is the veil piercing order

19   in this case, does it have the same legal effect?

20              In other words, is Mr. Mansur's assets

21   brought into these estates, the same way that

22   Ms. Rabello's assets were brought into

23   Petroforte?

24              Maybe that's too long to translate.

25              INTERPRETER:  You're going to need to break

 1   that up some because it's so complicated, but he says
 2   he understands.
 3               THE WITNESS:  The effect for Katia Rabello,
 4   which was to disconsider the legal status of the
 5   companies to make her personally responsible, the
 6   same process exactly occurred to make Mr. Mansur
 7   personally responsible by not recognizing, therefore,
 8   the legal status of the company.
 9               One thing is the responsibility, the
10   liability of the companies, and something else is
11   to pass on the liability for the bankruptcy to
12   other companies in the group.
13               THE COURT:  And what about to Mansur,
14   individually?
15               THE WITNESS:  What do you mean?
16               THE COURT:  Did the veil -- and maybe I
17   should stop.
18               Are you going to get into the second
19   order?
20               MS. HAUSER:  Yes.
21               THE COURT:  So maybe that clarifies it.
22   All right.  I -- I was curious about Petroforte and
23   whether it was of similar effect, and I'm -- that --
24   that's been discussed, so I'm going to let you go
25   back to where you were.

Page 50

1              You were asking questions about the
2    veil piercing order.
3    BY MS. HAUSER:
4         Q     What affect did the veil piercing order
5    have on Mr. Mansur?
6         A     The immediate effect was his personal
7    liability for the debts of the estate of the -- the
8    bankruptcy estate of Mappin.
9         Q     What investigation, if any, did you conduct
10   prior to applying for this order?
11        A     This order here?
12        Q     Excuse me, the veil piercing order in
13   Brazil.
14        A     A number of different surveys were
15   conducted, such as documents from the Central Bank of
16   Brazil; also -- also decisions that were made in
17   lawsuits involving the companies in the group;
18   opinions issued by the prosecutor in other cases; the
19   actual guilty verdict brought against him, against
20   Mr. Mansur in this bankruptcy proceeding; and a
21   number of other surveys and research.
22        Q     What did your research ---
23              THE COURT:  Wait, I -- I need to follow up
24   on some of those descriptions.
25              What -- what are you referring to by

1    "guilty verdict".

2            THE WITNESS:  In the bankruptcy proceeding

3    there's two parts, there's a civil part which has to

4    do with the assets, and the second part is the

5    possible criminal action against those who were

6    responsible for the bankruptcy actions.

7            MS. HARTLEY:  Your Honor ---

8            THE COURT:  Hold on.  Did you have an

9    objection?

10           MS. HARTLEY:  I do, Your Honor, as to any

11   of the criminal part.  We don't believe it has any

12   relevance with regards to the veil piercing order.

13           THE COURT:  Let -- let me reserve on that.

14   Was -- was the veil -- the Court, in entering the

15   veil piercing order, or did the Court, in entering

16   the veil piercing order, rely on any criminal

17   proceedings, if you know?

18           I don't remember seeing that, but the

19   translation is sort of ---

20           THE WITNESS:  That's not specifically

21   written, but many things are involved, including lack

22   of documentation of the financial transactions.

23           THE COURT:  Okay.  All right.  Well, I'll

24   let the testimony stand in terms of his answer to his

25   investigation, but if it -- it doesn't appear that,

Page 52

1    at least the translation on Exhibit 4, makes any

2    reference to that.

3                Were you planning to go into that?

4                MS. HAUSER:  No, Your Honor.

5                THE COURT:  Okay.  All right.  So I'll

6    sustain the objection just for safety's sake.  Going

7    forward we won't seek any testimony regarding any

8    criminal investigations.

9    BY MS. HAUSER:

10        Q     What did your investigation uncover, if

11   anything, and this is the investigation you conducted

12   prior to filing for the veil piercing order, about

13   Mansur's standard of living after Mappin Lojas

14   entered bankruptcy?

15        A     You mean in Brazil?

16        Q     In Brazil or elsewhere.

17        A     Repeat the question, please.

18        Q     What did your investigation leading up to

19   the filing of this veil piercing order, reveal, if

20   anything, about Mansur's standard of living after

21   Mappin Lojas entered bankruptcy?

22        A     In the standard of living, there was no

23   change at all in Mr. Mansur.  On the contrary, his

24   activity with other companies in Brazil and outside

25   of Brazil continued the same.

1          Q    What did your investigation uncover, if

2    anything, about the types of homes that Mansur was

3    living in?

4                MS. HARTLEY:  Objection, Your Honor --

5                THE COURT:  Hold on.

6                MS. HARTLEY:  -- to this line of

7    questioning.

8                They're trying to, I guess, go to the

9    investigation that led to the veil piercing

10   order.  There was never a trial on the veil

11   piercing order, and I don't know if they're

12   trying to establish things now that weren't

13   established in Brazil.

14               THE COURT:  Overruled.  I think it's

15   relevant to determine what formed Dr. Braga's opinion

16   to seek the order, and then it would be of greater

17   relevance, obviously, what the Court relied on in --

18   in -- in issuing the order, but I'll allow that, the

19   question.

20               So if you want to repeat it, it may be

21   easier for the translater.

22   BY MS. HAUSER:

23         Q    What did your investigation uncover, if

24   anything, about how Mansur was living personally in

25   Brazil?

Page 54

1      A    One of the things that came out right away

2    was the style of life that he maintained in London.

3    Besides being proven in the research, it was also

4    well known by everybody.

5               THE COURT:  Let me try to understand that.

6    What -- what timeframe are we in now?  Are we now in

7    the period of time after the veil piercing order or

8    leading up to it?

9               MS. HAUSER:  I was inquiring about the

10   period of time before he filed the petition for the

11   veil piercing order.

12              THE COURT:  Okay.  London would have been

13   after; correct?

14              THE WITNESS:  No, London was before that,

15   but right after the bankruptcy he seemed to have fled

16   to London not to be -- to have his -- to be found.

17              THE COURT:  Before the veil piercing order?

18              THE WITNESS:  Yes, before.

19              THE COURT:  Okay.

20   BY MS. HAUSER:

21      Q    What did your investigation uncover, if

22   anything, about how Mansur's lifestyle was being

23   funded?

24      A    His expenses -- his expenditures were

25   always very high.  Later he was working in the city

1   of Hebrion Preto (phonetic), which is a city in

2   Sao Paulo state, operating a sugar processing plant

3   there, paying rent of about 35,000 reals or $10,000

4   to rent a place to stay in that city, and putting

5   people in these companies to carry out their

6   transactions.

7        Q    What did your investigation reveal, if

8   anything, about who controlled these companies?

9        A    They were always controlled by Mr. Mansur,

10  but never directly, he had people representing him in

11  the companies.

12       Q    What evidence was submitted to the

13  Brazilian court, along with your application for this

14  veil piercing order?

15       A    All of the documents that I mentioned, for

16  example, from the Central Bank; from the prosecutor's

17  office; and in this petition that I submitted, which

18  is a very long one, there exists a big description of

19  a chain of companies and people, all interrelated,

20  some are partners in others.

21            But this -- they're always interconnected,

22  and he officially is the legal representative, the

23  attorney of these companies, and that's been -- that

24  is legally listed, it's in the courts.

25            THE COURT:  So there were -- there were

1   documents presented linking him to the various

2   companies that were the subject of the veil piercing

3   order?

4            THE WITNESS:  The connection is not

5   official, it's not in the commercial registry, but

6   there are powers of attorney registered indicating

7   that he is the legal representative of the companies.

8   There is a company called Sandy Hill, he used the

9   checks -- he used checks from that company to make

10  personal expenditures.

11           THE COURT:  I -- hold on, I was asking you

12  a more general question, but before I do, Ms. --

13  Ms. Hartley.

14           MS. HARTLEY:  Your Honor, I just want to

15  object.  Not one fact -- or I don't want to say it's

16  fact, but allegation that Mr. Braga is testifying to

17  now, has been determined by the Court in Brazil.

18           I understand the Court wants to inquire

19  as to what he relied on or why he even sought the

20  veil piercing order, but there has been no

21  findings as to any of this, and would at some

22  point possibly move to strike this information

23  and this Court shouldn't make such findings.

24           THE COURT:  Yeah, well, I'm not -- I'm not

25  taking this testimony to necessarily make findings,

1    at least not at this point.  The Brazilian court
2    entered the order.
3                I'm just trying to determine, as
4    Ms. Hauser is through the testimony, what he knew
5    when he applied for it, and what -- what he
6    presented in order to obtain the order.
7                So at this point I'm going to overrule
8    the objection to this line of questioning.
9                Let me go back and just restate my
10   question.  I wasn't asking specifically about
11   different corporations, but just generally, did
12   you present evidence to the Court that these
13   various companies were owned or controlled by
14   Mr. Mansur?
15               THE WITNESS:  Yes, yes.
16               THE COURT:  Okay.  All right.
17   BY MS. HAUSER:
18        Q    Do you have examples from your
19   investigation of the types of people who were running
20   these companies for Mansur?
21        A    It's well known that the owners of the
22   companies were running them, one is a personal
23   trainer, a gardener, a horse trainer, and it's well
24   known that these people don't have the financial
25   wherewithal to run the companies that they were

Page 58

1    listed as owners of.

2         Q    What notice, if any, was provided to

3    Mr. Mansur of this August 6, 2011 veil piercing

4    order?

5         A    2000 what?

6         Q    The August 6, 2011 veil piercing order.

7         A    What -- what notifications did he receive?

8         Q    What service, legal service?

9         A    Yes, there was notice printed or published

10   in the official newspaper of this order, and an

11   attorney was set for Mr. Mansur in this process.

12        Q    When, if ever, has Mr. Mansur challenged

13   the sufficiency of notice that he received of the

14   veil piercing order?

15        A    He did not respond.

16             THE COURT:  I think it's been stipulated

17   today that he was served.  Did I -- I think I heard

18   that.

19             MS. HARTLEY:  Their process -- I mean, they

20   don't serve like we do in the U.S. Your Honor.

21             THE COURT:  Right, but you're not --

22             MS. HARTLEY:  They published ---

23             THE COURT:  -- disputing that he had notice

24   of the veil piercing order?

25             MS. HARTLEY:  No, no.

Page 59

1          THE COURT:  Okay.  Okay.  Then I don't need

2    really testimony on the details of how he was served.

3    BY MS. HAUSER:

4          Q    Who, if anyone, has appealed the veil

5    piercing order?

6          A    The companies asked for an appeal, the

7    companies that I had sought to have their legal

8    status as companies disconsidered.

9          Q    When did Mansur file an appeal of the veil

10   piercing order?

11         A    He didn't do any -- any appeal, but the

12   only thing he did is when I went to fulfill this

13   order, he objected to the blocking of his ownership,

14   his shareholder -- his share holdings in other

15   companies.

16         Q    Okay, and we'll get to that in a little

17   bit.

18              Please turn to Tab 8 in your binder.  This

19   has been marked as Plaintiff's Exhibit Number 8 or

20   marked for identification, rather.

21              Do you recognize this document?

22         A    Yes.

23         Q    What is it?

24         A    It's a request on my part to the Brazilian

25   judge to certify that Mr. Mansur is personally

Page 60

1  liable.

2       Q    Did you prepare this document?

3       A    Yes.

4       Q    Did you file this document with the

5  Brazilian court?

6       A    Yes.

7            MS. HAUSER:  At this time, Your Honor,

8  petitioner moves to have this document admitted into

9  evidence.

10            THE COURT:  Ms. Hartley?

11            MS. HARTLEY:  Oh.  No objection --

12            THE COURT:  If you spoke, I didn't hear

13  you.

14            MS. HARTLEY:  -- Your Honor.  Sorry.

15            THE COURT:  Are you objecting or not

16  objecting to Exhibit 8?

17            MS. HARTLEY:  Not objecting, Your Honor.

18            THE COURT:  Okay.  Well, Exhibit 8 will be

19  admitted into evidence.

20            (Thereupon, Plaintiff's Exhibit Number

21  8 was admitted into Evidence.)

22  BY MS. HAUSER:

23       Q    Why did you file this application?

24       A    First of all, I had to support the

25  disconsideration or the failure to observe or the not

1    observing the legal status of the companies on a

2    number of different bases, and normally when a

3    certain time goes by without an appeal being filed,

4    then the Court will declare that the time has passed.

5         Q    Please turn to Plaintiff's Exhibit

6    Number 9.  Do you recognize this document?

7         A    Yes.

8         Q    What is it?

9         A    It's a decision on the part of the

10   bankruptcy judge, this is asking him to certify this

11   document or the -- the certification that I

12   mentioned, and if you will permit me to read?

13        Q    Sure.

14        A    The decision did annul the recognition of

15   the legal status of certain companies and as a

16   result, it reached the wealth of Mr. Ricardo Mansur

17   covered by the decision and -- and expressly as the

18   bankruptcy and whose personal property should answer

19   to the debts of the bankruptcy estates.

20             THE COURT:  Okay.  I would note document --

21   Exhibit 9 is in evidence and the translation is

22   basically the same as our translator provided.

23             It says -- it says that the decision, I

24   guess referring to the earlier decision, reached

25   the assets of Ricardo Mansur, including expressly

Page 62

1    as bankruptcy party, and whose personal assets

2    are liable for the debts of the bankruptcy

3    estate.

4              I wanted just to clarify, now that

5    you've introduced Exhibit 8, because Exhibit 8,

6    the application, is dated November 24, 2014, and

7    in the declaration, Paragraph 26, it refers to an

8    application filed on December 16, 2014, which

9    from the description sounds like the same

10   application.

11             MS. HAUSER:  It is, Your Honor.  I think

12   that was a typo in the declaration.

13             THE COURT:  Okay.  All right.  I don't --

14   I'm not finding that to be material, I just wanted to

15   make sure we weren't talking about two different

16   applications.

17             So the application in Declaration

18   Paragraph 26, is, in fact, Exhibit 8?

19             MS. HAUSER:  Yes.

20   BY MS. HAUSER:

21       Q    Dr. Braga, could you please confirm that

22   the -- this is the -- Exhibit 8 is the application

23   that led to the -- the order --

24             THE COURT:  Exhibit 9.

25   BY MS. HAUSER:

1      Q      -- on Exhibit 9?

2      A      You mean the decision expressed in -- in

3   Exhibit 9?

4      Q      Yes.

5      A      Yes.

6      Q      Could you please turn to Plaintiff's

7   Exhibit 11?

8             Do you recognize this document?

9      A      Yes.

10     Q      What is this?

11     A      It's a decision by the appellate court in

12  Brazil of a -- of an objection entered by Mr. Mansur

13  against the blockage of stock that he has in a number

14  of companies.

15     Q      How is the order that Mr. Mansur was

16  appealing here, similar or different to the veil

17  piercing order?

18     A      In one thing, he is made liable.  Here he's

19  objecting to the endorsement of the veil piercing

20  order, which had the result of blocking his -- his

21  stock.

22     Q      To clarify, this appeal was of which order?

23     A      There was the order not to consider the

24  legal status of the companies.  In order to enforce

25  that order, I had to come in with a petition to block

Page 64

1    his stock in the companies, and so this, he is now

2    having an appeal of the order that I asked for that

3    would block his stock, but not against his being

4    called liable.

5        Q    Did Mr. Mansur appeal this decision?

6        A    Yes, he came in with a special appeal,

7    which was denied.

8        Q    When, if ever, has any Brazilian court

9    entered a stay or suspended the effects of the veil

10   piercing order as to Mr. Mansur?

11       A    I'm sorry, I didn't understand the

12   question.  When ---

13       Q    When, if ever, has a Brazilian court

14   entered a stay or suspended the effects of -- of the

15   veil piercing order as to Mr. Mansur?

16       A    It has not done that, it has not suspended.

17       Q    Would you please turn to what has been

18   marked as -- for identification as Plaintiff's

19   Exhibit Number 3?

20            INTERPRETER:  With clarification you said?

21            MS. HAUSER:  Marked for identification.

22            INTERPRETER:  Identification.

23   BY MS. HAUSER:

24       Q    Do you recognize this document?

25       A    Yes.

Page 65

1      Q     What is it?

2      A     This is the certificate that I requested

3   where it is set, and if you will allow me to read the

4   important parts?

5      Q     Actually, before we get there for just a

6   moment, was this certificate issued by a court in

7   Brazil?

8      A     Yes, it's for the judge who was overseeing

9   the bankruptcy.

10            MS. HAUSER:  Your Honor, at this time,

11   petitioner would move to have this exhibit admitted

12   into evidence, Exhibit Number 3?

13            THE COURT:  Ms. Hartley?

14            MS. HARTLEY:  Your Honor, we would just

15   object.

16            THE COURT:  Get a little closer to that

17   microphone if you're going to ---

18            MS. HARTLEY:  Your Honor, we would object.

19   It's not an order, it doesn't cite to any orders.

20   Other certifications that have been entered in this

21   proceeding were reference orders, and, in fact, it

22   contradicts orders that are in evidence and that are

23   attached as a declaration.

24            THE COURT:  This wasn't ---

25            MS. HARTLEY:  We don't understand the

1    purpose, no one got notice of why he was requesting

2    this certification.  It clearly was requested after

3    we filed our response because the -- the orders that

4    are attached to the declaration did not indicate he

5    has the authority.  He now requests it in this

6    certificate.

7              THE COURT:  When was this -- let me reserve

8    for a moment and ask questions.

9              When -- when was this certificate

10   requested?

11             THE WITNESS:  I don't know if it was this

12   week or last week.

13             THE COURT:  And Ms. Hartley, when was it

14   first disclosed to you?

15             MS. HARTLEY:  I believe yesterday --

16             THE COURT:  When did you get a copy --

17             MS. HARTLEY:  -- possibly Monday --

18             THE COURT:  -- today, yesterday?

19             MS. HARTLEY:  -- I apologize, we received

20   it.

21             THE COURT:  Okay.

22             MS. HARTLEY:  And it's December 12th, Your

23   Honor.

24             Your Honor, they clearly had more than

25   a month to prepare for this, plus they've been

1    preparing for years to reach the U.S.

2              If they needed the authority, they

3    could have requested it.  It's not in any of the

4    orders that are attached to his declaration and I

5    just ---

6              THE COURT:  Yeah, I'm at a bit of a loss

7    because I don't want to read it and then not admit

8    it, but I don't know what it is.

9              MS. HAUSER:  If I may -- if I may?

10             THE COURT:  Response.

11             MS. HAUSER:  This is not an order granting

12   him authority.  This is a certificate from the

13   Brazilian court confirming that he's had the

14   authority.

15             THE COURT:  Based on -- but without

16   reference to orders?

17             MS. HAUSER:  It's referenced to what has

18   been entered to the Court.

19             MS. HARTLEY:  I'm sorry, what?

20             MS. HAUSER:  If you'd give me one moment.

21   It's from the clerk of court saying that he's had

22   this authority.

23             MS. HARTLEY:  Yes, but other certifications

24   established in this proceeding, and that have been

25   part of the record, reference orders.  This doesn't

1   reference any orders and the order in the -- orders

2   in the declaration that Mr. Braga is relying on to

3   give him the authorization to seize and sell the

4   stock, don't say what they say, and so now he's

5   trying to obtain something to get the relief from

6   this Court that he hasn't been able to in Brazil,

7   Your Honor.

8              THE COURT:  Okay.  Did you want to add

9   anything based on what was whispered in your ear or

10  no?

11             MS. HAUSER:  Oh, I guess we were -- well,

12  is the challenge authenticity or -- I mean, it's from

13  the Brazilian court, and so it's confirming his

14  authority.

15             We would also say, Your Honor, that

16  under Chapter 15, that there does not actually

17  need to be a certificate from the Brazilian court

18  granting this type of authority, so in this case

19  this is actually just superfluous saying that he

20  does have the --

21             THE COURT:  Yeah.  Well, I'm going -- I'm

22  going to --

23             MS. HAUSER:  -- authority from the Court.

24             THE COURT:  -- sustain the objection and

25  determine authority issues as -- as needed based on

Page 69

1   orders of record, not a certificate that was obtained

2   for purposes of -- of this proceeding, recently

3   obtained.  So I'll sustain the objection.

4          Let me just get a sense of timing and

5   tell you what my schedule is.  When do we start,

6   1:30; right?  We can order in, I guess.

7          What do you -- first of all, this will

8   be your only witness, I assume?

9          MS. HAUSER:  Yes.

10          THE COURT:  Okay.  How much more do you

11   think you have?

12          MS. HAUSER:  Maybe 15 minutes, 10 minutes.

13          THE COURT:  Okay, and then, Ms. Hartley,

14   you have cross, I assume, but are you calling any

15   witnesses?

16          MS. HARTLEY:  No, Your Honor, just

17   cross-examination.

18          THE COURT:  All right.  So I have -- I have

19   court starting at 1:30.  As I mentioned, I think when

20   we set this, it may be, unless there's conflicts,

21   that we -- we may have to continue after I finish my

22   1:30 and two o'clock matters, but I'll probably just

23   order in, so we can finish at least the testimony and

24   perhaps finish everything before my afternoon

25   calendar.

```
 1                But since I've already interrupted,
 2     let's take a five-minute break.
 3                THE MARSHAL:  All rise.
 4                THE COURT:  Don't discuss your testimony
 5     with anybody, please, during the break.
 6                (Thereupon, a brief recess was taken,
 7     after which the following proceedings were had:)
 8                THE COURT:  Okay.  Have a seat.  Thanks.
 9                All right.  My wiring technician and
10     CSO will now rewire the translator.
11                Okay.  Ms. Hauser, ready to proceed?
12                MS. HAUSER:  Yes, Your Honor.
13                THE COURT:  Okay.
14                MS. HAUSER:  May I approach the witness,
15     Your Honor, and hand him an exhibit?  This is
16     Defendant's Exhibit Number 6 that was marked for
17     identification.
18                Oh, sorry, this is the exhibit that's
19     been marked for identification as Defendant's
20     Exhibit Number 6.
21                MS. HARTLEY:  Okay.
22                MS. HAUSER:  I imagine they have no
23     objection.
24                THE COURT:  Yes.  The answer is yes now
25     that I know what it is.  Okay.
```

1          MS. HAUSER:  Do you have a copy, Your

2    Honor?

3          THE COURT:  I think so.

4          MS. HAUSER:  Did you give him a -- okay,

5    great.

6          THE COURT:  Yes.

7    BY MS. HAUSER:

8          Q    Dr. Braga, are you familiar with this

9    document?

10         A    Yes.

11         Q    What is this?

12         A    This is an appeal from a company where I

13   asked for extension of bankruptcy.

14         Q    What is the name of the company?

15         A    Society.

16         Q    Does this appeal have any affect on the

17   veil piercing order as to Mr. Mansur?

18         A    No, this is different because this here is

19   against -- asking for extension against this company

20   and for Mansur it's for his personal liability.

21         Q    Okay.  Let's talk about the -- the Florida

22   LLCs that are defendants in this matter.

23              What behavior by Mansur, if any, leads you

24   to believe that he would be using companies in Miami

25   to hold assets for his benefit?

Page 72

1        A    Because of the same activities, the same

2   conduct that he had in Brazil, that is first in

3   Sao Paulo, then in the interior of the state, and

4   then in London.

5        Q    And, Dr. Braga, if you could please turn to

6   what's been marked for identification as Plaintiff's

7   Exhibit Number 14 -- oh, sorry, 13?

8                INTERPRETER:  13 or 14?

9                MS. HAUSER:  13.

10               THE COURT:  This is not in evidence; right?

11               MS. HAUSER:  No, it's not.

12               THE COURT:  Okay.

13               MS. HAUSER:  Your Honor, as a housekeeping

14   matter, we have a records custodian affidavit from

15   Bank of America, and we would submit -- or would like

16   to move this into evidence as business records

17   under -- excuse me -- 803.6, and we also provided

18   written notice to defendant's counsel yesterday

19   morning pursuant to Federal Rule of Evidence 902.11.

20               THE COURT:  Ms. Hartley.

21               MS. HARTLEY:  Your Honor, we would object

22   as to relevance.

23               The bank records are not of Mr. Mansur,

24   they're of the company, Society -- Society Retail

25   & Auction, LLC, a Florida LLC.  They're trying to

Page 73

1  establish that the debtors have property here.

2          This would not go to that, as Society

3  is not designated as a debtor, I don't know for

4  what purpose, other than unfair prejudice to

5  Mr. Mansur.

6          THE COURT:  Response.

7          MS. HAUSER:  Yes, Your Honor.

8          THE COURT:  Let me just clarify.  So your

9  objection is to relevance?

10         MS. HARTLEY:  Yes, Your Honor.

11         THE COURT:  Okay.

12         MS. HAUSER:  These bank records in

13  particular, the account that we provided records for

14  ending in 6499, is an account in the name of

15  defendant Society Retail & Auction, LLC.

16         If you turn to the signature card that

17  we included here, you will see that Mr. Mansur,

18  along with defendant ---

19         THE COURT:  Where am I looking now?

20         MS. HAUSER:  It is just past the first blue

21  tab.

22         THE COURT:  Okay.  Is -- is Society Retail

23  & Auction, LLC, is that one of our defendants?

24         MS. HAUSER:  Yes, it is, Your Honor.

25         THE COURT:  Okay.  I'll let the relevance

1    be explored further.  I don't want to get a full

2    argument on it now.  As it's a Bench trial, I'll

3    overrule the objection and allow Exhibit 13 to come

4    in and give it whatever weight I deem appropriate

5    once we get the evidence and argument in.

6            So you can refer to it now and ask him

7    questions.

8            MS. HAUSER:  Thank you, Your Honor.

9            (Thereupon, Plaintiff's Exhibit Number

10   13 was admitted into Evidence.)

11   BY MS. HAUSER:

12       Q    Dr. Braga, what evidence, if any, have you

13   uncovered that Mr. Mansur is using defendant, Society

14   Retail & Auction, LLC to hold assets for his benefit?

15       A    This company we have the financial

16   transactions for it.

17           THE COURT:  That doesn't tell me anything.

18           Hold on, is there an objection?

19           MS. HARTLEY:  Your Honor, I'm going to

20   object to the line of questioning.  We're not here to

21   pierce the corporate veil of Society.

22           THE COURT:  Well, there -- there is an

23   issue, though, of whether we're freezing the assets

24   of the LLCs.  You're objecting to that; correct?

25           MS. HARTLEY:  Yes, Your Honor.

1              THE COURT:  To me that's probably the

2    big -- I think that is the issue, other than -- I

3    don't say other than to take it lightly, but in the

4    adversary proceeding, the issue, if I grant

5    recognition, is going to be scope of relief, and I

6    don't think there's an issue of freezing his

7    ownership interest, right, from the defendants?

8              MS. HARTLEY:  If the Court recognizes the

9    main proceeding --

10             THE COURT:  Right.

11             MS. HARTLEY:  -- and the veil piercing

12   order --

13             THE COURT:  Yeah.  So then ---

14             MS. HARTLEY:  -- no, Your Honor.

15             THE COURT:  Then I thought there were two

16   layers, the third layer being actually taking control

17   of the assets, and Mr. Hollembeak said we're not

18   seeking that relief today, so I think we're down to a

19   dispute over whether the assets of the defendants,

20   besides Mansur, should be frozen in a preliminary

21   injunction.

22             So if this is going to -- this is not

23   to pierce the corporate veil, but may be relevant

24   to the remedy issues, so a long-winded preface to

25   overruling the objection.

1          Okay.  The question as phrased was:

2    What evidence that this LLC is holding assets or

3    did I ---

4              MS. HAUSER:  Yes, yes, Your Honor.

5              THE COURT:  Okay.  So what is there in this

6    document that I should be looking at or if it's in

7    evidence, I guess, Ms. Hauser, you can point me to

8    it, but ---

9              MS. HAUSER:  Yes, Your Honor.  I can

10   provide a proffer now or Mr. Hollembeak can also

11   discuss these during his argument.

12             What we're seeing here in these

13   records, payments -- well, each month between 40

14   and $70,000 is deposited into this account and is

15   dissipated throughout the course of the month.

16             The expenses that are coming out of

17   this account are going to car leases,

18   Mr. Mansur's landlord, direct TV, Atlantic

19   Broadband, these are personal expenses, not

20   expenses of a company.

21             THE COURT:  Well, yeah, I'm -- I'm

22   regretting in part that I'm asking you to walk me

23   through it because you can't -- I guess you could

24   point to something that is in the document, but

25   you're kind of testifying now that transactions or

1  payments out -- how do we know that they're for him,

2  for example?

3            What -- what are you referring to,

4  let -- let's do it that way.  Point me to what

5  you want me to look at in the document, and then

6  we'll see if there's competent testimony as to

7  what -- to tying those payments to Mansur.

8            MS. HAUSER:  Well, first, Your Honor, if we

9  look at the signature page, only Mr. Mansur and

10  defendant, Jose Santos, are signatories to this

11  account.

12            THE COURT:  Okay.

13            MS. HAUSER:  Mr. Santos has disclaimed any

14  interest or ownership in these entities.  We expect

15  to be ---

16            THE COURT:  Wait, where is that in

17  evidence?

18            MS. HAUSER:  We received notice from his

19  counsel yesterday, and we expect to be working out a

20  dismissal from this action if he does not contest ---

21            THE COURT:  Okay.  I won't consider that as

22  testimony at this point, other than I can take

23  judicial notice that he's not here.

24            All right.  So Mansur and Santos are

25  the signatories, and then you were, before I cut

1    you off because I thought you were getting into

2    your conclusions, which might not be supported by

3    the evidence itself, you said that, and I assume

4    this is -- this is pretty straightforward, that

5    there are deposits in and --

6              MS. HAUSER:  There are cash deposits ---

7              THE COURT:  -- checks or transfers out.

8              So what -- what is it in the transfers

9    out that would appear to be for Mansur's benefit,

10   and you can -- you can do it through testimony if

11   Dr. Braga has any more knowledge of these

12   transactions than are reflected in the document

13   itself?

14             MS. HAUSER:  We would just be pointing to

15   the same transactions in the accounts, Your Honor.

16             THE COURT:  But Like what, I mean?

17             MS. HAUSER:  So if we look at the October

18   1st through October 31st statement ---

19             THE COURT:  Wait, where is that?

20             MS. HAUSER:  That should be --

21             THE COURT:  Near the end?

22             MS. HAUSER:  -- likely toward the end.

23             THE COURT:  Okay.  These are checks.  Okay.

24   I think I'm -- I think I'm there.  This is

25   October 1st through October 31st --

Page 79

1            MS. HAUSER:  Yes, Page 4.

2            THE COURT:  -- 46,000 in deposits and

3    35,000 in checks, and 7,000 in other withdrawals.

4            MS. HAUSER:  Yes, Your Honor.

5            THE COURT:  Okay.

6            MS. HAUSER:  If you look at Page 4 of that

7    statement --

8            THE COURT:  Okay.

9            MS. HAUSER:  -- you see telephone payments

10   for Mr. Mansur on 10/7 --

11           THE COURT:  Okay.  All right.  Well, that's

12   fine, then.

13           MS. HAUSER:  -- Direct TV payments.

14           THE COURT:  It wasn't -- it wasn't your

15   testimony if it's something actually reflected in a

16   line item, then my comment was misplaced.

17           So at least this one you're showing, it

18   shows payment with an actual reference to

19   Mr. Mansur.

20           MS. HAUSER:  Correct.

21           THE COURT:  And then there's another one on

22   10/7, FPB credit card referencing Mansur.

23           And are there several other -- if we

24   look through the documents, several other

25   references to Mansur?

Page 80

1          MS. HAUSER:  Yes, Your Honor.  We see

2   Direct TV on this page on 10/20, and these are spread

3   throughout the documents.

4          THE COURT:  Okay.

5          MS. HARTLEY:  Your Honor --

6          THE COURT:  Yes.

7          MS. HARTLEY:  -- he is a principal of the

8   company.  There's nothing to reflect, although his

9   name is indicated, that the phone wasn't used for

10  business use or that any of these other items relate

11  to the business.

12         THE COURT:  TV?  Well, anyway, what

13  about -- well, what do we -- do we have documents,

14  other than the declaration itself that was relied on

15  in the TRO, that indicate his ownership interest in

16  any of these LLCs?

17         MS. HAUSER:  No, Your Honor.  We have that

18  he's a signatory on this account and what was filed

19  on Sunbiz.

20         THE COURT:  Sunbiz, is that in, is that

21  in ---

22         MS. HARTLEY:  No, Your Honor, that hasn't

23  been introduced into evidence.

24         THE COURT:  Okay.  Well, I'll -- I'll stop

25  for now and -- and let you go back to additional

1    questions.  I guess the documents in evidence, in

2    closing, which may -- we may not get to before we

3    need to break, we can -- you can refer to other

4    withdrawals or checks.

5              Okay.  So further questions for

6    Dr. Braga?

7              MS. HAUSER:  Yes, just a few, Your Honor.

8    BY MS. HAUSER:

9        Q    Dr. Braga, what is the approximately total

10   amount of unpaid claims in the Mappin bankruptcy?

11       A    You mean the amounts, dollar amounts?

12       Q    Yes, please.

13       A    I don't know if I understood your question,

14   but right now the debts of the estate reach around a

15   hundred million dollars or around 300 million

16   (inaudible).

17       Q    What prospects does the Mappin estate have

18   for further recovery in Brazil at this time?

19              INTERPRETER:  What are the prospects for

20   recovery?

21   BY MS. HAUSER:

22       Q    What prospects does the Mappin estate have

23   for further recovery in Brazil at this time?

24       A    The process is practically closed now

25   because there has been no more finding of assets.

1       Q    And what evidence have you uncovered to
2   date that Mr. Mansur is evading creditors in the
3   Mappin estate bankruptcy?
4            INTERPRETER:  That he's doing what to
5   creditors?
6            MS. HAUSER:  Evading.
7            INTERPRETER:  Evading.
8            MS. HARTLEY:  Objection, Your Honor.
9            THE COURT:  Hold on, wait.
10           MS. HARTLEY:  Again, I don't know how this
11  relates, I guess, to whether this should be a foreign
12  main proceeding or not.
13           THE COURT:  What's the -- what's the --
14  well, I -- I had my own clarification I was going to
15  seek about time -- timeframe, but why don't you try
16  it by a more specific question and then we'll see if
17  there's still a relevance objection.
18           INTERPRETER:  What was the question,
19  please?
20           MS. HAUSER:  Okay.
21  BY MS. HAUSER:
22       Q    Around the time that you filed for the veil
23  piercing order, what evidence did you have that
24  Mr. Mansur was evading creditors from the Mappin
25  bankruptcy?

1        A    There was evidence, for example, he was

2   moving from one country to another.  It was -- often

3   it was very hard to find him, personally.  Basically,

4   that's it.

5        Q    How would recovery against Mr. Mansur in

6   this Court affect the creditors of the Mappin Lojas

7   estate in Brazil?

8              THE COURT:  Hold on.

9              THE WITNESS:  Quite a lot, because in

10  Brazil if the finding of property has already come to

11  an end, anything that -- else we could find will add

12  to the ability to pay the creditors.

13             THE COURT:  Assuming -- assuming you find

14  and recover more than it's costing you to chase them;

15  right?  It -- it's more of a cynical comment.

16             I'm saying, it's costing lots of money

17  to pursue him, but if you -- if you recover more

18  than your expenses and legal fees, it's -- it's

19  certainly evident that that will benefit the

20  creditors.  Okay.

21             THE WITNESS:  Yes, I understand.

22             MS. HAUSER:  No further questions at this

23  time, Your Honor.

24             THE COURT:  Just -- just -- just to

25  clarify, the Exhibit 13 was just several months of

Page 84

1    account records from one account of one of the LLCs?

2              MS. HAUSER:  Yes, Your Honor.

3              THE COURT:  Okay.

4              MS. HAUSER:  There's also cash deposit

5    slips toward the end of the exhibit.

6              THE COURT:  Okay.  All right.

7    Cross-examination?

8              MS. HARTLEY:  Thank you, Your Honor.

9                   CROSS-EXAMINATION

10   BY MS. HARTLEY:

11        Q    Good afternoon, Mr. Braga.

12        A    Good afternoon.

13        Q    Mr. Braga, you testified that there was a

14   UK proceeding?

15        A    Yes.

16        Q    Was Mr. Mansur represented by counsel in

17   the UK proceeding?

18        A    I don't know if there was any involvement

19   of him in the process.

20        Q    Did anyone contest the establishment of

21   that proceeding in the UK?

22        A    I didn't receive any information from

23   attorneys about that.

24        Q    Was the UK proceeding under seal or

25   ex parte?

Page 85

1          INTERPRETER:  Ex parte you said?

2          MS. HARTLEY:  Yeah.

3          THE WITNESS:  The process was open without

4   being a secret of justice, but the other procedures

5   were.

6   BY MS. HARTLEY:

7       Q    If you would turn to Tab 2?  The order only

8   authorizes you to travel to countries for

9   investigation; isn't that correct?

10      A    I'm not sure, but the paper does say this

11  decision gives me permission to go out of the country

12  in order to enforce other orders that had already

13  been made.

14      Q    Under the translation of the order, it

15  states, quote, "I authorize the bankruptcy trustee to

16  travel to any countries as may be necessary for the

17  investigation."

18          There is no mention in the translation that

19  you have authority to enforce other orders.

20      A    No.

21      Q    You testified that you made a deposit in

22  the name of Mappin here in the United States.

23          How much was the deposit?

24      A    $1,000.

25      Q    If you would turn to Tab 8 and Tab 9,

1    your -- your petition and the order?

2              The order only entitled you to block stock;

3    correct?

4              THE COURT:  Did you mean block transfer of

5    stock, is that -- or what ---

6              MS. HARTLEY:  Well, it's to block the

7    shares, sort of to freeze, is how I understand it.

8              THE WITNESS:  It says -- the order says

9    that the property or the wealth of Mr. Mansur has to

10   answer for the creditors in the bankruptcy.

11   BY MS. HARTLEY:

12        Q    Pursuant to the order, you're not entitled

13   to seize or sell any of the shares, are you?

14        A    Not -- not by this one, no.

15        Q    And, in fact, you're not entitled to freeze

16   the assets of the non-debtor companies, are you?

17        A    That are not debtors?

18             THE COURT:  Which companies?  Are you

19   referring to the companies that were the subject of

20   the veil piercing order?

21             MS. HARTLEY:  Yes.

22             THE WITNESS:  Not in relation to those

23   companies, no.

24   BY MS. HARTLEY:

25        Q    Are any of the defendants named in the

Page 87

1    adversary proceeding here, except for Mr. Mansur,

2    parties to the veil piercing order?

3         A    No.

4         Q    If you would look at what has been marked

5    as Defendants' or Respondents' Exhibit 6, please?

6              THE COURT:  I don't think it's in the

7    notebook.  Do you want to hand him a copy?

8              MS. HARTLEY:  Oh.

9              THE COURT:  Ms. Hauser handed him one

10   earlier, but she may have taken it back.

11             MS. HARTLEY:  If -- may I approach?

12   BY MS. HARTLEY:

13        Q    If you'd turn to Page 7 of the order, the

14   appellate court found that the long report drawn up

15   by the receiver representing the assets at around

16   300 pages, to argue in favor of the petition for

17   inverse disregard of legal personalty, is with all

18   unilateral and in many places barely hints at a

19   diversion of funds; isn't that correct?

20             THE COURT:  You're -- you're reading

21   Page 7?

22             MS. HARTLEY:  Well, it's Page 7 of the

23   translation.

24             INTERPRETER:  Okay.  Where are we looking?

25             MS. HARTLEY:  Oh, I'm sorry.  Here's the

Page 88

1   part -- he may only have the English one, I don't
2   know.  I don't know if the pages are the same.
3              INTERPRETER:  Which text are you reading
4   from?
5              THE COURT:  Maybe the translator can find
6   the Portuguese paragraph that you're reading and so
7   he can read it in Portuguese --
8              MS. HARTLEY:  Oh.
9              THE COURT:  -- instead of retranslating it
10  back.
11             MS. HARTLEY:  Do you have another one in
12  Portuguese?
13             THE COURT:  Can't he read -- can we go back
14  a step?
15             First of all, I don't remember, was
16  this offered into evidence yet, with or without
17  objection?
18             MS. HAUSER:  We referenced it, we did not
19  offer it into evidence.
20             THE COURT:  Oh, you had -- you had --
21             MS. HARTLEY:  Oh, okay.
22             THE COURT:  -- reserved on it; right?
23  Okay.
24             MS. HARTLEY:  Okay.
25             THE COURT:  Can we just go back a step.

1   Has this been identified?  I don't remember from the

2   direct, other than he said it didn't relate to the

3   issues and you're going to tell me it does, I assume

4   so ---

5           MS. HARTLEY:  I thought it had, but I'll go

6   through it, Your Honor.

7           THE COURT:  What -- what is it?  Why don't

8   you --

9           MS. HARTLEY:  Yeah.

10          THE COURT:  -- proffer --

11          MS. HARTLEY:  Sure.

12          THE COURT:  -- and then if the other side

13  objects to the proffer we can ---

14  BY MS. HARTLEY:

15      Q    Mr. Braga, if you could look at what has

16  been marked as Exhibit 6?  Do you recognize this

17  document?  What is it?

18      A    It's a decision by the Court, that it

19  complained against one of the companies involved in

20  the disconsideration of its legal status.

21      Q    Okay.

22          THE COURT:  Was it one of the companies

23  named in the veil piercing or this is a different

24  company?

25          THE WITNESS:  This is one of those that was

Page 90

1   involved, yes.

2           THE COURT:  Okay, and this order, I think

3   you did say earlier, denied extension of the

4   bankruptcy to the assets of this company?

5           THE WITNESS:  Yes.  No, the decision had

6   been modified to open to the contrary.

7           THE COURT:  Okay.  I didn't understand

8   that, whether you're talking about a later decision

9   or this decision itself --

10          MS. HARTLEY:  No, if you look at ---

11          THE COURT:  -- denies extension of the

12  bankruptcy to the Society Tours --

13          MS. HARTLEY:  Denies the reverse ---

14          THE COURT:  -- Partisa Casos (phonetic)?

15          THE WITNESS:  Yes.

16  BY MS. HARTLEY:

17      Q    Mr. Braga, if you'd look at your

18  declaration, Paragraph 24 ---

19          THE COURT:  I'm sorry, was there an

20  objection Ms. ---

21          MS. HARTLEY:  Well, I haven't introduced

22  yet.

23          MS. HAUSER:  Right, that's why I was

24  standing up.

25          THE COURT:  Okay.

Page 91

1   BY MS. HARTLEY:

2       Q    If you look at -- I don't know if you have

3   it in front of you, but Paragraph 24 of your

4   declaration.

5       A    I'm not sure.

6       Q    Well, in Paragraph 24 of your declaration,

7   you state that various entities that were the subject

8   of the August 6, 2011 veil piercing order appealed;

9   is that correct?

10      A    Yes.

11      Q    Okay, and in Paragraph 24, you referenced

12  the Tribunal de Justica de Sao Paulo --

13           INTERPRETER:  Logistica, what's the word,

14  Logistica Sao Paulo?

15           MS. HARTLEY:  Yeah, the Sao Paulo Court of

16  Appeals.

17  BY MS. HARTLEY:

18      Q    -- allowed them to defend against the

19  application for reverse veil piercing.

20      A    Yes.

21      Q    Okay.  Is what has been marked Exhibit 6,

22  one of the orders that the Sao Paulo Court of Appeals

23  entered that you referenced in Paragraph 24?

24           INTERPRETER:  I'm sorry, what was the

25  question again?

1           MS. HARTLEY:  Sure, that's okay.

2    BY MS. HARTLEY:

3       Q    Is Exhibit 6 one of the orders Mr. Braga

4    references in Paragraph 24?

5       A    I didn't understand the question.

6       Q    Okay.

7       A    Try again.

8           THE COURT:  Do you have a copy of the

9    declaration, maybe he can look at?

10          MS. HARTLEY:  Yeah.

11          THE COURT:  I do, but it's marked up, and

12   since Exhibit 6, Ms. Hartley, is only the

13   translation, it says Court of Justice, Judicial

14   Branch, but --

15          MS. HARTLEY:  Sorry, I was ---

16          THE COURT:  -- he established that that is

17   the same -- maybe we should establish that -- is that

18   the same court of appeals he's referencing?

19          But, yeah, show him 24, maybe that will

20   move this along, and if you need it translated to

21   be comfortable, that's fine.

22   BY MS. HARTLEY:

23      Q    Please review Paragraph 24 of your

24   declaration.

25          INTERPRETER:  Excuse me, I'll read it to

1   him.

2            THE WITNESS:  Yes.

3   BY MS. HARTLEY:

4       Q    Okay.  Is Exhibit 6 one of the orders

5   referenced in Paragraph 24?

6       A    Yes, if I've understood the question, yes,

7   that was one of the appeals brought before the Court.

8       Q    Okay, and did the court of appeals issue

9   similar orders with respect to other parties that

10  appealed the reverse veil piercing decision?

11      A    Each company that felt that it had been

12  harmed by the order brought its own specific appeal.

13      Q    And this is one of those appeals; correct?

14      A    Yes.

15      Q    Okay.

16           THE COURT:  So Exhibit 6 reversed the veil

17  piercing order as to the named company, Society

18  Tours; is that correct?

19           THE WITNESS:  Yes.

20           THE COURT:  And were there appellate orders

21  reversing the veil piercing as to any of the other

22  companies named in the veil piercing order?

23           THE WITNESS:  No, what happened was that

24  each one, each company that felt that it had been

25  harmed, appealed.  So there are a number of appeals

Page 94

1    filed.  They -- they had the same attorney, but each

2    one was a separate appeal in relation to that

3    company.

4              THE COURT:  And as far as you recall, no

5    similar -- no order similar to Exhibit 6 reversing

6    the veil piercing?

7              THE WITNESS:  You mean a different

8    decision, another decision?

9              THE COURT:  Yeah, Exhibit 6 was only as to

10   Society Tours, and the question, and maybe

11   Ms. Hartley was also going to ask it, were there

12   similar orders as to any of the other veil piercing

13   named companies?

14             THE WITNESS:  Yes, there were appeals made

15   in other companies and also decisions made, and the

16   decisions in relation to the other companies were

17   similar.

18   BY MS. HARTLEY:

19        Q    In fact ---

20             THE COURT:  Mean -- meaning that the veil

21   piercing order was reversed as to those companies?

22             THE WITNESS:  Yes, it was.

23   BY MS. HARTLEY:

24        Q    In fact, the veil piercing order was

25   reversed as to all the parties except Mr. Mansur; is

Page 95

1   that correct?

2        A    It was reversed for the parties that

3   appealed, but Mansur did not appeal.

4              THE COURT:  Okay.

5              MS. HARTLEY:  Okay.  At this time I would

6   like to introduce what has been marked as Exhibit 6

7   for the defendants/respondents into evidence?

8              THE COURT:  Okay.

9              MS. HAUSER:  No objection.

10             THE COURT:  All right.  Exhibit 6 is in.

11             (Thereupon, Defendants' Exhibit Number

12  6 was admitted into Evidence.)

13             THE COURT:  And what else?

14  BY MS. HARTLEY:

15       Q    Okay.  Mr. Braga, are you aware that as of

16  March 2016, the new Brazilian Civil Procedure Code

17  came into effect?

18             THE COURT:  Hold -- hold on just one

19  second, I need to -- that's the one, isn't it?

20             LAW CLERK:  Yes.

21             THE WITNESS:  Yes.

22             THE COURT:  All right.  I'm -- I'm sorry,

23  you can proceed.

24  BY MS. HARTLEY:

25       Q    Mr. Braga, are you aware that such

1    legislation changed the procedure related to

2    corporate veil piercing?

3              INTERPRETER:  To corporate ---

4              MS. HARTLEY:  Veil piercing.

5              THE WITNESS:  Yes, in details, yes.

6    BY MS. HARTLEY:

7         Q    Okay.  Mr. Braga, isn't it true that the

8    new civil procedure code gives defendants an

9    opportunity to present a response and conduct

10   discovery after receiving the complaint?

11        A    Yes.

12        Q    This was not the procedure that was in

13   effect at the time the veil piercing order was

14   entered in this case?

15        A    No, that law was not specifically in place,

16   but the actual provisions of it were because they --

17   this new law simply reiterated what the constitution

18   had already been guaranteed.

19        Q    If you'd turn to what has been marked as

20   Exhibit 11?  Mr. Braga, isn't it true that the

21   November 24, 2015 order, in fact, only determined to

22   block or freeze the shares owned by Mr. Mansur?

23        A    Yes, that he had in those companies.

24        Q    Okay.  Okay.  Do you ---

25              THE COURT:  I want to make sure that was

 1    translated correctly.

 2              The question was, as I understood it:

 3    Isn't it true that the January 15, 2000 --

 4              MS. HARTLEY:  I had said, Your Honor, the

 5    November 24, 2015 order.

 6              THE COURT:  That was the application, I

 7    think.

 8              MS. HARTLEY:  Okay.  I was referencing, I

 9    guess his Paragraph 28 of the declaration.

10              THE COURT:  Oh, November 24, 2000 ---

11              MS. HARTLEY:  Yeah.

12              THE COURT:  Okay.  All right.  Then I'm

13    confused about what -- which appeal we're talking

14    about.

15              MS. HARTLEY:  Your Honor ---

16              THE COURT:  What -- what -- just restate

17    your question.  I won't make him answer it again,

18    just maybe I didn't hear what -- what ---

19              MS. HARTLEY:  Yeah.

20    BY MS. HARTLEY:

21         Q    Mr. Braga, isn't it true that the

22    November 24, 2015 order, in fact, only determined to

23    block or freeze the shares owned by Mr. Mansur?

24         A    Yes, it did determine that which was to

25    enforce the order to disconsider the legal

1    personalty.

2         Q    Okay.  Mr. Braga, in your declaration you

3    say that both the August 11, 2011 veil piercing

4    order, and the January 15, 2015 decisions, so these

5    are Tab 9 and Tab 4, would provide authorization for

6    you to collect Mansur's assets outside of Brazil?

7              INTERPRETER:  I'm sorry, confiscate?

8              MS. HARTLEY:  No, collect.

9              THE WITNESS:  I don't remember the content

10   of those decisions by their dates, but the decision

11   was the following:  Once Mr. Mansur had been made

12   liable, I had the obligation to collect and to locate

13   assets, and to block assets, and that's what I

14   normal -- obligatorily do in Brazil.

15   BY MS. HARTLEY:

16        Q    Could you please point to which order

17   authorizes you to collect the assets?

18        A    No, specifically right here, I can't, I

19   don't have any way to show this.

20        Q    Okay.  So nothing that's been introduced

21   into evidence shows your authority to collect the

22   assets?

23        A    Okay.  The authorization exists, but it is

24   a result of the order to disconsider the legal

25   status, the natural result, because if I don't do

1   these -- take these measures, I'm not complying with

2   the order.

3              THE COURT:  Disregard legal status of what

4   entities or who are you referring to?

5              INTERPRETER:  Should I ask him?

6              THE COURT:  Yeah.

7              THE WITNESS:  Exactly what is your

8   question, sir?

9              THE COURT:  His last answer said his

10  authority is the natural result of the order to

11  disregard the legal status, and I was asking, what

12  was the legal status of who?

13             THE WITNESS:  Look, the order to disregard

14  the companies, to enforce it, that's exactly when I

15  asked the Judge to give an order to block the assets

16  of Mr. Mansur that he had in other companies, and

17  that was actually the object of one of the appeals

18  presented here.

19             THE COURT:  Okay.  Can I just go back for a

20  moment, Ms. Hartley?  I'm sorry, I just got confused

21  because there was a November 24, 2014 application

22  that was in evidence, but you were referring to a

23  November 24, 2015 order, which is referred to in his

24  declaration, but is that order one of our exhibits?

25             MS. HARTLEY:  No, Your Honor.  We do have

Page 100

1    it here in Portuguese, it hasn't been translated,
2    but ---
3                 THE COURT:  Okay.  No, that's fine.
4                 MS. HARTLEY:  Yeah.
5                 THE COURT:  I just wanted to look at it if
6    it was in; if it's not in, then I'm not inviting
7    other evidence.
8                 MS. HARTLEY:  I referenced it, Your Honor,
9    because the appeal of that decision is in evidence.
10                THE COURT:  Okay.
11   BY MS. HARTLEY:
12        Q    Mr. Braga, if you would look at
13   Paragraph 38 of your declaration?
14                What exhibit in evidence authorizes you to
15   retrieve the assets of the debtors' estates?
16        A    Off the top of my head, I can't remember.
17        Q    Okay.  If you would look at Declaration
18   Paragraph Number 49.  Paragraph 49 references
19   Exhibit C to your declaration, which is Tab 11.
20        A    Yes.
21        Q    Mr. Braga, isn't it true that in Brazil all
22   that has been determined by the Court in the
23   June 17, 2016, is the blocking of the shares of
24   Mr. Mansur in companies in which he was a
25   shareholder?

1      A    This -- this -- this appeal does talk

2    specifically about that, the blockage of shares.

3      Q    It does not discuss the seizure of those

4    shares, does it?

5      A    The seizure of the shares?

6           THE COURT:  Yeah, turnover, to give to you

7    the shares.

8           THE WITNESS:  It talks about blocking the

9    shares, and then they become automatically available

10   for -- to the judge of the bankruptcy.

11          THE COURT:  Me or Brazil?

12          THE WITNESS:  In Brazil.

13          THE COURT:  Are we talking about the shares

14   of the companies named in the veil piercing order or

15   are you talking about the shares of the LLCs that are

16   defendants?

17          THE WITNESS:  The -- look, the order was

18   one -- a generic one talking about the shares in

19   companies that belong to Mr. Mansur.

20   BY MS. HARTLEY:

21     Q    Which generic order is Mr. Braga

22   referencing?

23     A    Reliability is established for the owner of

24   the company for payment of the debts against the

25   bankruptcy estate.  All of his assets are collected

1   by me, kept by me, sold by me to -- to put these --

2   the amounts gained into escrow for eventual payment

3   of the debts of the bankruptcy estate.

4              THE COURT:  But -- but -- I'm sorry,

5   Ms. Hartley, but I'm trying to get clarification --

6              MS. HARTLEY:  Yeah.

7              THE COURT:  -- of my question.

8              Let me ask it this way:  If -- if it's

9   established that Mr. Mansur owns the Florida

10  LLCs, will you be asking me to direct that the

11  LLCs be turned over to you or will you be going

12  back to Brazil for that authority?

13             THE WITNESS:  No, the -- there would be

14  requested here to do the blockage --

15             THE COURT:  Okay.

16             THE WITNESS:  -- and that would be to

17  enforce the order that exists.

18             THE COURT:  All right.  I think this goes

19  back, and I don't know if Ms. Hartley was going to

20  ask, but I don't know if you answered, which order

21  are you saying gives you the authority to recover the

22  shares of the Florida LLCs, was that ---

23             THE WITNESS:  There is a statement that

24  requires the administration of the bankruptcy to get

25  into a number -- to intervene in a number of

1  jurisdictions.  It's a secret procedure, but there it

2  was authorized -- it was authorized for me

3  specifically to come to the United States to put in

4  an ancillary request for bankruptcy, and to collect,

5  to block, and eventually to repatriate the values.

6          So I've come-- so I've come to the

7  American courts to bring this about so that I can

8  carry out the order that had been given.

9          THE COURT:  Okay.  Well, I think maybe to

10 save some time, Ms. Hartley, the -- the -- if you

11 have questions like this about orders, fine, but if

12 we have some orders in, and maybe there's others that

13 aren't in, but the parties are going to argue based

14 on what's --

15         MS. HARTLEY:  In evidence.

16         THE COURT:  -- what's in evidence.

17         MS. HARTLEY:  Okay.

18         THE COURT:  Although, I -- I take it from

19 when he's talking about generic orders, there are

20 orders that we've already looked at that do

21 specifically say that Mr. Mansur's assets, which

22 would include his ownership of anything, are subject

23 to the Brazil bankruptcy, but you -- you can argue

24 later as to whether there's limits to what he can do

25 based on those orders.

1           MS. HARTLEY:  Okay.

2           THE COURT:  All right.  I wasn't telling

3      you to stop your questions --

4           MS. HARTLEY:  No, I have no further

5      questions, Your Honor.

6           THE COURT:  -- but just I think when we're

7      dealing with what orders say what, it's better to let

8      the parties get that organized or maybe Ms. Hauser on

9      redirect can point him to orders that she wants to

10      reiterate, but okay.

11           MS. HARTLEY:  Okay.  Thank you.

12           THE COURT:  Looks like you're done.

13           Redirect?

14           MS. HAUSER:  Very brief, Your Honor.

15                    REDIRECT EXAMINATION

16      BY MS. HAUSER:

17      Q    Dr. Braga, if you could please turn to

18      Exhibit Number 1?  If you look at the last sentence

19      of the first paragraph, it references that the Judge

20      granted the instruction of final and faithfully

21      discharge of the duty of trustee in bankruptcy in the

22      above proceedings.

23      A    Which -- which is the document?  Is this

24      the right one that I'm looking at?

25      Q    It should be Tab 1.  There should be a

1    Portuguese version that he can reference.  There's

2    also an English version right below -- behind it.

3         A    You mean it's my declaration?  You mean

4    it's my appointment as an administrator?

5         Q    Yes, that order.

6         A    What's your question again, then?

7         Q    The last line of that order -- the first

8    paragraph of that order references duties of trustee

9    in bankruptcy.

10              From where do trustees in bankruptcy in

11   Brazil derive their duties?

12        A    This is specifically in the bankruptcy law.

13        Q    And under this law, is one of the duties

14   that you can collect and liquidate assets?

15        A    It's my duty, first of all, to do a survey

16   to locate assets, and to collect the assets, to keep

17   them, and to sell them, and there's no option here.

18   This is an obligation that I have.

19              MS. HAUSER:  Thank you.  No further

20   questions.

21              THE COURT:  Okay.  Then you can step down.

22              Do you have any other -- you have no

23   other witnesses; correct?

24              MS. HAUSER:  No, Your Honor.

25              THE COURT:  And did we deal with what

1  exhibits -- I want to make sure I've noted what's

2  been admitted and whether there's any that you're

3  withdrawing or have not yet -- I have -- I have in

4  Numbers -- let me do it this way, and then you can

5  tell me if you're seeking to introduce anything else,

6  Exhibits 1, 2, 4, 8, 9, 11 and 13.

7              MS. HAUSER:  Your Honor ---

8              THE COURT:  And the only other -- I think

9  the only other one we dealt with was 3, where I

10  sustained an objection.  The only other one you moved

11  to introduce was 3, and the objection was sustained.

12             MS. HAUSER:  Yes, Your Honor.

13             At this time we would also move to

14  introduce what has been identified as Plaintiff's

15  Exhibit Number 12.  These are the Sunbiz filings

16  from the defendant LLCs.

17             THE COURT:  Okay.

18             MS. HAUSER:  These are publicly available

19  on the Sunbiz website.

20             THE COURT:  Okay.  Ms. Hartley.

21             MS. HARTLEY:  Your Honor, we would object.

22             THE COURT:  I need a little more.

23             MS. HARTLEY:  Yeah, I know.

24             It's not a certified copy of a public

25  record.  The evidence is not self-authenticating,

Page 107

1    and they don't have a witness here to -- to

2    introduce those documents.

3                THE COURT:  All right.  I haven't studied

4    the rule, but I thought there was something about

5    public records on websites.  I mean, if we --

6                MS. HARTLEY:  I mean, if you want to ---

7                MS. HAUSER:  You can also ---

8                THE COURT:  -- went on the website would we

9    see what it ---

10               MS. HAUSER:  Yes, you can take judicial

11   notice, as well, Your Honor.

12               MS. HARTLEY:  And that's fine, Your Honor,

13   but if the Court takes judicial notice, I just want

14   to -- that you could take judicial notice that that

15   document exists, but not for the truth of what's

16   asserted in those documents.

17               THE COURT:  Well, the -- the -- they would

18   come in to show that on the annual report Mr. Mansur

19   is listed as an authorized person, and that the

20   mailing address and principal place of business is

21   this address on North Bay Road, that's basically what

22   it's coming in for?

23               MS. HAUSER:  Yes, Your Honor.

24               THE COURT:  For that purpose, then, is that

25   consistent with the limitation that you were urging?

1        MS. HARTLEY:  Yes, Your Honor.

2        THE COURT:  Okay.  All right.  Then 12

3   is -- Exhibit 12 is admitted.

4            (Thereupon, Plaintiff's Exhibit Number

5   12 was admitted into Evidence.)

6        THE COURT:  So that completes the evidence,

7   we're just down to argument, I believe?

8        MS. HARTLEY:  Yes, Your Honor.

9        THE COURT:  All right.  So let's talk

10  timing.  I don't think we'll -- we're going to be

11  reopening the evidence, so if Dr. Braga needs to --

12  to leave, that's fine.

13        I have a hearing at 1:30, so I need to

14  break now.  It may or may not take a full half

15  hour, but then I have another hearing at 2:00,

16  which, what do you think, half hour, yeah, might

17  even be less.

18        Why don't you -- well, let's just say

19  2:30.  Do you have a problem coming back at 2:30?

20        MS. HAUSER:  No, Your Honor.

21        MR. HOLLEMBEAK:  No, Your Honor.

22        THE COURT:  Okay.  Then let -- let's do

23  that.

24        Okay.  Thanks.

25        THE MARSHAL:  All rise.

1              (Thereupon, a lunch recess and other

2    matters on the Court's calendar were heard, after

3    which the following proceedings were had:)

4              THE COURT:  Okay.  Welcome back.  We have

5    finished our other matters -- have a seat, thanks --

6    so I guess we're ready for closing arguments.

7              MR. HOLLEMBEAK:  Good afternoon, Your

8    Honor.  Jeremy Hollembeak, from the law firm of

9    Kobre & Kim, on behalf of the foreign -- putative

10   foreign representative, Dr. Braga.

11             I didn't know if Your Honor wanted to

12   talk housekeeping.  In terms of timing, I would

13   hope to think I need no more than 30 minutes --

14             THE COURT:  Okay.

15             MR. HOLLEMBEAK:  -- and would like to

16   reserve five of that for any kind of response.

17             THE COURT:  Okay.  That's fine.

18             MR. HOLLEMBEAK:  I want to take recognition

19   first, because I don't understand them to be

20   objecting -- the defendants to be objecting to many

21   of the requirements of recognition, if anything,

22   the -- the foreign representative requirement, but if

23   Your Honor wants me to go through the -- the

24   individual bases of why we meet the test for

25   recognition under 1517, I'm happy to do so.

1              THE COURT:  I'm not -- independent of the
2    response and objection, and the issues noted at the
3    outset today, I don't believe you need to supplement
4    the record.
5              What I was thinking would be maybe
6    helpful would just be to see -- to look at the
7    findings and -- and -- and perhaps just confirm
8    that they're not being contested and that there
9    has been evidence presented.
10             So jurisdiction, I don't believe is
11   being contested, except to the extent of assets
12   in the -- in the U.S., and we've -- we've talked
13   about that being an issue to determine, but
14   other -- other than that, the findings of
15   jurisdiction and core proceeding and venue.
16             The proposed finding C, that Dr. Braga
17   is the duly appointed foreign representative,
18   is -- is stipulated, Ms. Hartley?
19             MS. HARTLEY:  Yes.
20             THE COURT:  Okay, and that the 15 case was
21   commenced under Chapter 15.
22             MS. HARTLEY:  Provided the Court relies
23   upon the veil piercing order.
24             THE COURT:  Right, and I think it's been
25   stipulated already that this is a -- a foreign main

Page 111

1    proceeding entitled to recognition if the manifest --
2    manifestly unjust -- manifestly contrary to U.S.
3    public policy argument is unsuccessful.
4              Let's see, are there issues, though,
5    with -- I think there may have been some issues
6    raised in conjunction with the scope of relief in
7    the injunction that may also go to the additional
8    relief that -- that's sought?
9              MR. HOLLEMBEAK:  That's fine, Your Honor.
10   If -- if -- we can -- I'll just go through the
11   arguments and to the extent that I don't explicitly
12   refer to an argument for say 1506 applying to
13   recognition versus the injunctive relief --
14              THE COURT:  Okay.
15              MR. HOLLEMBEAK:  -- I mean it to apply to
16   both.
17              Your Honor, the -- the preliminary
18   injunctive relief that we're seeking here is
19   warranted, and what we're asking, and I mentioned
20   it this morning, is essentially provisional
21   enforcement of the veil piercing order on the
22   basis of which we would freeze assets or continue
23   to freeze assets through the length of the
24   injunctive -- injunction, would be through to a
25   further hearing on final enforcement of the veil

Page 112

1    piercing order, and in conjunction with that, a

2    final turnover order that -- that's consistent

3    with the -- that's the relief that's requested in

4    the complaint that commenced the adversary

5    proceeding.

6                 If Your Honor has any sort of -- if it

7    would be clarifying, this is a case cited in

8    the -- in the respondent's brief, that was

9    actually issued by Judge Glenn in New York two

10   days after we commenced this case, but this is

11   In Re:  Inversora Electrica De Buenos Aires,

12   Case Number 16-12854, Bankruptcy Court, Southern

13   District of New York, and I have -- all the cases

14   I refer to today I have copies of, if Your Honor

15   would like, and I have copies ---

16                 THE COURT:  Okay, you can hand them up at

17   the end.

18                 MR. HOLLEMBEAK:  Okay.

19                 THE COURT:  I probably won't take the time

20   to read it now, but ---

21                 MR. HOLLEMBEAK:  And if you guys want a

22   copy.

23                 So in that opinion, and this is at --

24   it's -- it's a Westlaw citation, so this is at

25   star 4, it says ---

Page 113

1            THE COURT:  Well, what's the -- you didn't

2    give me the Westlaw citation.

3            MR. HOLLEMBEAK:  Actually, I don't even

4    have a Westlaw -- I mean, I got it off Westlaw, but

5    it says 63 Bankruptcy Court Decision 109.  It doesn't

6    have a Westlaw citation on it.

7            THE COURT:  All right.  Well, anyway --

8            MR. HOLLEMBEAK:  Right.

9            THE COURT:  -- if you're handing it up,

10   that's ---

11           MR. HOLLEMBEAK:  So there Judge Glenn said

12   Section 1521(a)outlines the discretionary relief the

13   Court may order upon recognition.  The Bankruptcy

14   Code confers exceedingly broad discretion since the

15   Court may grant any appropriate relief that would

16   further the purposes of Chapter 15 and protect the

17   debtors' assets and the interest of creditors, and

18   then it cites Leif Clark, ancillary and other

19   cross-border insolvency cases.

20           And it quotes from that, it says

21   Section 1521(a)(7) authorizes the Court to grant

22   the foreign representative the sort of relief

23   that might be available to ---

24           THE COURT:  Go a little slower.  I know

25   we're not protecting the hands of a manual reporter

1   anymore, but you're going too fast for my brain.

2        MR. HOLLEMBEAK:  Sorry.

3        It says, Section 1521(a)(7) authorizes

4   the Court to grant the foreign representative the

5   sort of relief that might be available to a

6   trustee appointed in a full bankruptcy case,

7   including the turnover of property belonging to

8   the debtor.

9        So that -- that's the relief that we're

10  seeking ultimately here, and so this is really

11  just about what is the property of the debtor,

12  right, and at the heart of that is the veil

13  piercing order that we're seeking now to enforce

14  on a provisional basis, and I'd submit, Your

15  Honor, we met the evidentiary standard for a

16  preliminary injunction.

17        THE COURT:  As to who and -- and what,

18  because you've got a bunch of defendants,

19  including -- why don't I see -- oh,

20  Roberta De Menezes e Arruda, that's the debtors' --

21  that's Mr. Mansur's wife?

22        MR. HOLLEMBEAK:  Yes, that's our

23  understanding.

24        THE COURT:  Okay, and you're seeking to --

25  what relief against her, freezing her assets?

1           MR. HOLLEMBEAK:  Freezing assets in her

2    name.

3           THE COURT:  And what have you -- I don't

4    remember her name even being mentioned except in

5    Ms. Hartley's notice of appearance at the beginning

6    of the case -- I mean, her -- her appearance on

7    behalf of that defendant.

8           What evidence is -- is there, other

9    than he's a bad guy that's been running around

10   the world hiding assets that would entitle you to

11   freeze her assets?

12          MR. HOLLEMBEAK:  Other than the

13   relationship, Your Honor, I don't -- we don't have

14   any specific evidence with respect to her.

15          You know, I think we filed this case

16   after a substantial investigation and we're, to

17   some extent, you know, speculating as to what we

18   would find and -- and with -- with some of the

19   defendants we've confirmed that now with the

20   discovery that we've had under the TRO, and that

21   we would ask the Court to continue under a

22   preliminary injunction.

23          THE COURT:  That phrase, "some extent

24   speculating," doesn't really meet the standards for

25   injunctive relief to freeze the assets of a

1    non-debtor, does it?

2              MR. HOLLEMBEAK:  Well, Your Honor, I think

3    maybe I used the wrong phrase, but we also have the

4    history -- the testimony of the foreign

5    representative and the history of this particular

6    individual using naranjas or oranges, as I understand

7    the term to be a Brazilian term basically for

8    strawman, including people that are involved in his

9    personal life, a personal trainer, a gardener.

10             THE COURT:  But do we go serve the gardener

11   at North Bay Road as a John Doe and freeze his assets

12   or her assets?

13             I mean, I'm -- I'm not saying there's

14   no record of this individual evading collection

15   efforts, but we're -- we're dealing with

16   injunctive relief against specific entities --

17             MR. HOLLEMBEAK:  Right.

18             THE COURT:  -- and their -- and their

19   assets.

20             MR. HOLLEMBEAK:  So I think I misspoke,

21   Your Honor.  If I recall, I don't have a copy of the

22   order with me, but we're only seeking to freeze the

23   assets of Mr. Mansur or the four ---

24             THE COURT:  Okay.  Then maybe I -- let me

25   go back to the proposed preliminary injunction.

1              Okay.  Well, the proposed language in

2    paragraph -- or the language in Paragraph 3 of

3    the proposed order that just says the defendants

4    and agents, employees, and so forth, can't

5    transfer any assets that are in their custody or

6    control or possession that may be beneficially or

7    equitably owned by Mansur, that -- that I

8    understand, or can't destroy or alter any

9    documents that may relate to his assets.

10             It was really Paragraph -- well, let me

11   see.  So, well, actually, then, what -- you're

12   not freezing assets of any of the defendants

13   themselves unless they're deemed to be -- so what

14   are -- I don't know what the defendants do with

15   the order.

16             Do they decide whether assets that

17   they're holding, like the LLCs, are assets of

18   Mansur?  I mean, ultimately you're going to have

19   to prove that they are and get -- get turnover,

20   but ---

21             MR. HOLLEMBEAK:  Right.  I mean, I think

22   that they will know if they're beneficially holding

23   assets that really belong to Mansur, if it's being

24   done in the way that we understand it to have been

25   done in Brazil.

1              Ultimately, the burden is on us to

2     prove that, you know, those are his assets, but

3     if we have the order in place, and then we see a

4     transfer going out and can later prove to Your

5     Honor that that was, indeed, a transfer in

6     violation of this order, that's still significant

7     protection from our perspective, rather than just

8     saying we have to -- we can't get any injunctive

9     relief until we go out and establish the evidence

10    that frankly would give -- we could make a

11    turnover argument with respect to.

12              I mean, they ---

13              THE COURT:  Okay.  But maybe I was

14    misinterpreting the scope.

15              So the language that talks about

16    prohibiting disposition of assets, as to Mansur,

17    it would prohibit him from disposing, selling or

18    transferring any ownership interest in any of the

19    entities or any other assets he has, I guess.

20              MR. HOLLEMBEAK:  Anything in his name,

21    yeah.

22              THE COURT:  As to the other defendants, it

23    just prohibits them from destroying any documents or

24    transferring any assets in their possession, custody

25    or control that are owned nominally, beneficially,

Page 119

1    equitably or otherwise by Mansur.

2            And so when they deal with their

3    assets, they just will be doing so at their own

4    risk, if they knew or should have known that

5    these were assets that belonged to him, is that

6    kind of the concept?

7            MR. HOLLEMBEAK:  I mean, we believe they

8    will know or not know.  I mean, if -- I mean, they

9    will know if it is or is not Mansur's assets.

10           The two other individuals and his wife,

11   will know if the money in the bank account or

12   some other piece of property, you know, they

13   personally paid for or, you know, Mr. Mansur gave

14   them the money or ---

15           THE COURT:  Okay.  So you're not -- you're

16   not requesting an order that says some bank account

17   in the name of the wife, per se, is frozen because

18   she's a defendant.  It -- it only requires her to not

19   transfer any money she's holding on his behalf.

20           MR. HOLLEMBEAK:  Correct.

21           THE COURT:  Okay, and the same with the

22   LLCs, you're not seeking to just blanket freeze any

23   accounts, including the account of the -- that's the

24   subject of Exhibit 13, you're just ---

25           MR. HOLLEMBEAK:  No, Your Honor, we are --

1    we are seeking a full blanket freeze of the LLC

2    assets because the only information we have indicates

3    that he's -- Mr. Mansur is a 100 percent owner of

4    those assets, and the discovery we've gotten to date,

5    and was admitted into evidence, gives us the strong

6    suspicion that those -- at least the account with

7    respect to the one LLC, is being used for

8    Mr. Mansur's personal expenses.

9              THE COURT:  Yeah, well, and I might be

10   inclined to grant you that, but I'm just not seeing

11   even in the proposed order, although I did -- I did

12   believe that that was an issue and that you were

13   seeking that, something that freezes the assets of

14   the LLC defendants.

15             Is that in the proposed injunction?

16             MR. HOLLEMBEAK:  I believe it is, Your

17   Honor.

18             THE COURT:  I thought it's only -- I

19   thought it's only stated as enjoining, trans --

20   enjoining, transfer, encumbrance or disposing of any

21   assets in their possession that are owned by Mansur.

22             MR. HOLLEMBEAK:  If that's what the

23   proposed order says, Your Honor, then maybe I

24   misspoke because ---

25             THE COURT:  Well, I don't know, maybe I'm

Page 121

1    getting you off track.

2              MR. HOLLEMBEAK:  I apparently ---

3              THE COURT:  Did we leave something out or

4    what were we looking at?  Maybe there was a finding.

5              Any of your teammates want to tag in?

6    I'm looking at 3.2 the -- the actual proposed

7    preliminary injunction order that was -- that was

8    part of the original relief --

9              MR. HOLLEMBEAK:  Yeah, I ---

10             THE COURT:  -- and maybe I should look at

11   the TRO because if you're seeking to --

12             MR. HOLLEMBEAK:  Oh --

13             THE COURT:  -- extend the TRO, then ---

14             MR. HOLLEMBEAK:  -- I'm sorry.  The one

15   that was filed with the original motion, we filed an

16   amended -- so this -- this wouldn't be -- we -- we

17   filed an amended proposed order --

18             THE COURT:  Yes, now I do remember that.

19             MR. HOLLEMBEAK:  -- with -- with our

20   response to their motion to continue.

21             THE COURT:  Okay.

22             MR. HOLLEMBEAK:  Although I'm not sure that

23   it -- it changed in this respect.  So I have a copy

24   of the order now, I apologize.

25             THE COURT:  Well, let's see what's in the

1    TRO, what was frozen.  I think Paragraph 2 of the TRO

2    is pretty much the same as Paragraph 3 that I was

3    just referencing in the original proposed injunction.

4              MR. HOLLEMBEAK:  I think that's right, Your

5    Honor.

6              THE COURT:  Let me see.  Does anybody have

7    a printout of what the actual proposed injunction is,

8    then?  Let me -- let me go back to that, maybe I can

9    find it.

10             There was a -- yeah, there was a red

11   line.

12             MR. HOLLEMBEAK:  It was filed a week ago

13   Monday on the 5th.

14             THE COURT:  Yeah.  No, I remember looking

15   at it at the last hearing, and then in getting ready

16   for today's hearing, we were just scrambling a bit

17   to -- to pull orders.

18             But it may not be any different on the

19   issue we were just discussing, that is whether

20   it -- it purports to freeze or seeks to freeze

21   all of the assets of the LLCs, as opposed to just

22   telling them if you were holding assets,

23   nominally or beneficially owned by Mansur, you

24   can't dispose of them, and maybe that's enough to

25   actually specify the bank account and that one --

1      for that one debtor.

2                But I don't know that we have a showing

3      that any bank accounts or assets of any of the

4      other LLCs are -- enough of a showing to make a

5      finding now that any other particular asset is

6      beneficially or nominally owned by Mansur.

7                MR. HOLLEMBEAK:  Well, here's what I can

8      tell you, Your Honor, because we ---

9                THE COURT:  I do have the proposed amended

10     preliminary injunction order.  It was ---

11               MR. HOLLEMBEAK:  Yeah, I don't think it's

12     different in this respect, I think you're right about

13     that.

14               THE COURT:  Okay.  Yeah, some of these

15     changes, I think, were dealing with what was then a

16     timing issue of structuring it to contemplate relief

17     before an order granting recognition or relief after

18     an order, but ---

19               MR. HOLLEMBEAK:  I think that's right.

20               THE COURT:  All right.  We're treading

21     water, but here I -- I'm a little tired, too.  I

22     started looking at the rest of this stuff about 5:30

23     this morning.

24               So are you then asking for relief

25     beyond what's in the proposed injunction, and

1    if -- if so, what is it?  I think the only thing

2    you've said so far is you -- you would like the

3    order to specifically freeze the account in

4    Exhibit 13.

5              MR. HOLLEMBEAK:  Yes.

6              THE COURT:  Okay, and are you also seeking

7    to freeze assets of the LLCs, other than the assets

8    described in the language of the order, that is

9    assets that the LLCs are holding for Mansur?

10             MR. HOLLEMBEAK:  With respect to the other

11   LLCs, we are seeking that, Your Honor.

12             THE COURT:  All right.  So then the

13   question is:  What evidence supports that?

14             MR. HOLLEMBEAK:  Right.  I don't have any

15   other than the submissions of the secretary of state

16   filings that show that Mansur is the owner, but we

17   have not located any bank accounts with those

18   entities.

19             If -- yeah.  I mean, it's fine with us

20   if the -- if the order is limited to the current

21   language with respect to those LLCs.  If -- if

22   the Court feels that's all the relief it can

23   give, then -- then we can live with that.

24             THE COURT:  Okay.  Within the scope of that

25   language, although not specified, would be Mansur's

1   actual ownership holdings in the LLCs?

2            MR. HOLLEMBEAK:  Correct.

3            THE COURT:  Okay.  Let's -- let's come back

4   on rebuttal after I hear from Ms. Hartley what her

5   views are on the scope of the injunction.

6            So just -- just game plan, without

7   revealing work product or strategy, you'd have

8   the -- you're going to take discovery.  Then at

9   some point you're going to try to come in and say

10  we're ready to prove that the -- the ownership

11  interests are subject to the veil piercing order,

12  we want turnover.

13           You, I assume, may come in to take

14  control of the LLCs and if you find out more

15  about the assets of the LLCs, you may come in and

16  seek relief against the specific assets?

17           MR. HOLLEMBEAK:  That's right, Your Honor.

18           THE COURT:  Okay, and then I guess I'm not

19  sure why you're still calling it provisional

20  recognition of the veil piercing order.

21           Aren't we -- aren't you asking me to

22  recognize the veil piercing order and the only

23  issue is what is that enforceable against?

24           MR. HOLLEMBEAK:  Yes, but I guess I thought

25  that was a semantic twist to it.

Page 126

1          THE COURT:  Yeah, all right.

2          MR. HOLLEMBEAK:  Yeah.

3          THE COURT:  It doesn't matter what we call

4    it, as long as it's -- if that's the concept.

5          I think the -- the other question I had

6    on the scope of the preliminary injunction, I'm

7    going to go where I had written the notes, is the

8    accounting issue, Paragraph 5.  Let's see if it

9    changed.

10          It doesn't have -- it doesn't have any

11   timing.  It just says, defendants are directed to

12   provide an accounting of Mansur assets in their

13   possession, custody or control, and turn over to

14   the foreign representative any and all documents

15   concerning Mansur's assets, affairs, rights,

16   obligations or liabilities.

17          I just had a question whether -- if

18   that was going to stay in, what the timing would

19   be, and if it was appropriate at all, or whether

20   that should just be part of the discovery?

21          MR. HOLLEMBEAK:  I think the timing would

22   be something we could work out with -- with counsel,

23   provided I think there's a scheduling date on the

24   docket that was automatically generated in February

25   for a hearing in the adversary proceeding or -- or a

1    status conference or something.

2              So I -- I think within the next, you

3    know, 30 days or so, we'll be seeking, you know,

4    accounting or -- type information from them

5    seeking depositions, possibly of ---

6              THE COURT:  Well, that's my question.  Do

7    we need -- do we need a separate provision without

8    any specific -- specific timing, time deadline, for

9    them to provide an accounting or is that something

10   that can just be done in discovery and maybe change

11   the language that -- that says that the plaintiffs

12   are entitled to an accounting --

13             MR. HOLLEMBEAK:  That's fine with us.

14             THE COURT:  -- and documents as part of the

15   discovery?

16             MR. HOLLEMBEAK:  That's fine with us, yes.

17             THE COURT:  Okay, and what -- what were you

18   agreeing to earlier when we were looking at

19   Paragraph 6, because I think you were conceding that

20   it would not be appropriate at this point to actually

21   turn over to the trustee any bank accounts, vehicles,

22   other assets?

23             MR. HOLLEMBEAK:  Right.

24             THE COURT:  You would still want the --

25   kind of the generic language in the beginning of

1    Paragraph 6 that's consistent with 1520?

2              MR. HOLLEMBEAK:  Correct, Your Honor.

3    It -- yeah, it would basically be a reservation of

4    rights that we could come back to Your Honor if we

5    identified specific assets.

6              THE COURT:  So maybe it's just the first

7    line and a half, the foreign representative is hereby

8    entrusted with the administration and realization of

9    Mansur assets in the United States, and that's

10   basically what 1520, I guess, what is it (a)(8), one

11   of the -- one of the provisions of 1520, it just has

12   pretty much that same language, I think.

13              1520(a)(5), that's the language in

14   Paragraph 8 of the proposed recognition order.

15   So it would just be no more or less than really

16   the rights on recognition --

17              MR. HOLLEMBEAK:  Yes.

18              THE COURT:  -- at this point?

19              Okay.  All right.  So Mansur's interest

20   in the LLCs would essentially be frozen, and I

21   would think the injunction should actually refer

22   to that specifically, not as part of the general

23   language.

24              The assets, and this is not a ruling,

25   I'm just sorting out where we've come, the assets

1    of the LLCs or other defendants are only impacted

2    to the extent they're beneficially or otherwise

3    owned by Mansur, and that's sort of an open

4    question, I guess, in terms of proof.

5              But what you said earlier is if -- if

6    there's a transfer of assets, you want to be able

7    to show that they violated the injunction because

8    they knew they were transferring assets that

9    belonged to him?

10             MR. HOLLEMBEAK:  Correct, Your Honor.

11             THE COURT:  Okay, and then you wanted to

12   actually specifically freeze the -- the B of A

13   account for Society -- what was it, Society Retail &

14   Auction, LLC?

15             MR. HOLLEMBEAK:  We do, Your Honor.  I

16   don't know that it's going to ultimately bear much

17   fruit at this point, but ---

18             THE COURT:  Okay, and then what -- what we

19   mentioned earlier, I think that I would -- would put

20   in, that -- well, the concept here is that turnover

21   or administration of specific assets would await a

22   finding that they're assets of Mansur --

23             MR. HOLLEMBEAK:  Correct.

24             THE COURT:  -- or perhaps some separate

25   veil piercing against the LLCs in -- in further

1    proceedings within this 15.

2              But I'd also want to put in some

3    language that said that any creditor of an LLC,

4    and perhaps the LLC, itself, could seek -- well,

5    it would only apply, I guess, to the bank account

6    that -- that Auction, LLC could seek relief from

7    the freezing of the bank account for whatever --

8    for whatever cause.

9              I mean, if there was a creditor that

10   needed to be paid, but we'll get into that maybe

11   a little bit more through -- though Ms. Hartley.

12             MR. HOLLEMBEAK:  Sure.

13             THE COURT:  All right.  We're kind of

14   jumping around, maybe more my doing, but why don't we

15   circle back to the legal issue on 1506.

16             MR. HOLLEMBEAK:  Okay, Your Honor.

17             So 1506.  I think what I would point

18   Your Honor to is -- well, let's take a step back.

19   Your Honor in Petroforte, the opinion, there was

20   an analogy to Warren Buffett, and I just want to

21   explain really quickly for Your Honor's benefit

22   what is going on in Brazil that the evidence

23   showed today.

24             I mean, this is argument, they can say

25   that that's not true, but there's -- there's veil

1    piercing and then there's reverse veil piercing.

2              So if we were dealing with

3    Warren Buffett and companies that he owned, the

4    authority to pierce the veil of a debtor that's a

5    company owned by Warren Buffett would then pull

6    Warren Buffett's assets into that debtor's

7    estate.  That's veil piercing.

8              Reverse veil piercing, which is the

9    relief that applied to every other entity that

10   was impacted originally by the veil piercing

11   order, other than Mansur, is to say that, okay,

12   now that we've pulled in the assets of

13   Warren Buffett, every other entity that he owns,

14   even if that entity had no relation to the debtor

15   in question, is really his -- just his assets,

16   his personal assets, because there was a blurring

17   of the corporate form.

18              So there are entirely two different

19   types of relief and they require different kinds

20   of evidentiary support.

21              There was testimony today, and I think

22   counsel admitted that when -- when Dr. Braga

23   filed for the order, there was a 300-page

24   petition, and I don't know if most or all, but

25   many of the entities, other than Mr. Mansur, got

1   notice of the opinion and appeared.

2            There's -- there's ample evidence.  We

3   read from several orders where other entities

4   that were originally affected by the ex parte

5   veil piercing order were given relief from that

6   order.  So, Your Honor, it just isn't true that

7   there's not -- there wasn't due process.

8            In addition ---

9            THE COURT:  So the -- the -- the relief

10  that Ms. Hartley focused on in cross, that not only

11  her Exhibit 6, but by the testimony, all of the other

12  entities subject of the reverse veil piercing that

13  appealed, won on appeal, and their assets were no

14  longer subject to the debts of the bankrupt, is

15  that -- is that correct, and that -- and that, in

16  effect, shows that there was ample opportunity to

17  litigate and contest the ex parte order?

18            MR. HOLLEMBEAK:  That's correct, Your

19  Honor, but -- but those are still ongoing

20  proceedings.

21            The -- the point is, there was an

22  ex parte order that said these other entities,

23  through first the veil piercing, and then

24  additionally the reverse veil piercing, into

25  these third-party entities that were related to

Page 133

1  Mansur, but not to Mappin, specifically, that
2  those assets were all pulled in together.  It was
3  entered ex party.
4            Those entities then appeared and
5  contested, and the reverse veil piercing piece of
6  that was stayed, basically.
7            And when you -- when you look at -- it
8  was Exhibit C to the declaration, I believe it's
9  Tab -- it was Tab 9 -- I'm sorry, Tab 11 in our
10 binder.  I mean, this is the -- I'm on the second
11 to last page of the order.
12           The very -- the first paragraph up
13 towards the top after the break says, as you can
14 see, Ricardo Mansur, the shareholder, should
15 respond with his assets to the debts incurred due
16 to the bankruptcy of the Mappin group.
17           In turn, the exacerbated, I take that
18 to mean challenged, but challenged decision
19 determined freezing the corporate shares
20 belonging to the appellant, the breach of tax
21 privacy, again, I think that's a translation
22 issue, as well as investigations into companies
23 wherein Ricardo Mansur is partner or people with
24 whom he has a close relationship.
25           That decision was made on the grounds

1   of strong indications of the existence of asset

2   disorder between the bankrupt companies and the

3   juridicial (phonetic) entities.  I don't know

4   exactly what that means, but if you go down to

5   the next page, at the top of the next page, and

6   this is the -- the language that they cite in --

7   the defendants cite in their response.

8            It says, finally it should be stressed

9   that in the current procedural period we are

10   facing circumstantial evidence of asset disorder

11   and misuse of enterprises belonging to

12   Ricardo Mansur or people linked to it.  These

13   facts and all evidence must still be duly proven

14   beforehand.

15            In the future, we can decide about the

16   appropriateness or not of the disregard of the

17   corporate form of the aforementioned legal

18   entities.

19            THE COURT:  This -- remind me, this was an

20   appeal of the order that -- that made it clear that

21   his ownership shares would be frozen?

22            MR. HOLLEMBEAK:  That's correct.  I know

23   the translation is not perfect, but I think it's

24   pretty clear from that language that it's talking

25   about other -- other enterprises owned by

1    Ricardo Mansur and the people linked to it.

2              So, in effect, what the Court there is

3    saying is -- is not unlike what we're saying

4    today, is that before the Court, this Court,

5    would grant final relief giving us access to all

6    of the assets of one of the LLCs for purposes of

7    collection and turnover and liquidation, we would

8    have to prove that there's -- that they are

9    basically alter egos of Mr. Mansur.

10             Okay.  That -- that is still what's

11   before the Court in Brazil.  The foreign

12   proceeding is still -- the foreign representative

13   is still pursuing that relief, but that -- that

14   is all the result of those entities getting

15   notice, just like Mr. Mansur, of the veil

16   piercing order in the first place, showing up and

17   appealing, and having the -- the reverse veil

18   piercing relief of that -- from that order

19   stayed.

20             So just bringing it all back around to

21   1506.  If you look at the cases, you know, it's

22   clear that you don't have to -- to prove that

23   there is due process in a foreign proceeding, you

24   don't have to show the exact circumstances that

25   was in Petroforte, which is that the -- the

1    entity being pierced had, you know, actually put

2    on evidence and lost.  They just have to have the

3    opportunity.

4            And I would point Your Honor to an 11th

5    Circuit called Daewoo, and it's slightly

6    different circumstances.  It dealt with someone

7    who was bringing a claim against an entity that

8    had gone through a bankruptcy restructuring in

9    Korea, and the lower court said, this is a claim

10   that you should have brought in that bankruptcy.

11           They responded, well, we didn't -- we

12   didn't have the chance to put on evidence, but

13   the Court had found that they had notice of the

14   opportunity to put on evidence and did not, and,

15   therefore, the Court basically, as a -- as a

16   matter of comity, precluded them from pursuing

17   that claim in the U.S.

18           And I would point specifically to the

19   language ---

20           THE COURT:  What's the cite?

21           MR. HOLLEMBEAK:  Yeah, it's 459 F3d. 1249,

22   and then the pin cite is 1258, and in particular, the

23   passage at Headnote 12 says, the District Court did

24   not clearly err when it found that Daewoo America had

25   notice of the proceedings in the Korean bankruptcy

Page 137

1    and an opportunity to participate in those
2    proceedings.
3              The record, which contains multiple
4    notices received by Daewoo America, and the
5    evidence of the participation of Daewoo America
6    in the bankruptcy process supports that finding.
7              The argument of Daewoo America that its
8    claims against the defendants were not heard,
9    does not refute that Daewoo America had notice of
10   and participated in the Korean bankruptcy
11   proceedings.
12             Moreover, the record supports the
13   conclusion of the District Court, that the notice
14   received by Daewoo America was adequate.  The
15   record evidences that Daewoo America received
16   notice of all of the main events of the
17   bankruptcy proceedings, including the final
18   meeting of the creditors on September 30, 2002,
19   to vote on the modified reorganized plan.
20             Daewoo chose not to attend the meeting,
21   and Daewoo America did not either vote by proxy
22   or otherwise object to the modified
23   reorganization plan.
24             So this is -- I -- I admit to you, Your
25   Honor, this is not a Chapter 15 case, but it's

Page 138

1    very, very analogous.  So if this isn't binding

2    authority, it's -- it's very -- it should be very

3    persuasive.

4            We have -- it's -- it's -- it's not

5    disputed that Mr. Mansur received notice here,

6    and so this is exactly like Petroforte in that

7    the due process that was given was the

8    opportunity.  It's not whether or not he actually

9    took it, it's that he had the opportunity.

10           And, furthermore, if he -- he's never

11   raised this objection in Brazil, but if he

12   believed that he didn't have the opportunity,

13   that's -- that's a decision for the Brazilian

14   courts and he should have raised it there.

15           And if you look at the cases in the

16   Chapter 15 context, such as the -- the Southern

17   District of Florida case in SNP Boat, 483 B.R.

18   776, it's clear that courts in Chapter 15 context

19   don't sit as appellate courts for the decisions

20   that -- that were made by -- by the foreign court

21   in the main proceeding.

22           The final -- well, I don't know if it's

23   the final, but I just want to for a second

24   address this reference to the new procedural law

25   in Brazil.  The defendants did not submit any

1  evidence with respect to this -- this issue, and

2  I assume under the Rules of Civil Procedure, that

3  this is an issue of foreign law that needs to be,

4  you know, put into evidence.

5         But let's assume for a second that it

6  means what they say it means, that doesn't --

7  that doesn't mean that it applies retroactively

8  or that it necessarily means the veil piercing

9  order was entered without giving due process.

10         It would be no different if tomorrow

11  the Supreme Court revised Federal Rule of Civil

12  Procedure 65 to say, no longer can you get an

13  ex parte TRO under that.  That doesn't mean that

14  TROs that courts had issued that were extant at

15  that time were necessarily rendered, you know,

16  null or violations of due process, and, again,

17  the -- the -- the easiest way to tell that he had

18  the opportunity and could have taken it is -- is

19  the relief that was given to the other entities.

20         Finally, one more point, the -- the

21  suggestion was made in the papers, and I think I

22  heard it today, that he didn't appeal the veil

23  piercing order in Brazil because his assets were

24  already frozen.

25         Well, you know, his assets are frozen

1  here and he was able to appear by counsel today.

2  So I don't -- I don't really understand that

3  argument.

4          If Your Honor would like, I'm prepared

5  to talk about the property issue or if you have

6  any questions on -- on 1506.

7          THE COURT:  Just more out of curiosity on

8  the state of the law, because I -- I know I had the

9  sense that in recent years this -- this -- that

10  depositing money in a bank account was enough, that

11  the jurisdictional hook was -- was -- jurisdictional

12  burden was fairly light, but I don't remember if the

13  11th Circuit has ruled on it.

14          I thought there was, at some point, a

15  2nd Circuit case or maybe a District Court case

16  out of the 2nd Circuit that said it wasn't

17  enough, but that other courts have gone other

18  ways, but I think it's going to be -- well, it

19  will be moot if I enforce the veil piercing

20  order.

21          But if you had something to say on the

22  sufficiency of the bank account, that ---

23          MR. HOLLEMBEAK:  Yeah, I guess I would just

24  say I'm not aware of any 2nd Circuit or -- or Dis --

25  Southern District of New York decision subsequent to

1    Barnett on this issue.

2              But the very section that they quote

3    from this November 23, 2016 order from

4    Judge Glenn -- and I didn't see it before, but

5    here is the Westlaw cite, it's 2016 Westlaw

6    6956645.  They cite in their paper this quote

7    from the case at star -- Page Star 3, where a

8    foreign debtor does not have a domicile or place

9    of business in the United States, the focus

10   shifts to whether the debtor has sufficient

11   property present in the United States to form the

12   basis for jurisdiction, and that's where they end

13   it in their brief.

14             The very next sentence says, this Court

15   has found that an undrawn attorney retainer held

16   in a United States bank account provides a

17   sufficient basis for jurisdiction, and I -- I

18   assume that Judge Glenn is up on the current

19   state of the law in the 2nd Circuit, and he said

20   that two days after we filed our petition.

21             THE COURT:  Okay.

22             MR. HOLLEMBEAK:  I would be happy to

23   discuss, you know, the reasons that -- and courts and

24   commentators that have found Barnett to be wrong, but

25   it doesn't sound like it matters if ---

1           THE COURT:  Barnett came out of what?

2           MR. HOLLEMBEAK:  Barnett is the 2nd Circuit

3    decision from 2013, Drawbridge is part of the name,

4    and it -- it -- the Court there found applying

5    construction of the Bankruptcy Code, that because

6    Section 103 of the Bankruptcy Code says that

7    Chapter 1, without any qualification applies to

8    Chapter 15, that Chapter -- that Section 109(a)

9    applied to Chapter 15, even though there's a separate

10   definition for a debtor in Chapter 15, and there's

11   other indications in the statute that that's just not

12   the way it should be, but other courts have

13   explicitly disagreed with that.

14           THE COURT:  Yeah, that's sounding more

15   familiar now, that that incorporation of 109 was not

16   something that other courts have followed.

17           All right.  Well, that -- that's more,

18   perhaps, academic than important on -- on our

19   argument.

20           All right.  So unless there's anything

21   else, I'll let you come back on any -- for

22   rebuttal on any of the issues that are argued by

23   the defendants.

24           Okay.  Ms. Hartley.

25           MS. HARTLEY:  Your Honor, the

1    defendants/respondents would assert that the

2    recognition and enforcement of the veil piercing

3    order would be manifestly contrary to public policy

4    in the United States, and Section 1506 certainly

5    provides that the recognition or other relief may be

6    denied.

7              THE COURT:  Are there 1506 cases that have

8    turned on due process?

9              I mean, your argument distinguished

10   Petroforte.  In Petroforte I also talked about

11   the cases that have applied 1506, and it's

12   typically when there's relief being requested or

13   recognition of a foreign order that would

14   directly violate a U.S. statute.

15             So is there any case law where the

16   courts have found that an order of a foreign

17   court would not be recognized under the

18   manifestly unjust section because of a due

19   process argument?

20             MS. HARTLEY:  I'm not aware.  I don't know

21   that -- I'm not aware, Your Honor.

22             THE COURT:  I don't think you should look

23   over to the --

24             MS. HARTLEY:  No, they're not going to help

25   me.

1          THE COURT:  -- trustee, I don't think

2    they're going to help you.

3          MS. HARTLEY:  They're not going to help me.

4          THE COURT:  Although, your -- your team

5    wasn't --

6          MS. HARTLEY:  But Your Honor ---

7          THE COURT:  -- offering much by way of body

8    language either.

9          MS. HARTLEY:  That's -- that's not to say

10   it's not there, Your Honor.  However, it's

11   actually -- I mean, it's not even a law, I mean, it's

12   our Constitution.  I mean, I don't see how you get

13   more important than that as manifestly unjust when

14   it's in violation of the U.S. Constitution.

15         THE COURT:  No, I -- I understand the

16   argument.  There's no argument that you're making,

17   and I think the case law is pretty consistent, that

18   the overall bankruptcy structure in Brazil meets our

19   standards of -- for -- for comity, that it's not --

20   it's not a statute that is undeserving of respect,

21   itself.  It's the application or recognition of this

22   particular order entered under one particular

23   procedural mechanism in Brazil that you said violates

24   due process.

25              But I was just asking whether there's

1   any -- any cases that have said, we won't

2   recognize a foreign order because the order was

3   entered without the sufficient due process to

4   meet due process standards --

5              MS. HARTLEY:  Our standards.

6              THE COURT:  -- in the United States?  I'm

7   not aware of any.

8              MS. HARTLEY:  Yeah.

9              THE COURT:  I didn't do independent

10  research, but ---

11             MS. HARTLEY:  But, Your Honor, the argument

12  can be made that in light of the change in the

13  Brazilian law, and I believe there is testimony in

14  evidence by Mr. Braga regarding that, so I believe

15  the Court can consider it, that that would show that

16  the law that was in place at the time would be in

17  violation and, therefore, the Court shouldn't

18  recognize the order that stemmed from that process.

19             THE COURT:  Putting that aside for the

20  moment, what's wrong with the argument that I

21  previewed was my -- my view, and the trustee argued

22  that -- that it's the opportunity to be heard that

23  governs more than whether you availed yourself of

24  that opportunity, if you're talking about due process

25  issues?

1            MS. HARTLEY:  Because hand in hand with

2    that goes to, I believe, the underlying proceeding,

3    and there were no findings made in the veil piercing

4    order.

5            In fact, order -- several orders even

6    reference that there's circumstantial evidence,

7    and I believe the evidence that's been presented

8    from both sides even show that nothing was proven

9    and there were no findings.

10            So like this Court in Petroforte, Your

11    Honor in that case, relied not only on the due

12    process, but also that there were specific

13    findings that were made, whether it was

14    underlying or on appeal.

15            So even if Mr. Mansur didn't avail

16    himself of the appellate procedure, the

17    underlying order is -- is void and shouldn't be

18    relied on because there were never even any

19    findings.

20            And so this Court is going to base an

21    entire Chapter 15 proceeding, and give

22    extraordinary relief under a preliminary

23    injunction order or a permanent injunction order

24    and other relief post recognition all based on an

25    order that is not based on any findings or any

1    evidence.

2              THE COURT:  But it's essentially adopting

3    the relief requested by the trustee based on the

4    trustee's allegations; right?

5              I mean, the Court -- the testimony

6    today, and there's page citations in some of

7    these orders to Page 389 and 1240, there was --

8    there was a significant presentation to the Court

9    before it entered the veil piercing order;

10   correct?

11             MS. HARTLEY:  Yes.

12             THE COURT:  Even if it didn't make specific

13   findings as to the allegations by Dr. Braga?

14             MS. HARTLEY:  Yes, Your Honor.  However ---

15             THE COURT:  How is that different than --

16             MS. HARTLEY:  Because they're not findings.

17             THE COURT:  -- default judgments under our

18   law?

19             The defendant doesn't respond to a

20   complaint, the allegations are deemed true.  If a

21   defendant is properly served, they can't come in

22   later and say, wait a minute, there's no due

23   process, the Court never independently made any

24   findings and I never participated.

25             MS. HARTLEY:  But our courts are very

1    protective of that right, and we know that time after

2    time defendants can come in and set aside defaults

3    and set aside default judgments because critical to

4    our process is being able to be heard in court, and

5    that our courts would rather decide a matter on the

6    merits than let it go by default and default

7    judgment.

8              In addition, Your Honor, the references

9    that are made in the order, I would -- again,

10   they weren't findings and, in fact, Exhibit --

11   what we marked as Exhibit 6 and was introduced

12   into evidence, which is the appellate court

13   decision, specifically states on Page 7, quote,

14   "The long report drawn up by the receiver

15   representing the assets, at around 300 pages, to

16   argue in favor of the petition for inverse

17   disregard of legal personalty, is with all

18   unilateral and in many places barely hints at a

19   diversion of funds."

20             This is the same 300 pages that the

21   veil piercing order, in Your Honor's

22   interpretation, is relying on.

23             Again, I don't believe there were any

24   findings ever made.  No -- none of the appellate

25   courts or subsequent orders rely on any findings

Page 149

1   or reference any findings, and even if a party in

2   our court doesn't show up to appear, we're

3   usually required to put on our case in chief and

4   try it, even without.

5           You know, we've got to put in the

6   evidence, the affidavits, you know, whatever we

7   need.  The Court just doesn't give us a judgment

8   based on circumstantial evidence and media

9   coverage.

10          THE COURT:  But doesn't the fact that the

11  appellate court upon presentation of argument by the

12  entities that were subject of the veil piercing

13  order, vacate it or reverse the -- the trial court,

14  doesn't that in -- in and of itself show that

15  there -- there is procedural due process as long as

16  you avail yourself of the opportunity?

17          I mean, yes, it's different than our

18  procedures because it's on appeal, not -- by --

19  by coming in to -- to challenge an ex parte

20  order, but why is that manifestly contrary to our

21  concepts of due process if he could have done it?

22          MS. HARTLEY:  Well, because Brazil even

23  recognized it was manifestly unjust and altered their

24  code to provide for that to occur at the initial

25  level and not the appellate level, Your Honor.

1              THE COURT:  Okay, and that takes me back to

2    my question from this morning.  Wouldn't the

3    retroactive application of the new law to orders

4    presently in -- in effect be something that a

5    Brazilian court would have to determine?

6              MS. HARTLEY:  Yes, and I also am not

7    asserting that it does have retroactive effect,

8    necessarily, I don't believe it does.

9              However, this Court shouldn't, again,

10   rely on an order that under the current process

11   wouldn't be even allowed to be entered, under our

12   laws wouldn't be allowed to be entered.

13              And, again, in Petroforte, not only was

14   your Court's concern regarding the due process

15   and opportunity to be heard, but it's also the

16   findings.  So, again, even if the party didn't

17   avail themselves of those opportunities, the

18   movant is required to prove their case, that's a

19   requirement here, and it should be something that

20   would be considered manifestly unjust.

21              THE COURT:  Okay.  Let -- let's turn to the

22   scope of relief if -- if I grant recognition.

23              MS. HARTLEY:  Uh-huh.

24              THE COURT:  Just to summarize where I

25   thought we got, we kind of -- the Yiddish would be

1  sort of fumphed (phonetic) around, what the

2  plaintiffs were seeking and what I was contemplating,

3  but the plaintiffs are seeking a freeze of Mansur's

4  interest -- a prohibition on Mansur disposing,

5  encumbering, transferring his interest in the LLCs,

6  and I think you agreed that if recognition is

7  granted, that's -- that's appropriate relief.

8          Then there's the general language which

9  would require the defendants and the LLCs to not

10  transfer or encumber any assets that are

11  described as beneficially or otherwise owned by

12  Mansur, and then there's the specific freeze they

13  believe should be ordered to the Auction, LLC

14  bank account subject of Exhibit 13 documents, so

15  that -- that's -- that's what's, I think,

16  proposed.

17          Did I summarize it correctly?  I think

18  we were kind of going back and forth a little

19  bit, but that sounds right, Mr. Hollembeak?

20          MR. HOLLEMBEAK:  Yes, Your Honor.

21          THE COURT:  Okay.  All right.

22          MS. HARTLEY:  Your Honor, we would object

23  with regards to the freezing requiring the other

24  defendants, meaning the non -- other than Mr. Mansur,

25  to freeze any assets in their possession, custody or

Page 152

1    control, that are owned nominally, beneficially,

2    equitably or otherwise.

3              Opposing counsel even said, you know,

4    that then they're going to do their discovery and

5    come back and say oh, you transferred this, and

6    that was owned by Mansur.  I think it puts an

7    undue burden on the parties.

8              I mean, certainly if something is

9    clearly in his name, that's one thing, but if

10   they're going to subsequently seek to pierce

11   corporate veils and do that, I'm just concerned

12   that they're going to come back and claim that

13   we've been in violation, when at the time it's

14   reasonable for those defendants to believe that

15   those were not his assets.

16             So I just believe that that is

17   extremely broad and -- and it's far broader than

18   any relief that's provided in the Brazil courts

19   or any of the orders that are -- were evidence

20   that's before this Court.

21             The only rights that Mr. Braga has had

22   in the Brazilian court is to freeze the shares of

23   Mr. Mansur in other entities.

24             THE COURT:  Yeah, but there's language that

25   does say, and there's -- there's a batch of orders,

1    trial and appellate that we've looked at, that

2    ultimately it was clarified, and I believe affirmed

3    on appeal that the assets of Mansur are accountable

4    for the debts of the Brazilian bankrupt; right?

5            MS. HARTLEY:  And we don't dispute that,

6    Your Honor.

7            THE COURT:  Okay.  So this relief is saying

8    to the defendants, if you are holding assets of

9    Mr. Mansur, don't dispose of them, and if you have

10    documents relating to assets of Mr. Mansur, don't

11    alter or destroy them.

12            Would it -- would it address your

13    concern if -- if the clarification in the order

14    on the record was that this is only going to

15    expose the non-Mansur parties to contempt or

16    other relief if it's determined that they knew or

17    should have known that they were disposing of

18    assets that were owned or beneficially owned by

19    Mansur?

20            MS. HARTLEY:  Your Honor, that would help,

21    but our concern is we don't want to be in contempt of

22    any order, and -- and so, again, I understand their

23    concern about assets being transferred, but any

24    assets that are in his name or if they're a single

25    member LLC and the company, you know, has assets ---

1            THE COURT:  Well, Mr. Santos, I guess isn't
2   your client, it's Mr. Schwitalla's, and he's going to
3   come in, and there's been a representation he doesn't
4   object.
5            But just by way of example, what --
6   what would be wrong if he was -- if he's a
7   signatory on a bank account, because Mr. Mansur
8   didn't want to be on the account, although I
9   guess he is on the account that we looked at;
10  right?
11           Anyway, if -- if any of the defendants
12  were signatories on bank accounts of -- and they
13  knew they didn't have any interest in the money,
14  and Mansur said, give me the money, I mean, that
15  would be -- that would be pretty clear, but I
16  agree, I mean, it's sort of open ended.
17           It's -- it's -- it's putting the
18  defendants somewhat at risk that they are
19  violating the order, but that's why I said, if
20  they -- there would have to be some proof that
21  they knew or should have known.
22           I mean, I think the way that
23  Mr. Hollembeak described it was, if there is a
24  transfer, we want to have something in the record
25  that would provide some remedy if there was

1    transfers that these parties knew that were

2    transfers of assets that belonged to Mansur.

3              MS. HARTLEY:  But, Your Honor, there's

4    other remedies to get to that.

5              I mean, if they feel there's, you know,

6    fraudulent transfers or a transfer -- you know,

7    we see this in our courts every day, and they're

8    asking for relief before putting on any case.

9              As -- as the Court noted, you know,

10   they didn't even mention Mr. Mansur's wife,

11   Roberta, at all today, nor did they put on any

12   evidence as to any of the other defendants,

13   except for the introduction of the Florida LLC

14   documents.

15             THE COURT:  Okay, and then what about the

16   bank account of -- of the Auction, LLC?

17             MS. HARTLEY:  Again, Your Honor, we believe

18   that Mr. Braga is asking for relief here that he's

19   not entitled to and hasn't been afforded in Brazil.

20             Again, the only thing he's been able to

21   do is -- is freeze the shares of companies.  He

22   shouldn't yet be able to reach the assets without

23   showing more to this Court.

24             THE COURT:  Have you looked at these

25   account statements?  There were -- there were a few

1    that were -- a few of the line items that were

2    identified, but does it also -- maybe there's no way

3    of knowing, but is there anything to be derived just

4    from the checks or the line items that -- that show

5    disbursements in the ordinary course of the business

6    of this entity?

7              MS. HARTLEY:  I mean, that's just it.  This

8    is an operating company, Your Honor.  The trustee

9    has -- has done no discovery other than subpoenaing

10   records, but as far as to what these disbursements

11   are and whether they're legitimate business purposes

12   or not, and that's why we just have concerns with the

13   relief that's being requested in the permanent or

14   preliminary injunction, extending it to additional

15   assets and to these defendants.

16             THE COURT:  What -- what does the company

17   do?  We haven't -- we haven't heard evidence from

18   either side of what these entities are.

19             MS. HARTLEY:  Your Honor, the company was

20   an online auction company.  Parties would register,

21   and pay a fee to register, and then would bid on

22   different items, mostly electronics, but there were

23   other assets that were sold on the auction.

24             THE COURT:  Was this the entity that had

25   all the cars?

1          MS. HARTLEY:  Yes.

2          THE COURT:  Those were cars that it was

3     just holding for auction or -- I know this is going

4     beyond the evidence, but just for background?

5          MS. HARTLEY:  It's unclear and I'm not

6     sure, Your Honor.  I think he auctioned some cars,

7     but I don't know that all of those cars were for that

8     purpose.

9          THE COURT:  What if the injunctive language

10    was just restricting disbursements to Mansur or for

11    his benefit, and you could come in and seek relief if

12    he's actually working and is entitled to car payments

13    or under some theory --

14         MS. HARTLEY:  I think that would be --

15         THE COURT:  -- Direct TV, I don't know?

16         MS. HARTLEY:  -- fine, Your Honor.

17         THE COURT:  That would be ---

18         MS. HARTLEY:  It could be part of his

19    compensation or ---

20         THE COURT:  Okay.  All right.

21         I think I have the basics pretty clear

22    in my head, but I'm otherwise getting a little

23    blurry, so I don't know if you've had a chance to

24    go through all the issues or if not, what else

25    you wanted to say in closing.

Page 158

1           MS. HARTLEY:  The other item I think the

2   Court touched upon was the accounting.  We believe

3   that's premature, it's part of the adversary

4   proceeding and should be part of discovery.  I don't

5   know that -- I think we covered the other relief that

6   Mr. Braga was seeking.

7           THE COURT:  But you're not contesting some

8   revised language that would declare their entitlement

9   to discovery about assets that may be owned or

10  beneficially owned by him?

11          MS. HARTLEY:  No, not if the Court

12  recognizes this as a ---

13          THE COURT:  Just as part of discovery

14  essentially, okay.

15          MS. HARTLEY:  Oh, I was just thinking

16  something.  One second, Your Honor.

17          THE COURT:  Defendants' team, anything else

18  you wanted -- you can go up and whisper --

19          MS. HARTLEY:  I guess so, right.  Okay.

20          THE COURT:  -- tag in?

21          MS. HARTLEY:  There was still something

22  with the accounting.  Anyway, I'll hopefully recall

23  it.

24          Your Honor, just Section 5 -- 1522(a),

25  the Court may only grant discretionary relief

1    under Section 1521 if interests of the debtors,

2    creditors and other interested parties are

3    protected.  This Court even noted the concerns it

4    had for, perhaps, for creditors or lien holders.

5              Under Section 1522(b), the Court may

6    impose conditions on discretionary relief,

7    including post security or a bond.  As Dr. Braga

8    even testified, there's a tremendous number, I

9    guess of creditors in Brazil, and not very many

10   assets.

11             So if the Court is inclined to grant

12   the discretionary relief, again, we'd assert that

13   this is extraordinary relief.  TROs, you know,

14   are not taken lightly in our courts, that

15   Mr. Braga should be required to post a security

16   or a bond.

17             Again, we believe that the relief

18   they're asking here expands his powers.  He

19   doesn't have this authorization.  He's getting

20   relief here that he would not and does not have

21   in Brazil, and we would request that the Court

22   require him ---

23             THE COURT:  What -- can you be more

24   specific now that we've sort of whittled down?  If --

25   if it's -- if it's been determined that he has the

1    right to -- or you're saying he doesn't have the

2    technical authority under any of the orders we've

3    seen to actually recover the assets?

4            MS. HARTLEY:  Right, that he may have the

5    authority to freeze them, but anything further, we

6    believe he needs --

7            THE COURT:  Okay.

8            MS. HARTLEY:  -- authority from the Court

9    in Brazil.

10           THE COURT:  That's all we're doing, at this

11   point, would be freezing his ownership shares, which

12   you're not contesting, and freezing by order to the

13   third parties, any assets that they're holding that

14   belong to him.

15           So I'm not sure how this is going

16   beyond what he's authorized to do.

17           MS. HARTLEY:  There could be damages to the

18   parties, to the defendants, with regards to the

19   relief that's being sought.  If in the end -- again

20   they're -- they're asking for relief before proving

21   their case, so if -- if in the end these assets

22   shouldn't have been frozen.

23           THE COURT:  Okay.  Any rebuttal?

24           MR. HOLLEMBEAK:  Just a few items, Your

25   Honor.

1            THE COURT:  If it was -- if it was

2    perceived as just a casual question to Ms. Hartley,

3    take it as a proposed ruling and address it, that I

4    would only freeze the bank account of the auction

5    company to the extent of distributions to Mr. Mansur

6    or for his personal benefit, and the reason I'm

7    leaning in that way, if this is an ongoing business

8    and there's lots of other expenses being paid, then

9    this -- it may create havoc that is not justified

10   based on the mere fact that there's evidence that he

11   owns the entity and has been getting distributions.

12           MR. HOLLEMBEAK:  Well, Your Honor, I would

13   say, first of all, they've put on no evidence.  They

14   came, they asked for a continuance to get time.

15   They've put on no witnesses.  What's -- what's the

16   harm?

17           THE COURT:  They have no burden, though.

18           MR. HOLLEMBEAK:  Well, first of all,

19   it's -- it's an injunctive factor that -- that you

20   balance the harms, and we have to know what the harm

21   to ---

22           THE COURT:  All right.

23           MR. HOLLEMBEAK:  Mr. Mansur, they have

24   never said because of the freeze in the last 30 days

25   or 27 days, Mr. Mansur has been unable to do X or Y,

Page 162

1    or this company has been unable to do X or Y.

2              And I would submit that if it is an

3    operating business, as an online auction company,

4    why is it paying memberships for a country club?

5    Why is it paying rent at $24,000 a month for a

6    house if it's an online business?

7              I mean, please scrutinize that --

8    that -- those records that were put into

9    evidence, because they clearly demonstrate that

10   this is -- that there is, you know ---

11             THE COURT:  Well, that's why I was asking.

12   I mean, nobody walked me through it.  I'm planning to

13   take a fairly short break and then do a Bench ruling.

14             I mean, the injunction -- the TRO is

15   going to expire, we're going to finish today.  So

16   if there is more to re -- refer me to in the --

17   in the disbursements -- what you just mentioned

18   would probably fall within the scope of my

19   proposed order, disbursements to him for his

20   benefit, including rent payments or payments for

21   personal use of phones or memberships in country

22   clubs or the like.

23             Where did -- do you have any idea where

24   the money has come from that's going into this

25   entity?  I mean, we know that there's money going

Page 163

1   out, but ---

2            MR. HOLLEMBEAK:  Your Honor, the

3   majority ---

4            THE COURT:  You don't know if it's earning

5   that money through legitimate business or it's --

6   it's just a conduit, right, at this point?

7            MR. HOLLEMBEAK:  Yes, the majority of the

8   deposits, you'll see on those bank accounts, are cash

9   in large numbers that are just being made.

10           At the beginning of the month, there's

11  one or several deposits that equal a lot of money

12  and it's totally drained by the end of the month.

13  It's -- it's -- it's just a living account,

14  basically, and we, you know, have not yet figured

15  out where the money is coming from, but we

16  certainly have had no evidence that the auction

17  entity is a -- is an operating entity.

18           Your Honor, I -- this may be more

19  relevant for the future hearing, but I would --

20  on the burden, I would ---

21           THE COURT:  Well, here's like BMW Financial

22  Services, $6,000.  So there are several ---

23           MR. HOLLEMBEAK:  That's going out the door,

24  right?

25           THE COURT:  What's that?

Page 164

1          MR. HOLLEMBEAK:  That's going out the door,

2   right?

3          THE COURT:  Right, so I mean maybe that's

4   in connection with the operation of the business,

5   maybe it's his BMW, I don't know.

6          But, I mean, the point is there's an

7   awful lot of entries here that could be

8   consistent with the operation of the business and

9   the -- the -- it is a separate LLC, it hasn't

10  been veil pierced and there hasn't been any

11  specific showing, other than what is reflected in

12  some of the line items, that this entity, itself,

13  it's -- it's -- all of its assets should be

14  frozen.

15          MR. HOLLEMBEAK:  Well, the only evidence we

16  have is that Mr. Mansur is the hundred percent owner,

17  and if Your Honor enforces the veil piercing order,

18  the trustee should be able to step into his shoes --

19          THE COURT:  Right.

20          MR. HOLLEMBEAK:  -- as the owner.

21          THE COURT:  File a motion tomorrow and we

22  can hear it whenever, if you think there's enough

23  evidence.

24          I -- I don't know whether the Sunbiz

25  gets you to the goal line on taking over the

1    entities, maybe it does in the absence of other

2    evidence, but, you know, once you take over and

3    step into the shoes, that's fine.

4            But like I said earlier, if we have a

5    Chapter 7 debtor that files and has a wholly

6    owned company, until the trustee steps in, that

7    company continues to operate.

8            MR. HOLLEMBEAK:  I understand, Your Honor,

9    that's what the turnover claim in the existing

10   complaint is for.

11           THE COURT:  Right.

12           MR. HOLLEMBEAK:  We could file a motion,

13   but it would be a 1521 motion.

14           THE COURT:  No, but -- but the point is

15   it's not relief you're seeking today, the turnover

16   part.

17           MR. HOLLEMBEAK:  No, no, it's not, but in

18   terms of having to post a bond for an operating

19   business, I mean, there's just zero indication that

20   there's any harm.

21           THE COURT:  No, I'm not going to require a

22   bond if I -- if I limit the relief as contemplated.

23           MR. HOLLEMBEAK:  Just really quick, I would

24   point the Court to 472 B.R. 156, which is a case from

25   the Bankruptcy Court in Massachusetts, where the

1   Court spoke specifically to the burden of proof for a
2   foreign debtor or a foreign trustee taking over
3   assets of a debtor's subsidiary -- I mean, an
4   ownership interest in a -- in non-debtor
5   subsidiaries, and it says that the Court further
6   concludes that the foreign representatives have the
7   initial burden of demonstrating that the interests of
8   the foreign debtors and the U.S. companies are
9   sufficiently protected, but that the ultimate burden
10  of establishing the absence of sufficient protection
11  rests on the objecting parties.
12              The Court's conclusion is consistent
13  with the burden of proof imposed with respect to
14  turnover motions filed pursuant to 11 U.S.C. 542,
15  that's at pin cite 1 -- 472 B.R. pin cite 182.
16              THE COURT:  Who -- who wrote that?
17              MR. HOLLEMBEAK:  Judge Feeney, and it ---
18              THE COURT:  But what was the actual issue?
19  Is this going to any of the relief for today or just
20  the down the road when you're going to seek to take
21  control over the LLCs?
22              MR. HOLLEMBEAK:  It would apply directly
23  when we're back before you with a turnover order.  I
24  just wanted to demonstrate to the Court that they
25  have to -- they have to put on some -- they have some

1   burden.

2            They can't just -- their lawyer just

3   can't stand here and say that there will be

4   harm.  At some point -- we don't -- we'll seek --

5   we'll seek discovery, and if they can show to us

6   that it's an operating business, then maybe we

7   can work something out.

8            But it can't just be counsel standing

9   up here saying, in the face of the evidence that

10  we have, and the testimony of the -- of the

11  history of this individual, and in the foreign

12  representative declaration there's 20 plus

13  companies that are identified that were, you

14  know, alleged straw companies.  It's no surprise

15  that there's -- we found four in Florida.

16           And I -- and, frankly, I don't -- you

17  know, we're talking about the legal issues of the

18  relief.  You know, I don't expect him to be using

19  this account anymore.  There's no been -- there's

20  not been any deposits or anything since, you

21  know, we froze it a month ago.

22           THE COURT:  How did you serve him,

23  personally?

24           MR. HOLLEMBEAK:  Mr. Mansur?

25           THE COURT:  Yes.

1          MR. HOLLEMBEAK:  At his -- at this

2    residence on Bay Street, which is ---

3          THE COURT:  North Bay Road.

4          MR. HOLLEMBEAK:  Right, which is also the

5    address of all of the registered companies, so they

6    were all served personally there.

7          THE COURT:  Okay.  All right.

8          Ms. Hartley wanted to --

9          MS. HARTLEY:  Your Honor ---

10         THE COURT:  -- make a brief comment, I

11   guess.

12         MS. HARTLEY:  Yeah, this isn't further

13   argument, it was just something I forgot before.

14         I believe in the papers, at some point

15   they asked for either discovery or information or

16   accountings with regards to assets, you know,

17   anywhere, and we want to make sure that certainly

18   any relief should be limited to U.S. assets.

19         MR. HOLLEMBEAK:  Your Honor, I -- this is

20   not an issue that I'm prepared to -- I mean, I could

21   go into, but it's -- I disagree with that.

22         It's if entities are -- or people are

23   subject to the jurisdiction of this Court, and

24   control assets of Mr. Mansur's outside this

25   Court, it's no different than a Chapter 11 case

1    where Your Honor might use the contempt power to

2    keep someone from executing against a debtor's

3    assets overseas.

4              MS. HARTLEY:  Your Honor, we would

5    disagree.  Chapter 15 is -- is to protect the assets

6    that are here in the United States.

7              Again, counsel is trying to -- to put

8    the cart before the horse.  We're not -- we

9    haven't even proven any cases here or established

10   any assets here or elsewhere, but I believe --

11             THE COURT:  This sounds ---

12             MS. HARTLEY:  -- the discovery should be

13   limited to the United States.  They already have a

14   proceeding in the UK, they have a proceeding in

15   Brazil.

16             THE COURT:  I'm not sure where that

17   language is, but I tend to doubt that it's -- well,

18   I -- I don't know what's going to become operative or

19   not, but I don't necessarily agree with you that a 15

20   is limited to assets in the United States.  It's also

21   used for discovery of individuals in the

22   United States that may have knowledge of assets of

23   the debtor, wherever located.

24             So I -- I think the trustee has the

25   right to ask questions of people within this

1   jurisdiction about assets of the debtor, whether
2   located here or not.  I -- I could revisit that
3   if -- if it really becomes an issue.
4            All right.  Let me take a, I don't
5   know, I don't want to keep you too late, but
6   probably 15 or 20 minutes, I've got to go back
7   through some notes, and then we'll come back in
8   and rule.
9            ECRO:  All rise.
10           (Thereupon, a recess was taken, after
11   which the following proceedings were had:)
12           THE COURT:  Okay.  Have a seat.  Thanks.
13           All right.  There's obviously been
14   substantial briefing and argument presented in
15   the papers, and as I hope was evident by my
16   questions at the start this morning, my law clerk
17   and I spent a lot of time on the papers
18   beforehand with the intention, absent any major
19   surprise, of ruling today.
20           The extended temporary restraining
21   order expires tonight and, therefore, it was
22   necessary to enter some relief to continue
23   injunctive relief that may be appropriate, and it
24   was my intent to flesh out the issues and
25   determine the proper scope of a preliminary

1  injunction, and as to the recognition,

2  procedurally it's much simpler if they're both

3  done together so we don't have injunctive relief

4  that kind of bridges the pre and post recognition

5  time period.

6           So I am prepared to rule based on the

7  papers and the additional evidence and arguments

8  presented today.  I will be putting the ruling on

9  the record.

10          The Court conducted an evidentiary

11 hearing on December 14, 2016, on the foreign

12 representative's verified petition for

13 recognition of the debtors' Brazilian proceeding

14 pursuant to 11 U.S.C. Section 1515 and 1517,

15 which I'll refer to as the motion for

16 recognition, Docket Entry 3 in the main case; as

17 well as an evidentiary hearing to consider the

18 foreign representative, who I may refer to going

19 forward as the trustee's, request for a

20 preliminary injunction in a separate adversary,

21 Adversary Number 16-1626, that motion is Docket

22 Entry 3 in the adversary.

23          I've considered the record, including

24 the motion for recognition, the request for

25 injunctive relief, the response filed on behalf

1    of Mr. Mansur and several of the other defendants

2    in the adversary proceeding, including certain

3    LLCs alleged to be owned or controlled by

4    Mr. Mansur, the testimony of Dr. Braga, and the

5    exhibits introduced into evidence, and the

6    arguments presented by -- by counsel, both in the

7    memos and in court today.

8            Based on the findings and conclusions,

9    which I'm placing on the record, I will be

10   granting the motion for recognition and the

11   related relief sought in the motion for

12   recognition.  I'll also be entering a preliminary

13   injunction in the adversary, although the relief,

14   as I will specify later, will not include all of

15   the relief sought by the trustee and will include

16   certain other conditions for the protection of

17   other parties in interest.

18           Just to put some of the background

19   that's not really disputed into the record for

20   context, the debtor, Mappin Lojas, was a

21   department store chain incorporated in Brazil in

22   1990, it had been in base apparently for hundreds

23   of years prior to that in other places.

24           In October of 1996, Ricardo Mansur, one

25   of the defendants and respondents objecting to

1   the relief sought today, became the CEO of the

2   debtors.

3           In July of 1999, Mappin Lojas was

4   placed into a Brazilian insolvency proceeding.

5           July 6, 2011, the Brazilian trustee of

6   Mappin Lojas, as well as other entities that had

7   been brought into the proceeding over the years,

8   filed on an ex parte basis for relief to pierce

9   the corporate veil, actually reverse piercing is

10  more apt, to hold Mansur and his assets

11  personally liable for the debts of the

12  Mappin Lojas debtors.

13          The Brazilian court on August 6, 2011,

14  granted this request, Exhibit 4 at trial,

15  extending the insolvency proceedings essentially

16  over Mansur and certain entities, in essence,

17  turning them into debtors or making them liable

18  for the debts of the debtors.  This is the

19  so-called veil piercing order that we've been

20  focusing on at length in the papers and in the

21  hearing today.

22          I'm familiar essentially with the

23  procedures in Brazilian insolvency law for

24  bringing other entities into a bankruptcy that

25  have been determined to have been involved with

1  the estate or assets, whether by extension orders

2  that were -- the title of what occurred in the

3  Petroforte case, which I'll talk about a little

4  bit more, certainly on the law later, Case Number

5  14-15408, or by the relief in the veil piercing

6  order and subsequent orders that were entered in

7  the Brazilian bankruptcy here.

8          Mansur, according to the testimony, was

9  served with the veil piercing order on August 24,

10  2011.  Mr. Mansur is not contesting that the

11  order was served upon him.  He did not appeal the

12  veil piercing order.

13          December 2014, specifically

14  December 16th -- actually, this notation I think

15  was from my notes on the papers.  I think this is

16  actually the November 2014 pleading that is now

17  in evidence, Exhibit 9, I believe.

18          So I believe it's in November 2014,

19  the trustee sought a subsequent certification

20  from the Brazilian court that the veil piercing

21  order was a final non-appealable order, and that

22  it applied to Mansur individually.

23          On January 15, 2015, the Brazilian

24  court granted the trustee's request, and I

25  believe -- I may have the exhibit numbers

1   wrong -- no, I think the January 15th order is

2   Exhibit 9 and the November 24th, rather than

3   December petition itself, was Exhibit 8 at -- at

4   trial.

5            Mansur did not appeal the January 15,

6   2015 order.  He did appeal a separate order

7   entered on November 24, 2015, which specifically

8   authorized the trustee to collect or pursue

9   Mansur's shares in various Brazilian entities.

10           June 17, 2016, the Sao Paulo Court of

11  Appeals dismissed Mansur's interlocutory appeal

12  of the November 24, 2015 order, and I think that

13  is Exhibit 11.

14           If my facts are a little bit off in

15  terms of the dates and exhibit numbers of the

16  orders, and perhaps even in the contents, it

17  isn't materially changing my conclusions and

18  the -- the orders in evidence will supersede my

19  description of them if inaccurate in any regard.

20           On May 14, 2015, the trustee, after

21  discovering that Mansur was living in London,

22  filed a petition in the UK to open an ancillary

23  proceeding there.  That relief was granted in

24  order to allow the trustee to pursue assets of

25  Mansur located in the UK.

1             We didn't hear much about the results

2     there, other than the testimony that soon after

3     he received recognition, the trustee learned that

4     Mansur had moved to Miami Beach, and it is that

5     move to Miami Beach and the Southern District of

6     Florida, and information about assets the trustee

7     acquired that Mansur may own directly or

8     indirectly in this district, that information is

9     what triggered the filing of these Chapter 15

10    cases.

11            Specifically, the trustee is seeking

12    recognition of the Brazilian insolvency

13    proceeding of Mappin Lojas and its affiliates, as

14    noted, under 15 U.S.C. Sections 1515 and 1517,

15    and certain additional -- well, the automatic

16    relief that comes under 1520, and certain

17    additional relief that's discretionary under

18    1521.

19            As mentioned, the trustee in a separate

20    adversary proceeding is ultimately seeking

21    turnover from Mansur and the defendant LLCs, and

22    the other defendants, of any assets that can be

23    determined to be beneficially or legally owned by

24    Mr. Mansur.

25            The adversary, I believe I already

1  identified, is Case Number -- Adversary Number

2  16-1626.  In the adversary, the trustee sought,

3  and on November 21, 2016, the Court issued a

4  temporary restraining order, Docket Entry 6 in

5  the adversary.

6        That order provisionally recognizes the

7  veil piercing order; prevents entities that

8  received notice of the temporary restraining

9  order from dissipating assets that may be assets

10  of Mr. Mansur or destroying records that may

11  pertain to assets of Mansur; further allows

12  the -- further allowed the trustee to issue

13  subpoenas pre-recognition to anyone that might

14  have information as to Mansur and his assets.

15        In the adversary, the trustee is also

16  seeking an order extending the temporary

17  restraining order into a preliminary injunction,

18  as noted that's the issue we tried today, the

19  entitlement and scope of the preliminary

20  injunction, which aside from continuing the

21  relief already granted, would provide for other

22  relief, including requiring an accounting by the

23  defendants of Mansur's assets.

24        The temporary restraining order was

25  extended through the end of today, December 14th,

1    by this Court's December 6, 2016 order, extending

2    the temporary restraining order, Docket Entry 25

3    in the adversary.  That order also set a hearing

4    for today to consider the plaintiff's request for

5    preliminary injunctive relief.

6            Mansur and all the corporate or LLC

7    defendants in the adversary have filed an

8    objection, and the objection also, I think, was

9    on behalf of the defendant, Mr. Mansur's wife,

10   objecting to recognition of the foreign main

11   proceeding and to the scope of the injunctive

12   relief sought by the trustee.  The response and

13   objection is Docket Entry 18 in the main case and

14   Docket Entry 30 in the adversary.

15           Turning to the Court's conclusions from

16   the evidence and law, I'm not going to go through

17   each of the elements of recognition, we went

18   through that earlier, and the trust -- the

19   objecting parties are not contesting that this

20   is -- there is a Brazilian foreign main

21   proceeding, and Dr. Braga is an authorized

22   representative, that the petition was properly

23   filed here, other than a side issue on perhaps

24   jurisdiction based on assets.

25           But the primary issue, and that which I

1    will discuss at greater length, is the argument

2    by the defendants and respondents that the

3    enforcement of the veil piercing order would be

4    manifestly contrary to U.S. public policy under

5    11 U.S.C. 1506.

6              I will note that the defendants also

7    argue that the trustee has failed to establish a

8    sufficient property interest in the U.S. pursuant

9    to 11 U.S.C. Section 109 to form the basis for

10   jurisdiction.

11             I'd comment very briefly that I don't

12   believe the decision, and I think Mr. Hollembeak

13   referenced it as Barnett coming out of the 2nd

14   Circuit, is a majority view.  So even in cases

15   where a trustee simply deposits assets of the

16   estate in a retainer account in order to pursue

17   discovery in a U.S. jurisdiction, that is

18   intended to be enough.

19             It's a moot point here because with

20   recognition of the veil piercing order, there's

21   certainly evidence that there are assets or

22   potential assets of the estate in this

23   jurisdiction to form a -- in this -- in this

24   district to form a basis for jurisdiction.

25             And finally, as I mentioned, the

1  defendants are challenging the scope of the

2  relief, both under Section 1521 and in the

3  proposed preliminary injunction, even if the

4  petition for recognition is granted and the veil

5  piercing order is recognized and enforced.

6         The defendants argue that some of the

7  relief sought by the trustee in the preliminary

8  injunction, including the power to administer

9  Mansur's assets in the United States, is

10 premature and exceeds the scope of the

11 authorization afforded to the trustee by the

12 Brazilian courts.

13        Turning to 1506, and a lot of the basic

14 law we -- we pulled from my Petroforte decision.

15 I -- I -- I have kept track of the 1506 cases or

16 at least looked -- looked at citing references.

17 I'm not aware of any significant cases that

18 weren't presented in the papers.

19        The basics, Section 1506 provides a

20 recognition or other relief may be denied under

21 Chapter 15, quote, "if the action would be

22 manifestly contrary to the public policy of the

23 United States," closed quote.

24        To determine whether efforts by a

25 foreign trustee are manifestly contrary to U.S.

1   public policy, courts consider, quote, "one,

2   whether the foreign proceeding was procedurally

3   unfair; and two, whether the application of

4   foreign law, the recognition of foreign main

5   proceeding under Chapter 15 would severely hinder

6   a United States Bankruptcy Court's abilities to

7   carry out the most fundamental policies and

8   purposes of these rights," closed quote,

9   In Re: British Isle of Venice BVI, Limited, 441

10  B.R. 713, 717, Bankruptcy, Southern District of

11  Florida, 2010.

12          All of the courts, and certainly all of

13  the more recent decisions are -- I think are

14  unanimous that it's a very narrow public policy

15  exception and is -- is a -- a quote that I

16  believe was in Petroforte, quote, "the narrow

17  public policy exception contained in Section 1506

18  is intended to be invoked only under exceptional

19  circumstances concerning matters -- matters of

20  fundamental importance to the United States,"

21  In Re: Vitro, S.A.B. de C.V., 701 F.3d 1031 at

22  1069, 5th Circuit, 2012, quoting In Re: Ran,

23  R-a-n, 607 F.3d 1017, 1021, 5th Circuit, 2010.

24          Section 1506 is intended to protect the

25  most fundamental policies of the United States,

1   House Report 109-31I at 109, see also In Re: RSM

2   Richter, Inc. vs. Aguilar, In Re: Ephedra,

3   E-p-h-e-d-r-a, Products Liability Litigation,

4   349 B.R. 333, Southern District of New York,

5   2006.

6            I wanted to go back to a couple of

7   things in Petroforte that we didn't already pull

8   out because I discussed with Ms. Hartley whether

9   there were cases -- certainly due process is a

10  fundamental policy of the United States, so

11  there's -- there's nothing frivolous about

12  raising due process.

13           But I asked whether there were any

14  cases that found that due process was so lacking

15  in a foreign proceeding or foreign order that

16  courts have denied recognition or enforcement of

17  recognition of a particular order under 1506, and

18  I'm unaware of any.

19           If there are, my guess is it would be

20  under facts different from the facts here, where

21  there is absolutely no opportunity to defend

22  against, either initially or by appeal, the

23  relief entered in the foreign order subject of

24  the request for recognition, but a couple of

25  cases that I didn't already have in this -- these

1  excerpts that I do recall, to just provide an

2  example of really what 1506 I think is intended

3  to do.

4          One of them was, I think -- I think

5  Judge Gropper, but I'm not positive, but, anyway,

6  it's a Southern District of New York case,

7  In Re:  Toft, 453 B.R. 186, Bankruptcy, Southern

8  District of New York, 2011, and another case out

9  of the Eastern District of New York, In Re: Gold

10 & Honey, Limited, 410 B.R. 357, Bankruptcy,

11 Eastern District of New York, 2009.

12         Those cases applied 1506, and I'm

13 reading from or paraphrasing from Petroforte,

14 because the foreign orders at issue violated

15 specific U.S. laws dealing with the same subject

16 matter, and Toft was a pretty clear case where

17 the German administrator was seeking enforcement

18 of an order, I think it was to get at certain

19 e-mails or -- or other confidential

20 communications, but the crux of the decision was

21 that enforcement of the foreign order would be a

22 specific violation of federal U.S. wire tapping

23 laws.

24         And in Gold it was a little more

25 complicated, but it came down to enforcement of a

1    foreign -- the foreign order would be enforcing a

2    foreign order that had been entered in violation

3    of the automatic stay in a -- in a prior U.S.

4    bankruptcy proceeding.

5              Anyway, those are the type of instances

6    in which this narrow exception is applied, but

7    more on point, we -- we've -- we've looked at

8    similar Brazilian court orders, and Ms. Hartley

9    did a valiant job of distinguishing the

10   Petroforte case on its facts in some -- some

11   aspects, but let -- let's get into that.

12             The Court previously considered and

13   rejected an argument that the enforcement of

14   orders in a Brazilian case that extended the

15   bankruptcy to certain entities were manifestly

16   contrary to U.S. policy under Section 1506, and

17   that's the Petroforte decision, which we've been

18   referring to, In Re: Petroforte de Brasileiro de

19   Petroleo, Ltda., I apologize for my, I'm sure,

20   butchered pronunciation -- although is Dr. Braga

21   still here, yes, he is, okay -- 542 B.R. 899,

22   Bankruptcy, Southern District of Florida, 2015.

23             And by the way, is it Petroforte or

24   Petroforte, I'm always ---

25             DR. BRAGA:  Petroforte.

1          THE COURT:  Forte, so I wasn't only
2    partially wrong, I was wrong on either regards.
3          So in Petroforte, the Court held in a
4    similar factual scenario, that in general,
5    although Brazilian law may impose different
6    requirements for substantive consolidation, the
7    different standards standing alone did not
8    signify that Brazilian bankruptcy law is
9    manifestly contrary to U.S. public policy, citing
10   In Re: OAS, S.A., 533 B.R. 83 at Page 105,
11   Bankruptcy, Southern District of New York, 2015.
12          That -- that was part of the argument
13   in Petroforte, was that, in effect, these
14   extension orders that brought these individuals
15   and entities in and made their assets subject to
16   the debts of Petroforte, were in the nature of
17   substantive consolidation under procedures that
18   were so -- so different from our procedures, that
19   I should find that they're manifestly contrary.
20          That argument hasn't been made in this
21   case, and I won't belabor it, but there was also
22   an alternative argument in Petroforte that is on
23   point here, that the Brazilian proceeding was
24   ex parte, and that there was a due process
25   problem.

1          And in discussing the Brazilian

2   ex parte proceedings that were at issue in both

3   Petroforte and are at issue in this case, I cited

4   to language in Judge Bernstein's OAS decision, in

5   which he held that, quote, "due process is

6   satisfied because these ex parte proceedings and

7   orders are subject to ex post review, just as the

8   consolidation order has been subject to ex post

9   review," closed quote, and that's Petroforte at

10  Page 105, citing the OAS decision at -- no,

11  that's not right.  It's Petroforte at 908, citing

12  the OAS decision, 533 B.R. at 105.

13          All right.  There -- there are

14  distinctions factually.  The defendants argue

15  that in Petroforte the -- the parties affected by

16  the ex parte extension orders did appeal those

17  decisions in Brazil, which in turn allowed them

18  to present evidence, and that those appellate

19  proceedings gave rise to Brazilian appellate

20  decisions which discussed and weighed evidence,

21  and made specific findings to support the

22  extension of the Brazilian insolvency case to

23  these entities.

24          And the defendants focused on these

25  distinctions in an effort to persuade the Court

1   that in the absence of an appeal, we have just an

2   ex parte order with -- without specific findings

3   and uncertainty as to what evidence was or was

4   not considered, but certainly was done ex parte

5   by the trial court.

6           As noted, Mansur did not appeal the

7   veil piercing order, although the entities that

8   were the subject of reverse veil piercing did.

9   He also did not appeal the June 15, 2015 orders,

10  but he argues that in the absence of these

11  appeals, in the absence of any presentation of

12  evidence or specific findings, he was denied due

13  process and that the veil piercing order fails to

14  meet the fundamental standards of fairness in the

15  United States.

16          I conclude that enforcement and

17  recognition of the veil piercing order would not

18  be manifestly contrary to our concepts of due

19  process, and -- and this was previewed, I'm not

20  going to do much more than review what was said,

21  and obviously I came in this morning with this

22  pre -- with this preliminary view based on the

23  papers and the law, and haven't been persuaded

24  otherwise.

25          Mansur, as Mr. Hollembeak pointed out,

1    and I think it's the key, the issue is not

2    whether the order was simply ex parte, it's

3    whether he had an opportunity to present argument

4    and objection, and it's stipulated that he was

5    served with the order, he did not appeal the

6    order, even though he had the opportunity to take

7    an appeal and as also stipulated, to present

8    evidence and argument de novo on appeal under the

9    same procedures discussed at greater length in

10   Petroforte.

11           He chose not to appeal and avail

12   himself of these appellate remedies, and that

13   choice, particularly where there's no issue of

14   notice, cannot constitute a manifest unjustice

15   and a denial of due process.

16           We talked a little bit in the colloquy

17   during closing about default judgments.  I do

18   think there is a -- is some apt comparison, I'm

19   not saying it's identical, but in the U.S. if a

20   party doesn't respond to a complaint, they are

21   defaulted, and judgment is entered against them

22   on an ex parte basis.

23           In some instances, the plaintiff has to

24   present evidence in support of allegations, and

25   other cases -- other instances clearly pled

1  allegations are simply deemed to be true, and

2  just like as Ms. Hartley noted, we're pretty

3  liberal in vacating default judgments.

4  There is the procedure, albeit on

5  appeal in Brazil, to vacate veil piercing orders

6  and, indeed, the evidence showed, including

7  Exhibit 6 of the defendants, that on appeal the

8  corporate parties subject of the reverse veil

9  piercing did, in fact, present argument and

10 perhaps evidence and prevailed, at least at that

11 level of appeal, in setting aside the veil

12 piercing order.

13 The -- the -- there's a further

14 argument that he didn't appeal the veil piercing

15 order because the entirety of his assets were

16 frozen in 1999.

17 I couldn't reach any good conclusion

18 from that, as I said this morning.  Either he's

19 saying I couldn't afford to -- to appeal because

20 my assets were frozen, which we know is kind of

21 frivolous given that he apparently can afford

22 counsel and he can afford to live a good life,

23 but even if that freeze order from 1999 affected

24 his decision to appeal, doesn't alter the fact,

25 and there's no evidence that says he was somehow

1   restricted and could not have appealed and

2   presented argument and evidence on appeal to set

3   aside the veil piercing order.

4           So summing up, perhaps at the risk of

5   redundancy, which often happens in Bench rulings,

6   the factual differences between this case and

7   Petroforte do not change the result.  Despite

8   argument to the contrary, which is in Page 7 of

9   Mansur's response, he did have an opportunity to

10   submit argument and evidence if he had exercised

11   his right to appeal.

12           Ms. Hartley made the correct point, due

13   process is -- is an important constitutional

14   protection in our system, so I'm not at all

15   taking lightly the importance of -- of due

16   process as public policy, an important public

17   policy in the United States, but the only

18   situation in which I could see a due process

19   argument leading to a conclusion of -- an order

20   manifestly contrary to our concepts of due

21   process, if you simply did not have the right at

22   all to contest an order entered in a foreign

23   proceeding, either at the trial level or on

24   appeal.

25           Finally, and just briefly, the argument

1    that Brazil is changing or has changed its laws

2    to eliminate certain types of ex parte relief

3    when it comes to bringing additional parties or

4    their assets into a bankruptcy, that change in

5    the law doesn't make these ex parte proceedings

6    manifestly unjust.

7              If that change in the law somehow would

8    affect the enforcement of the veil piercing

9    order, that's an issue that would have to be

10   pursued in -- in Brazil.  I don't find that

11   change in the law, while possibly a good -- a

12   change in -- in policy and procedure, as a change

13   in the law that affects the outcome here.

14             Having recognized the veil piercing

15   order, I'm not going to say anything more about

16   the jurisdictional argument.  I think we've --

17   we've covered that sufficiently.

18             So in sum, I find the trustee is

19   entitled to recognition of the proceeding as a

20   foreign main proceeding, and to the additional

21   relief under Section 1521.

22             Let me just take a quick look at the

23   proposed order to see if I had any problems with

24   any language.

25             I guess on Page 3 -- by the way, when

Page 192

1   you submit the order, whoever is going to do it,

2   Ms. -- Ms. Hauser, presumably, send it to my

3   regular e-mail with -- in -- in Word form so I

4   can edit it.

5            So I'll -- I'll give you some notes,

6   but if -- if they're not all faithfully

7   incorporated or clearly described, I'll --

8   I'll -- I'll modify it.

9            But I did -- this is just procedural, I

10  think you should just refer to the testimony and

11  evidence somewhere in this long preamble to -- to

12  the relief.

13           The findings themselves, I guess this

14  might be sort of belts and suspenders language,

15  but in Paragraph 5, I'm not quite sure I

16  understand what this adds.

17           Once you get recognition, you get the

18  automatic stay, so is this basically just a

19  restatement of the stay otherwise applicable

20  under 1520?

21           I'm not -- it says commencing or

22  continuing any action concerning the debtors'

23  assets to the extent not stayed pursuant to 1520.

24  What -- what would that -- what would that be or

25  is this language from some other recognition

Page 193

1    orders that nobody can remember the source of?

2            One of your --

3            MR. HOLLEMBEAK:  Your Honor ---

4            THE COURT:  -- new York colleagues came up

5    with this and now it's in every order or what?

6            MR. HOLLEMBEAK:  It -- it has been in prior

7    orders that we've submitted, I think in this district

8    and others, but other than -- you know, the assets

9    with respect to Mr. Mansur are dealt with in the

10   preliminary injunction adversary.

11           THE COURT:  Okay.

12           MR. HOLLEMBEAK:  So I don't have any

13   specific assets, it's just (inaudible).

14           THE COURT:  All right.  It may just be --

15   even if it's just restating in -- in a separate

16   paragraph what is otherwise triggered by 1520 of the

17   Code, it's fine.  If -- if -- we can worry down the

18   road if there's some issue of whether this is somehow

19   extending the stay beyond what's otherwise provided.

20           I think the entrustment language in

21   Paragraph 8, as distinct from what had been

22   originally proposed in the preliminary injunction

23   is -- is simply a statement of the relief

24   automatically triggered in 1520(a)(5), so I think

25   that's fine, and I didn't have any other change.

1              With -- with recognition granted,

2     Ms. Hartley, I'll give you a minute, if you think

3     there's something that jumped out at you in the

4     order itself.  I think the scope issues were

5     really more in the injunction, but -- we're not

6     far from done, Al.  We've got cookies.  We'll

7     give you a cookie for staying late.

8              MS. HARTLEY:  Again, I guess, we take

9     issue ---

10              THE COURT:  Speak into the microphone.

11              MS. HARTLEY:  Your Honor, again, we take

12     issue, I guess with Paragraph 8.  Not with, of

13     course, the administration, but realization and

14     distribution of the debtors' assets, unless the Court

15     is ruling differently, but ---

16              THE COURT:  I think I looked and that was

17     just verbatim from 1520(a)(5).  What was I looking

18     at?  I must be looking at an old Code.

19              Oh, no, it's -- I'm sorry, it's

20     1521(a)(5).  The only word added is -- is

21     distribution, but I -- I'm not going to change

22     that.  I mean, we're -- we're all keenly aware

23     that there's got to be further proceedings and a

24     specific finding that some asset is an asset of

25     Mr. Mansur, and that as such, it -- it is subject

Page 195

1    to administration.

2           There's nothing in this paragraph

3    that's specifically giving any authority beyond

4    really what's going to be in the preliminary

5    injunction as to what's going to happen without

6    further court order.

7           Was there anything else?

8           MS. HARTLEY:  Paragraph 9, Your Honor.  It

9    puts the onus on all parties and interests, I guess,

10   whoever receives this order, to really do the

11   trustee's discovery for them.

12          THE COURT:  Where does this come from,

13   this -- this language, Mr. Hollembeak?

14          MR. HOLLEMBEAK:  Sir, I don't -- I don't

15   have a copy of the order.  Can I see it?

16          MS. HARTLEY:  Sure.

17          MR. HOLLEMBEAK:  Paragraph 9?

18          MS. HARTLEY:  Yeah.

19          MR. HOLLEMBEAK:  Your Honor, it's another

20   provision that we've put in based upon some other,

21   you know, precedents and things we found.

22          MS. HARTLEY:  Your Honor, I think they're

23   protected by Paragraph 7, of which ---

24          THE COURT:  If there's no specific

25   provision in 1520 or 1521, and this is just some

1    broader obligations imposed on everybody you send a

2    copy to, then I'm inclined to sustain the objection

3    and take it out, but similar to some adjustments

4    we're making in the preliminary injunction.

5                So, in other words, you can take

6    discovery against anybody to find out about

7    assets, but it's -- it's awfully broad to just

8    say anybody you send a copy of this to has some

9    immediate obligation to identify assets.  I mean,

10   we don't have that here, so I don't know what --

11   where it comes from.

12                It's a nice thought, but I don't know

13   where it comes from.

14                MR. HOLLEMBEAK:  Sure.  Understood, Your

15   Honor.

16                THE COURT:  All right.  So let's -- let's

17   take out nine.  You can seek reconsideration if

18   whoever convinced whatever judge in whatever

19   jurisdiction to put it in, I'll let you know how

20   they -- how they got there.

21                All right.  Well, this is -- this is an

22   appropriate exercise, so take your time,

23   Ms. Hartley.  We didn't focus on each paragraph

24   that much during the hearing itself, if there's

25   anything else that I may have skimmed over.

1              MS. HARTLEY:  I think the only other

2    paragraph would be Paragraph 11, just, I guess, a

3    clarification as to what's being sought.

4              THE COURT:  I think it just means no stay,

5    but -- oh, the petitioner is not subject to ---

6              MR. HOLLEMBEAK:  Yeah, at least -- at least

7    Clause C is an analogous provision in many orders I'm

8    familiar with from other districts --

9              THE COURT:  Yeah.

10             MR. HOLLEMBEAK:  -- New York and Delaware.

11             THE COURT:  This -- this doesn't seem to

12   really extend relief as much as just to try to

13   provide some protection to -- well, number one, not

14   to have any stay, and I guess, B is just reflecting

15   that there's -- the absence of anything else that's

16   going on that would affect the relief.

17             I -- I -- I mean, I think it's

18   hypothetical probably in this instance, but all

19   right, let's leave that in.

20             What else, that's it?

21             MS. HARTLEY:  I think that's it, Your

22   Honor.

23             THE COURT:  Okay.

24             MS. HARTLEY:  Thank you.

25             THE COURT:  Then we turn to the -- so with

1   those changes, the recognition order can be submitted

2   in -- in Word form to -- to my direct e-mail.

3            So there also is the issue that we

4   spent quite a bit of time on on the scope of the

5   prelim -- preliminary injunction arguments that

6   either some of the relief is premature or it's

7   beyond the scope of the authority granted to the

8   trustee, and I agree in part with the -- the

9   defendants.

10           I am, as noted, recognizing the veil

11   piercing order and subsequent orders clarifying

12   that do, despite some of the arguments that may

13   have been presented by the defendants, clearly

14   subject assets of Mr. Mansur to the debtors'

15   bankruptcy estate.  So I -- I don't find there's

16   any authority issue in trying to identify and

17   ultimately recover assets of Mansur.

18           It may be that there was -- there was

19   one order Ms. Hartley referred to that just said

20   he can travel to the jurisdiction, I don't think

21   that, in the context of everything that has been

22   entered, including things in some of the

23   appellate orders, means that all he could do is

24   come here and look around.  I mean, ultimately if

25   he finds assets, that's -- that's obviously the

1   purpose.

2           But having said that, there --

3   certainly the defendants are correct, there is no

4   order that subjects the assets of the other

5   defendants in the adversary proceeding to the

6   Brazilian bankruptcy.  Any attempt to reverse

7   veil pierce the LLCs or any attempt to get assets

8   of the wife have not yet been established, and so

9   the appropriate relief at this point is -- is

10  limited to assets that are already identified or

11  substantially identified as Mr. Mansur's assets.

12          So let's go through the same exercise,

13  it's going to be a little -- there's going to be

14  a few more changes, I think, in the preliminary

15  injunction.

16          So these -- I guess they're good, it's

17  just so dense to read these, what I would call,

18  with no disrespect intended, New York style

19  introductory paragraphs before the findings.

20          MR. HOLLEMBEAK:  No offense taken.

21          THE COURT:  I -- I mean, you should try to

22  read this out loud, you'd fall asleep before you got

23  to -- to the end for sure.

24          But, anyway, somewhere in there,

25  Ms. Hauser, if there is an appropriate spot and

1  it's not included, I think, again, we need to

2  refer to evidence and exhibits presented today.

3          But a lot of this is describing what

4  was asked for, correct, not what's being granted?

5  So let's go to the findings, jurisdiction,

6  notice -- and I don't know what you want to do,

7  you can kick it around with your team, but since

8  we're -- we're entering an order of recognition,

9  some of the language that was contemplated in the

10  injunction, if it was entered prior to the order

11  of recognition, may not be necessary, but I don't

12  want to take the time now to figure -- figure it

13  out, but I think Paragraph F, as I'm looking at

14  it, is probably one.

15          And I am satisfied with the risk

16  description in -- in Paragraph G, even without a

17  lot of specifics.  There -- there is a lot of

18  history here, perhaps not the extent of findings

19  against Mansur that we had against Ms. Rabello in

20  Petroforte, but a long history and enough to go

21  on here based on where he's living; the location

22  listed for all these entities at that address;

23  his ownership interest or membership interest in

24  these LLCs, I think all that, given the other

25  history testified to by Mr. Braga, justifies the

Page 201

1    injunctive relief and the findings in

2    Paragraph G.

3             Paragraph H, that deals with relief

4    without notice, I think is not really necessary

5    or appropriate now that we're -- we're entering

6    this injunction on notice.

7             Paragraph 1 is another paragraph, then,

8    in the, have to be modified, based on the

9    recognition order also being entered.

10            The injunctive relief, although I

11   expect you'll be able to get this in tomorrow and

12   entered tomorrow or Friday, I have another pretty

13   full day tomorrow, but I'll try to take a look at

14   it as quickly as I can, I -- I don't know,

15   think -- also talk about, I don't have an opinion

16   on whether it makes sense to have the recognition

17   order actually entered before the injunction,

18   depending on how you want to phrase this, but

19   anyway, we'll get both of them entered and just

20   coordinate it so there's no longer a discussion

21   of relief prior to entry of recognition.

22            Recognizing the veil piercing order,

23   pending -- yeah, see, there's a lot of paragraphs

24   here that have that same pending recognition of

25   the Brazilian proceeding, but I think that --

1   those can be easily changed.

2            All right.  So then we get to the --

3   the last couple of pages, which have the key

4   proceed -- the key provisions.  I guess I would

5   ask, I didn't really parse this in the TRO stage,

6   but I understand that are owned beneficially or

7   equitably, I'm not sure of the difference between

8   beneficial and equitable ownership, but I'm

9   wondering why you have nominally, because isn't

10  it really the other way around?  You're looking

11  for assets nominally -- nominally or legally

12  titled in somebody else that really belong to

13  him, not something that he's holding -- wouldn't

14  nominally mean he's -- they're in his name but

15  aren't -- aren't really his?

16            MR. HOLLEMBEAK:  I -- I think it means the

17  first part, that they're in his name.  We -- I

18  didn't -- we didn't mean to suggest that they're not

19  really his, so it's -- I guess that word, in

20  particular, in that paragraph is another belt and

21  suspenders.

22            THE COURT:  Okay.  All right.  I -- I

23  won't -- I won't parse that -- that further.

24            You could take a crack, Ms. Hauser, at

25  incorporating what I said during the closing in

1   terms of relief, and it addresses, in part, maybe

2   just in small part, Ms. Hartley's concerns, but I

3   want to include some language, maybe a little

4   more protective or limited than any person with

5   actual or constructive knowledge that violates

6   these -- this paragraph or maybe it's -- maybe

7   it's a different concept itself, but that it

8   would -- it would be a contempt of this order for

9   anybody -- any of the defendants who know or

10  should have known that an asset is an asset of

11  Mansur to -- to violate the injunction, but it's

12  late, and that's probably a sentence that I'll --

13  I'll play with, but that's the concept that needs

14  to be in there.

15          I -- I think it's a valid concern

16  because there -- it is a somewhat unusual

17  language to impose upon parties an injunction in

18  which they have to determine if an asset may be

19  beneficially owned, so to go after them is going

20  to require some showing that it really is

21  something that they knew was his or should have

22  known was his.  So we'll -- I'm going to try to

23  build that in.

24          Paragraph 4 is discovery.

25          Paragraph 5 is the one we discussed,

Page 204

1    and I, instead of directing and setting any

2    timetable for providing an accountant -- an

3    accounting, that the -- the plaintiffs are

4    entitled to obtain an accounting of Mansur assets

5    from -- that are in the possession or entitled to

6    obtain through discovery, something like that.  I

7    wanted to eliminate 5 as some separate direct

8    obligation for reporting back and just have that

9    as a statement of scope, perhaps, that ties in

10   with the discovery.

11            Does that make sense?

12            MS. HAUSER:  Uh-huh, yes.

13            THE COURT:  I mean, you don't have to

14   agree, but ---

15            MS. HAUSER:  It makes sense, yes.

16            THE COURT:  You understand that concept,

17   okay.

18            And then Paragraph 6, it was simply

19   going to be the sentence, entrusted with the

20   administration and realization of Mansur assets

21   in the United States, period, all the rest

22   essentially awaiting a finding of ownership by

23   Mansur.

24            I need to go back, though, because it's

25   not just a modification of language, it was

1   really some additional relief, and maybe just
2   spelling out specific relief that was within the
3   scope of Paragraph 3.
4               So whether it's by separate paragraph
5   or by including it as a parenthetical or
6   otherwise, I thought the relief in Paragraph 3,
7   or I find that the relief in Paragraph 3 should
8   specifically enjoin Mansur from disposition of
9   his ownership interest in any of the LLCs.
10              I think that's covered within the scope
11  of 3 as it's described, but I -- I would find it
12  appropriate to specifically put that in, and then
13  what we really are left with are whether we're
14  going to require the freezing of any assets of
15  the LLCs, other than under this general
16  description, assets of the LLCs that are assets
17  of his.
18              And -- and I kicked around a little bit
19  more in Chambers, and my law clerk and I went
20  through the -- the Exhibit 13 in greater detail,
21  and I'm now satisfied that there are so many
22  transfers that appear to be to or for the benefit
23  of Mansur, that I find sufficient evidence to
24  freeze that account with language which I think
25  probably is really language that would be derived

1 from 1522 to protect the interests of the LLCs

2 and their creditors, that the LLC or any creditor

3 aggrieved by the freezing of the account can seek

4 relief, and the Court will entertain the relief

5 on an expedited basis.

6    But whereas the burden of proof

7 certainly for injunctive relief is on the

8 plaintiffs, on further thought, Ms. --

9 Ms. Hartley, I do agree with Mr. Hollembeak, that

10 if -- if there was something -- well, I don't

11 want to say legitimate to imply that this is

12 necessarily illegitimate, but if there was some

13 ongoing business where there was monies in and

14 monies out, and the operation of a business, and

15 then there appeared to be substantial evidence of

16 that in the bank records, I may have limited the

17 injunction to distributions to Mansur or for his

18 benefit.

19    It seems that so much of it is to

20 Mansur or for his benefit, that I'm not sure

21 there is going to be any basis for the LLC to be

22 aggrieved or creditors, but, anyway, we'll put in

23 the opportunity for them to seek relief, them

24 being the LLCs or creditors of the LLCs who

25 believe the freeze of the bank account is not

1    consistent with the purposes of this order and --

2    and there should be some relief.

3              One of the other things that persuaded

4    us, as my law clerk noted, that if you had an

5    internet business, it's unlikely you would be

6    having cash deposits.

7              Now, that's not a finding, but it -- it

8    just goes back to if you think there's -- if

9    there's some legitimate business going on with

10   revenues coming in and expenses being paid, and

11   you need to use the money from the bank account,

12   then I -- I will entertain that on short notice,

13   but you need to come in and seek it, but for now,

14   I find sufficient evidence to -- to freeze that

15   account.

16             So those would be the two additions to

17   Paragraph 3, or maybe there was -- besides the

18   ones we -- we dealt with earlier, one is

19   specifically referencing his ownership interest

20   in the LLCs, and the other the bank account, and

21   I think that did it.

22             Is there anything consistent with my

23   ruling, if -- if that's a standard you think you

24   could interpret, Ms. Hartley, that you believe

25   should also be changed in this order?

1          I mean, it's not going to be etched in

2    stone, there can be reconsideration or -- or --

3    or relief, but ---

4               MS. HARTLEY:  Not at the moment, Your

5    Honor.

6               THE COURT:  Okay.  So the Bench ruling, it

7    should also be noted, Ms. Hauser, when I said in the

8    introductory language in both of the orders referring

9    to the evidence and testimony, it should also refer

10   to and incorporate by reference the findings and

11   conclusions in the Bench ruling.

12              The Bench ruling and the description of

13   the relief that will be in the two orders is

14   effective immediately, so that there's no gap.

15              If you have any communication with your

16   clients, Ms. Hartley, the absence of an order

17   being entered before midnight doesn't dissolve

18   the injunctive relief.  It's entered on the

19   record.

20              I think that's it.  Any -- any

21   questions or everybody is lulled into submission,

22   good or bad?

23              MR. HOLLEMBEAK:  Your Honor, I just wanted

24   to clarify the -- the length of the injunction.

25              THE COURT:  I don't know, what -- what does

1    it say?  I don't remember.  I think it's in -- if

2    it's a preliminary injunction, I think it -- unlike a

3    TRO, it just stays in place until amended or by

4    further order, doesn't it?

5            MR. HOLLEMBEAK:  Right, I just didn't know

6    if you wanted us to put that in there expressly.

7    I -- I don't think it's in there.

8            THE COURT:  You -- you can think about it

9    and propose it, but unlike a TRO, which under the

10   rules has -- has to be extended within whatever it

11   was, ten or 14 days, I think a preliminary injunction

12   is just there until modified or superseded by a final

13   judgment.

14           MR. HOLLEMBEAK:  Thank you.

15           THE COURT:  Okay.  All right.  Well, thanks

16   for getting this pulled together and presented.  I'm

17   glad we were able to get it done.  I'm bruised, but

18   not killed.

19           All right.  We'll be in recess.

20   Thanks.

21           (Thereupon, the above-proceedings were

22   concluded.)

23

24

25

Page 210

1

2                          CERTIFICATION

3

4    STATE OF FLORIDA:

5    COUNTY   OF   DADE:

6

7              I, Margaret Franzen, Shorthand Reporter

8    and   Notary   Public in  and for the State of Florida

9    at   Large,  do  hereby  certify  that  the  foregoing

10   proceedings  were  transcribed by me from an audio

11   recording held on the date and from the place as

12   stated in the caption hereto on Page  1 to the best

13   of my ability.

14                   WITNESS  my  hand  this  30th day  of

15   December, 2016.

16

17

18              _____

                          Margaret Franzen
19                Court Reporter and Notary Public
              in and for the State of Florida at Large
20                      Commission #FF100898
               My Commission Expires:  April 14, 2018

21

22

23

24

25